UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

IN CLERKS OFFICE

Joseph E. Blake,
           Plaintiff,

v.

Robert Murphy,
Kathleen Dennehy,
Massachusetts Department of Corrections,
           Defendant.

CIVIL ACTION NUMBER:

05 - 10508 RGS

*Referred to Ch MJ mB Bowler*

## COMPLAINT

### INTRODUCTION

1.  The plaintiff, Joseph E. Blake, is being detained at the Nemansket Correctional Center by the defendants, Robert Murphy the Superintendent of the Nemansket Correctional Center and Kathleen Dennehy the commissioner of the Massachusetts Department of Corrections.  The plaintiff has not been committed as a Sexually Dangerous Person pursuant to M.G.L. c. 123A, but is instead awaiting a decision from the trial court judge, while being detained at the Nemansket Correctional Center pursuant to § 14 (a) and (e).  The plaintiff has been held prisoner at this facility in excess of two (2) years.  The defendants are violating the plaintiff's rights under the Fourteenth Amendment of the United States Constitution by holding him in conditions more restrictive than the prison to which he was sentenced by the criminal court.  The defendants are also violating the plaintiff's civil rights by failing to follow their promulgated regulations as well as the statutes and laws of the Commonwealth of Massachusetts.  The plaintiff brings this action for damages and injunctive relief for violations of his civil rights pursuant to 42 U.S.C., §1983.

(5)

19.   At the Nemansket Correctional Center, the law library
is combined in one single room with the general library.   This
limits the total number of people who can access the library,
both law and general, to 25 at any given time.   This was not
the case at NCCI Gardner where the law library alone exceeded
the square footage of the entire library space at the Nemansket
Correctional Center.   Said space is inadequate to house both
the law and general libraries.

20.   At NCCI Gardner, Blake could obtain copies of relevant
legal cases and pleadings as well as make copies of such materials
to share with other prisoners.   At the NEmansket Correctional
Center the Superintendent and librarian refuse to allow the
law library to copy anything other than a prisoner's own original
legal work.   Blake is unable to get copies of grievances or
personal and official correspondences.

21.   At NCCI Gardner, Blake had access to the yard up to
49 hours per week.   At the Nemansket Correctional Center Blake
has access to the yard up to 18.5 hours per week. (Both figures
are the maximum numbers of hours on days when daylight is the
longest).

22.   The yards (2) at NCCI Gardner held a combined total
of 2 running tracks, a softball field, 3 basketball courts,
3 horseshoe pits, 6 sets of various workout bars and a bocci
pit.   At Gardner there are numerous benches to sit on and read
at, there are picnic tables for prisoners to play games at.
At the Nemansket Correctional Center there are no benches,
Bleachers or picnic tables in the yard and prisoners are
prohibited from bringing books papers or games to the yard.

(17)

bike and prisoners are not allowed to bring radios, walkmans
or any games to the gym.

27.   At the Nemansket Correction Center, there are 5 pages
of detailed rules for visitors and prisoners. If a visitor
arrives after the scheduled movement has been completed, the
visitor will be made to wait up to 50 minutes before the prisoner
is allowed to go to the visiting room. At N.C.C.I. Gardner
prisoners are allowed to go to the visiting room immediately
upon the arrival of thier visitor.

28.   At the Nemansket Correctional Center all prisoners,
including Blake, are required to be strip searched after every
visit including those from attorneys, doctors, and other
professionals. In these searches Blake is forced, by more than
one officer, to lift his penis and testicles for inspection;
run his fingers through his hair, then run his fingers inside
his mouth and finally forced to bend over and spread his buttocks
with his hands. All of these are strip search tactics applied
to the highest security criminals housed by the D.O.C.

29.   Blake is restricted to purchasing the same food,
clothing and appliances at the Nemansket Correctional Center
as all imates at level 4 prisons can buy. This despite the fact
that various companies provide a wide variety of clothing and
appliances suitable for secure facilities. At M.C.I. Norfolk,
a comparable level 4 facility, prisoners can purchase hamburger,
chicken, onions, peppers, garlic, oranges, bananas, apples,
pancake mix, flour, crisco oil, and four flavors of Ben & Jerry's
Ice cream. These items are not available to residents of the
Nemansket Correctional Center, despite the fact that a variety

of grocery suppliers provide delivery service.

30.  At N.C.C.I. Gardner, Blake was not limited to the frequency at which he was allowed to order clothing and appliances. At the Nemansket Correctional Center Blake is restricted to making one order per 90 day period for clothing and/or appliances.

31.  The Nemansket Correctional Center has previously allowed food, clothing and appliances to be sent into the facility from outside vendors and family members without jeoperdizing the mission of the D.O.C. or the security of its personel.

32.  At N.C.C.I. Gardner there was a substantial number of prisoners (40), including Blake, working in prison industries where they could earn up to $65.00 per week. At the Nemansket Correctional Center there are only 15 industries job slots which earn a minimum of $2.00 per day. The prisoners at the Nemansket Correctional Center remain "slaves of the state," a sobriquet generally reserved for prisoners doing time for a ciminal offense.

33.  In the past prisoners could suplement their limited incomes by producing craft items in their cells or by constructing wood products, in the Nemansket Correctional Centers wood shop for sale to employees, family members or friends. Though the Nemansket Correctional Center maintains an operating wood shop it is limited to production of items for D.O.C. employees only and residents can no longer enjoy a financial profit from their work, nor can they engage in craft work for outside sale.

34.  At N.C.C.I. Gardner Blake was able to participate
in college credit computer courses; other programs available
included welding, small engine repair, horticulture, food service
and barber school. At the Nemansket Correctional Center there
are no education programs beyond the G.E.D. programs.

35.  At the Nemansket Correctional Center there is a so
called "computer lab" to which access is severely limited. At
best Blake could secure a 30 minute time slot once per week.
The access time would be further reduced from 30 minutes by
the amount of time it takes to reach the lab area, stand in
line to be subjected to a pat search, sign into the lab and
log onto an archaic computer system, all of which reduces useable
computer time to 10 - 15 minutes per week. This is contingent
upon Blake's ability to secure a time slot which are assigned
on a first come first serve basis with civil detainees being
the last to be assigned access. If Blake attempts to do legal
work on these computers he will lose what little taccess he
may have.

36.  On knowledge and belief other state hospitals' allow
limited access to the internet to access information, just "surf
the net", or to do legal research. None of these activities
are available to Blake at the Nemansket Correctional Center.

37.  At N.C.C.I. Gardner Blake had access to a word
processor and typewriters with both memory and spell check.
Prisoners who were housed at the Nemansket Correctional Center
prior to 1997 are still allowed to keep personal computers and
printers in their cells while all new detainees and prisoners
are limited to using a plain electric typewriter without spell
check or memory.  Requests to the Superintendent for the purchase

(10)

of computers by prisoners, are currently going unanswered or being denied.

38.   At N.C.C.I. Gardner all of the showers used by Blake had standard shower controls which allowed Blake to adjust the water temperature and keep the water running for the entire length of the shower.  At the Nemansket Correctional Center all showers have a push button control which leaves the water, at best, tepid and on for only 15 - 20 seconds at a time.

39.   At N.C.C.I. Gardner Blake could freely exchange newspapers and magazines with other prisoners.  At the Nemansket Correctional Center Blake is subject to disciplinary action for doing so.

40.   At N.C.C.I. Gardner the chow hall was large enough to accomodate the inmate population and allowed sufficient time to eat the meal.  At the Nemansket Correctional Center there are not wenough tables to seat even a small portion of the population, at it's current level, a level that continues to increase.  The prisoners are herded through the chow hall, euphemistically refered to as the Inmate Dinning Room (IDR), that doesn't allow the minimum allotted 20 minutes for prisoners to eat.  Blake and other prisoners are frequently forced to stand and consume a portion of their meals because there are no available seats, which in turn causes the guards to begin yelling for the prisoners to move out even quicker.

41.   The three week cycle of food served at the Nemansket Correctional Center is the same menue that is served at all other prisons operated by the D.O.C.

42.   The food, if prepared in the manner prescribed by the D.O.C. nutritionist in the food service manual (issued

twice annually) purports to be nutritious yet it fails to take
into account the new nutritional values provided by the USDA.

43.  The preparation of the food, at best, is indifferent
at worst attrocious and  unpalatable, frequently further denies
Blake a proper daily nutritional intake.  The majority of the
menu is prepared off site at the D.O.C. "warehouse" and trucked
into the facility, leaving no accountability for mistakes in
preparation, or drastic deviation from the recipies created
by the D.O.C. nutritionist.  Portions are frequently incorrect
in size and are excessively high in carbohydrates.  Meals are
served at temperatures below the safe levels which the Centers
for Desiese Control has identified as a common factor responsible
for food borne illness.  The temperatures are also not compliant
with the state codes promulgated by the Department of Public
Health which govern the temperatures at which food is to be
served, as covered in the minimum standards for food establishments.

44.  Superintendent Murphy has treated complaints about
food related issues with complete indifference and these
problems continue to recur.

45.  The regulations and restrictions that apply to
criminals, whose conditions of confinement are designed to punish
are applied to Blake despite the findings of Youngberg v. Romeo,
457 U.S. 307 (1982), which entitle more considerate treatment
and conditions of confinement than that afforded criminals
whose confinement is designed to punish.  It has been Blakes
experience that these regulations and restrictions, set out
in Title 103 of the Code of Massachusetts Regulations, are more
zealously inforced at the Nemansket Correctional Center than

(12)

at other prison facilities Blake has been confined to.

46.  At N.C.C.I. Gardner, as well as other prisons, there
is some form of council which is, at least to a limited extent,
allowed to advocate on behalf of prisoners, with the prison
administration, other compatable facilities also have "lifers"
groups.  No such groups exist at the Nemansket Correctional
Center.

47.  At the Nemansket Correctional Center all "new" (post
1997) prisoners, including Blake, are not allowed to purchase
reading lamps.  As a prisoner at N.C.C.I. Gardner, Blake, if
assigned to a two-man cell, would have had a reading lamp issued
as part of the cell furniture.  Prisoners at the Nemansket
Correctional Center since prior to 1997, who had lamps are allowed
to keep them.  The cells at the Nemansket Correctional Center
are lit by a single two bulb, four foot, flourescent fixture
mounted in the center of the ceiling in a position that causes
the top bunk to completely block the light from the bottom bunk
despite Toussaint v. McCarthy, 597 F.Supp. 1388, 1409 (N.D.Cal.
1984) ("[E]ach inmate must be afforded sufficient light to
permit him to read comfortably while seated or lying on his
bunk.")  In addition, if the prisoner is housed in the top bunk,
he has the light glaring into his eyes from less than three
feet away.  The existing lighting was not designed for the
instalation of bunk beds and is inadequate on the bottom bunk
and overwhelming on the top bunk.

48.  At N.C.C.I. Gardner, Blake, a member of the Native
American Spiritual Awareness Council (N.A.S.A.C.), had access
to the 15' x 30' space provided for N.A.S.A.C. religious use

(13)

mornings, afternoons, and evenings 7 days per week.  Blake had
access to corporate worship items ie: the sacred pipe, drum,
smudge, rattle sage, sweet grass, cedar, music CDs, access to
extensive written documentation, teachings of Native American
lore and religious practices.  In addition the N.A.S.A.C. circle
at N.C.C.I. Gardner was in the process of obtaining, and has
since obtained, the materials necessary to construct a purification
"sweat" lodge.  Which they are currently allowed to use on a
regular basis.  These items were all all provided by the institution
out of programs and treatment funds.  These sacred items were
available to Blake anytime that Blake had access to the religious
space provided by Gardner.  Also contained within this space
was an extensive resource and book library of Native American
mateial.  On Solstices and Equinoxes, both Native American
observances, members of the N.A.S.A.C. circle were allowed to
provide canteen and garden items to supplement the jerky, squash,
corn, and lima beans provided by the D.O.C. which brought these
feast days more into line with Native American tradition.  For
these 4 annual observances N.A.S.A.C. would meet for all 3
movements of the day, or, for in excess of 7 hours.  At the
Nemansket Correctional Center a 10' x 10' room is provided for
a maximum of 90 minutes twicw per week, there are fewer items
for corporate worship and those items are only sporatically
available.  There are no resources or books, and a 2½ cubic
foot storage locker is the only area provided for the storage
of the sacred items for multiple groups.

49.  At N.C.C.I. Gardner Blake was allowed at least a
modicum of dignity during mandatory urinalysises in that he

(14)

was able to remain fully clothed while urinating into a cup.
At the Nemansket Correctional Center Blake and other prisoners
are required to strip naked prior to giving a specimen.

### COUNT II - FAILURE TO PROVIDE THE MINIMAL
### CIVILIZED MEASURE OF LIFE'S NECESSITIES.

50.   The Massachusetts Department of Public Health has
promulgated regulations which prescribe mandatory minimum
standards of fitness for human habitation at 105 CMR 410.   These
are "a minimal civilized measure of life's necessities and apply
to all dwelling units, unless otherwise provided for in the
code.   Correctional facilities operated by the D.O.C. are not
subject to 105 CMR 410, but are subject to 105 CMR 451.   The
Supreme Judicial Court has recently reaffirmed that the Nemansket
Correctional Center is a "secure mental health facility" not
a "correctional facility". Commonwealth v. Knapp, 441 Mass.
157, 168, 804 N.E.2d 885, 894 (2004), citing Doe v. Gaughan,
808 F.2d 871, 879 (1st Cir. 1986)

51.   105 CMR 410 provides that:

410.440 Minimum Square Footage
(A) Every dwelling unit shall contain atleast 150
square feet of floor space for the first occupant, and atleast
100 square feet of floor space for each additional occupant
the floor space to be calculated on the basis of total habitable
room area.

(B) In a dwelling unit, every room occupied for
sleeping purposes by one occupant shall contain atleast 70 square
feet of floor space; every room occupied for sleeping purposes
by more than one occupant shall contain atleast 50 square feet
of floor space for each occupant.

(C) In a rooming unit, every room occupied for sleeping
purposes by one occupant shall contain atleast 80 square feet
of floor space; every room occupied for sleeping purposes by
more than one occupant shall contain atleast 60 square feet
per occupant.

52.   The minimum health and sanitation standards for Correctional Facilities regarding room size are recomended standards and are not mandatory. 105 CM 451.011 and 105 CMR 451.012 The recomended standards for room size in a Correctional Facility are:

### 451.320 Cell Size: Existing Facilities

Each cell or sleeping area in an existing facility should contain atleast 60 square feet of floor space for each occupant, calculated on the basis of total habitable room area, which does not include areas where floor to ceiling height is less than eight (8) feet.

### 451.321 Cell Size in a New or Renovated Facilities

Each cell in a new facility or a part of a facility constructed after the effective date of 105 CMR 451.000 should contain:

(A) For segregation and special management area where inmates are usually locked in for greater than ten (10) hours per day, at least 80 square feet of floor space for a single inmate.

(B) For inmates usually locked in for less than ten (10) hours per day, contain at least 70 square feet of floor space for a single inmate. Provide, however, two inmates may occupy a room or cell designed for double occupancy which has a floor space of 120 square feet.

53.   The cells at the Nemansket Correction Center contain 80 square feet of total floor space. If one deducts the areas where the floor to ceiling height is less than eight (8) feet due to permanently attached bunkbeds, desk, toilet and wash basin, there is 57 square feet of floor space in each cell at the Nemansket Correctional Center where prisoners are secured in excess of ten (10) hours per day.

54.   105 CMR 451.112 provides that:

Each inmate and each employee shall have access to a toilet and handwashing sink at all times.

55.   Blake and all other prisoners at the Nemansket Correctional Center have no access to a toilet when they are

in the yard. Blake has experienced extreme discomfort as a result
of the lack of toilet access. Other prisoners simply relieve
themselves against the fence.

56.  Over five years ago the court in **King v. Greenblatt,**
53 F. Supp. 2d 117, 134, (D. Mass. 1999) noted:

>         To be sure, there are issues in the day to day
> management of the Treatment Center. Funds are being sought from
> capital planning funds to install toilet facilities accessable
> to the yard to attempt to address the resident's complaint about
> lack of toilet facilities in the yard.

### COUNT III - TELEPHONES

57.  At the Nemansket Correctional Center, as well as all
other Correctional Facilities run by the DOC, all telephone
calls made by Blake and all other prisoners are subject to
monitoring and recording. A recorded announcement interupts
the call approximately every 8-10 minutes to announce that "this
call is from a Correctional facility and is subject to monitoring
and recording." Blake is limited to a pre-authorized list of
15 phone numbers; 5 attorney numbers and 10 other persons to
whom calls can be made. Blake may only update his pre-approved
phone list once every three (3) months.

58.  All phone calls made by Blake and all other prisoners
at the Nemansket Correctional Center must be made collect using
a carrier under contract with the DOC eliminating his ability
to contact his Grandmother, a major influence in his upbringing.

59.  The rates charged by the carrier under contract to
the DOC are substantially more expensive than those paid by
the general public, particularly compared to rates charged when
using pre-paid phone cards.

60.  For each call Blake makes to family members, none
of which are within the state of Massachusetts, the cost of

the call is $3.95 for the first minute and $.69 for each
additional minute using the DOC carrier.  The calls are further
limited to 30 minutes requiring that the $3.69 cost of the first
minute be paid each time the 30 minute limit expires.

61.  Under the contract with the carrier and regulations
of the DOC the carrier pays a commission on telephone tolls
paid by Blake and all other prisoners directly to the General
Funds of the Commonwealth of Massachusetts.  103 CMR 482.07 (6).

62.  There is no authorization in the General Laws of
Massachusetts for a commission to be charged to prisoners for
collect phone calls and to be paid into the General Fund.

63.  Limiting the number of persons Blake may call, the
duration of those calls, not allowing the use of custom calling
features and the monitoring and recording of those calls is
more restrictive than justified by any compelling government
interest.

64.  In July 2003 the D.O.C. changed carriers for prisoner
phone calls. The new carrier will not allow collect phone calls
from Blake and other prisoners to a number of other carriers
including the carrier used by Blake's Grandmother, thereby
denying Blake telephone contact with a key member of his support
structure.

65.  On information and belief other state hospitals allow
their residents to posses cellular phones.  No such option is
available to Blake at the Nemansket Correctional Center.

## COUNT IV - CLASSIFICATION

66.   Prior to being in prisoned at the Nemansket
Correctional Center Blake received a point based score under
the defendants classification system, which would have classified
Blake to be placed in a minimum security prison.  However, the
defendants have arbitrarily determined that no sex offenders
shall be placed at a minimum security prison or work release
program.

67.   The Nemansket Correctional Center is the sole
institution for persons imprisoned under M.G.L.c. 123A, "and
therefore it must encompass all levels of security within one
facility." King v. Greenblatt, supra at 28.  Though Blake is
imprisoned at the Nemansket Correctional Center in a civil
detainee status and not as a commited person he is subject to
the same high security procedures as apply to other prisoners
who have long histories of escape, violence, murder and rape,
including rape while in prison or the Nemansket Correctional
Center.

68.   Blake has no history of violence in or out of prison
and has never attempted to escape.  Blake appeared at his
M.G.L.c. 123A trialwithout handcuffs gaurded often by a single
unarmed court officer, yet whenever moved outside the Nemansket
Correctional Center by the D.O.C. Blake is subject to the use
of handcuffs, leg irons and belly chains all while being escorted
by heavily armed D.O.C. employees.  In addition at the beginning
and end of each trip Blake is forced, with the threat of physical
violence, to, in the presence of one or more officers, strip
completely naked, forced to lift his penis and testicles for

75.   Blake has frequently been subjected to further delays
by the issuance of ten (10) day extensions by the grievance
officer, in total disregard for the fact that 103 CMR 491.18
only allows ten day extensions to be granted by the Superintendent.

76.   Blake has on few occasions had the grievance process
decided in his favor only to have that decision totally ignored
by the defendants.

77.   Blake has brought this to the attention of Edington
and the Superintendent at staff access.

78.   The defendants have taken no action to rectify the
non-compliance with grievance decisions issues, even though
specifically asked by Blake.

## COUNT VI - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT 1973

79.   Blake has been diagnosed as having a mental impairment
that substantially limits one or more of the major life activities
by requiring that he be confined to a secure mental treatment
facility.

80.   The DOC and/or the Massachussetts Executive Office
of Public Safety receive federal financial assistance.

81.   The defendants have denied Blake and all other civilly
detained and/or committed inmates the benefits and subjected
Blake to discrimination soley by reason of his disability.

82.   The defendants have failed to provide Blake with
programs and services in the most integrated setting appropriate
to his needs.

## Causes of Action

83.   The defendants have violated Blake's rights to

CAUSES OF ACTION

83.    The defendants have violated Blake's rights to
substansive due process of law under the Fourteenth Amendment
to the United States Constitution, and his rights under M.G.L.c.
123A § 6(a), by holding Blake in conditions of confinement which
far exceed the least restrictive alternative and which are
subsequentially more restrictive than the punitive conditions
of confinement under which Blake was held while still serving
his prison sentence.    Blake is entitled to damages and injunctive
relief against the defendants pursuant to 42 U.S.C. 1983 and
declaratory and injunctive relief pursuant to M.G.L.c. 231A.

84.    The Nemansket Correctional Center is a "secure mental
health facility not a correctional facility" as the Massachusetts
Supreme Judicial Court has ruled in Commonwealth v. Knapp, 441
Mass. 157, 168 (2004), then the minimum standards of fitness
for human habitation set out in 105 CMR 410 apply, and Blake
is entitled to injunctive relief to enforce the minimum standards
of human habitation as provided by M.G.L.c. 111, §127A, et seq.

85.    Blake and all other persons imprisoned at the Nemansket
Correctional Center are entitled to damages and injunctive relief
because the defendants have failed to provide the minimal civilized
measure of life's necessities under either 105 CMR 410, et seq.
or 105 CMR 451, et seq.    The State Sanitary Code's Minimum
Standards of Fitness for Human Habitation.

86.    The failure to apply 105 CMR 410, Minimum Standards
of Fitness for Human Habitation violates the right of Blake
and all other persons imprisoned at the Nemansket Correctional
Center to equal protection of the laws as guaranteed by the
Fourteenth Amendment to the United States Constitution and

entitles Blake to damages and injunctive relief pursuant to
42 U.S.C. § 1983.

87.  As applied to Blake and all other persons imprisoned
at the Nemansket Correctional Center, M.G.L.c. 123A violates
Blake's rights to substansive due process.  As applied the
statute is not narrowly tailored to further a legitimate and
compelling governmental interest.  The conditions of confinement
at the Nemansket Correctional Center are indistinguishable,
and in many cases more punitive than those of prison.  By design
the defendants have mandated that the same regulations apply
to both the Nemansket Correctional Center and all other prisons
of the Department of Corrections.  In practice the conditions
of confinement at the Nemansket Correctional Center are
substantially more restrictive than the prison in which Blake
was held in prior to the start of M.G.L.c. 123A proceedings.
Although the courts have ended conditions which were barbaric
and inhumane at the Nemansket Correctional Center in the 1970's,
the conditions of confinement still are no better than a poorly
run prison.  (see King v. Greenblatt, supra, for a description
of the appalling conditions which existed at the Nemansket
Correctional Center in the 1970's.)  The defendants continue
to ignore major components of prior court orders, including
failing to implement a classification system and least restrictive
non-punitive conditions of confinement.  With the reenactment
of civil commitment in September of 1999 and the resultant
substantial influx of newly committed persons, the defendants
have made no provisions for adequate space for the newly committed
persons, and instead have willfully created a situation of

overcrowding in a facility that was already overcrowded by the
defendants' decision to treat state inmates using the same
facilities.  There is neither the legislative, executive nor
judicial will to implement true civil commitment.  Instead what
is called "civil commitment" is a chimerical as "seperate but
equal" and is nothing more than extended punishment.  Blake
is entitled to damages and injunctive relief under 42 U.S.C.
§ 1983, because M.G.L.c. 123A is unconstitutional as applied
to himself.

    88.  Blake is entitled to judicial review of the
Superintendent and Edington's grievance decisions under M.G.L.c.
127, § 38(h), in accordance with the standards set out in M.G.L.c.
30A, § 14, because the decisions are:

        A) Not supported by substantial evidence,

        B) based on errors of law,

        C) made upon unlawful procedure,

        D) in excess of the statutory authority or jurisdiction
of the D.O.C.,

        E) arbitrary or capricious, an abuse of discression,
or otherwise not in accordance with the law.


CLASS ACTION

    89.  The plaitiff class consists of all persons at the
Nemansket Correctional Center who are:

        A) Civil detainees;

        B) Being held in conditions of confinement which far exceed
least restrictive alternative;

        C) Being held in conditions which are far more punitive
than prison;

        D) Housed in a secure Mental Health facility which does
not meet the Minimum Standards of Fitness for Human Habitation;

E) Being subjected to "civil detainment" or "commitment" but as applied to the class is nothing more than an increase and continuation of the punishment for the crimes for which class members have completed their prison sentences; and

F) who are being charged an an unathorized fee for telephone services.

RELIEF

1. The court grant preliminary injunction enjoining the defendants from failing to immediately:

A) Impliment the least restrictive conditions of confinement necessary for the plaintiff, which shall not be any more restrictive than the conditions of confinement at NCCI Gardner or alternatively return the plaintiff to NCCI Gardner to be held under the same conditions of confinement under which he was held immediately prior to his transfer to the Nemansket Correctional Center.

B) Remove all restrictions on telephone calls made by the plaintiff and all other prisoners at the Nemansket Correctional Center, including the manner in which the plaintiff can pay for these calls.

D) Allow the plaintiff and other prisoners at the Nemansket Correctional Center to purchase and have a computer and a printer, and other appliances which do not pose an immediate threat to employees or residents, compact discs containing educational, legal research, and entertainment materials.

2. Grant the plaintiff and all other prisoners at the Nemansket Correctional Center damages in an amount equal to

(25)

the unauthorized monitary exactions paid by the plaintiff as commissions on collect phone calls which have been paid to the General Fund of the Commonwealth.

3. Declair that M.G.L. c. 123A is unconstitutional as it is being applied to the plaintiff and all other prisoners confined at the Nemansket Correctional Center and order the immediate release of the plaintiff.

4. The court enjoin the defendants preliminarily and perminantly from subjecting the plaintiff and all other prisoners confined to the Nemansket Correctional Center to a grievance process that does not comply with M.G.L. c. 127, §38E.

5. Award the plaintiff damages, costs and reasonable attorneys fees for violation of his civil rights pursuant to 42 U.S.C. 1983.

6. Certify this action as a class action.

7. Grant further relief as justice and equity require.

                                   Joseph E. Blake,
                                   Plaintiff, Pro Se

                                   Joseph E. Blake, Pro Se
                                   Mass Treatment Center
                                   30 Administration Rd
                                   Bridgewater, MA 02324

## VERIFICATION

I, Joseph E. Blake, state under pains and penalties of purjury that I have made all the factual allegations in the foregoing complaint as true and correct, with personal knowledge and observation.


DATED: _____

                                   Joseph E. Blake

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Joseph E. Blake

IN CLERKS OF

2005 MAR -8  P 12: 02

U.S. DISTRICT COURT
MASS

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Plymouth
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Robert Murphy, et al.

05-10508

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se

ATTORNEYS (IF KNOWN)

Unknown

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                        AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 443 Housing/ Accommodations | ☐ 530 General | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

**PERSONAL INJURY**
☐ 362 Personal Injury — Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Civil Action, claiming civil rights violation pursuant to 42 U.S.C., §1983 as well as violations of the plaintiff's rights under the 14th Amendment to the U.S. CONstitution

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☐ YES  ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE

DOCKET NUMBER

DATE  2-10-05

SIGNATURE OF ATTORNEY OF RECORD  ProSe

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) *JOSEPH E. BLAKE* v.
*ROBERT MURPHY, ET AL.*

2005 MAR -8 P 12:02

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

U.S. DISTRICT COURT
DISTRICT OF MASS.

— I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

— II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
         740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

— III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
         315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
         380, 385, 450, 891.

— IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
         690, 810, 861-865, 870, 871, 875, 900.

— V.     150, 152, 153.

05-10508 RGS

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

_____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
COURT?
                                                              YES          NO

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                              YES          NO

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                              YES          NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
28 USC §2284?
                                                              YES          NO

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                              YES          NO

   A.    IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

   B.    IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME *JOSEPH E. BLAKE, PRO SE*
ADDRESS *30 ADMINISTRATION ROAD, BRIDGEWATER, PLYMOUTH Co., MASS.*
TELEPHONE NO. _____

(Cover sheet local.wpd - 11/27/00)