UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-10508-RGS

JOSEPH E. BLAKE,
        Plaintiff,

v.

ROBERT MURPHY, *et al*,
        Defendants.

### AFFIDAVIT OF MARYANNE PERCUOCO

1.  I am a registered nurse and am licensed as a nurse in the Commonwealth of Massachusetts. Since approximately 2001, I have been employed at the Massachusetts Treatment Center ("Treatment Center"), in the position of Health Services Administrator. I have worked in managerial capacities in Department of Correction ("DOC") facilities since August, 1996. Prior to January, 2003, I was employed by prior vendors that contracted with DOC to provide medical and mental health services to DOC inmates/residents. On January 1, 2003, I began employment with UMASS Correctional Health Care Program ("UMASS"), the company that presently contracts with DOC for the provision of medical and mental health services to DOC inmates/residents.

2.  As part of my responsibilities as the Health Services Administrator, I supervise the maintenance of medical and mental health records for all inmates/residents housed at the Treatment Center.

3.  I also review any Request for Reasonable Accommodation of Special Need(s) submitted by an inmate or resident pursuant to 103 DOC 207, <u>Special Accommodations for Inmates</u>. Joseph Blake has not submitted a request for any accommodation relating to any mental condition or impairment.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 20TH DAY OF MARCH, 2006.

Maryanne Percuoco

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 2005-10508-RGS**

JOSEPH E. BLAKE,
     **Plaintiff,**

v.

ROBERT MURPHY, *et al*,
     **Defendants.**

### AFFIDAVIT OF JOSEPH MURPHY

I, Joseph Murphy, being duly sworn, do hereby depose and state as follows:

1. Since 1986, I have been employed by the Massachusetts Department of Correction ("DOC"). I currently hold the position of Deputy Superintendent of Treatment at the Massachusetts Treatment Center ("Treatment Center"). I have held this position since January, 2005.

2. In my capacity as Deputy Superintendent of Treatment, I serve as the Treatment Center's Institution ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to special accommodations and access to programs for inmates with disabilities at the Treatment Center. DOC has developed a written policy for such accommodations, 103 DOC 207, Special Accommodations for Inmates, a true and accurate copy of which is attached hereto.

3. Pursuant to 103 DOC 207.04, Requests for Reasonable Accommodations, an inmate or resident may submit a request for reasonable accommodation by either (1) submitting a request to medical staff for a medically prescribed accommodation, or (2) by completing a Request for Reasonable Accommodation of Special Need(s) form, Attachment A to 103 DOC 207, Special Accommodations for Inmates. The inmate or resident then submits the request to either medical staff or to me. See 103 DOC 207.04(1), (3).

4. Joseph Blake has not submitted a Request for Reasonable Accommodation of Special Need(s) form relating to his mental illness or other mental impairment to me. Further, I have reviewed records to determine if he has submitted such a form from November, 2002, to the present. I could not locate any such form from Mr. Blake.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14TH DAY OF MARCH, 2006.

Joseph Murphy      3/14/06

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-10508-RGS

JOSEPH E. BLAKE,
**Plaintiff,**

v.

**ROBERT MURPHY,** *et al,*
**Defendants.**

---

### AFFIDAVIT OF ROBERT MURPHY

---

I, Robert Murphy, being duly sworn, depose and state as follows:

1.      Since November, 1997, I have been the Superintendent of the Massachusetts Treatment Center ("Treatment Center").

2.      I have been an employee of the Department of Correction ("DOC"), since 1976. I received my Bachelor of Science in Criminal Justice from Northeastern University in 1977. At that time, I was a Correctional Social Worker at MCI Cedar Junction. In 1979, I became a Correction Counselor at MCI Norfolk. In 1980, I became a Correction Counselor at MCI Concord and, in 1982, I became a Supervising Correction Counselor at MCI Concord. I held that position until 1985, when I became Director of Treatment at MCI Plymouth and then Director of Classification at MCI Shirley. In 1987, I was promoted to the position of Deputy Director of Classification Services for the entire Department. In 1988, I was appointed to be Deputy Superintendent of Patient Services at Bridgewater State Hospital ("BSH"). In 1992, I became the Deputy Superintendent of Treatment at MCI Framingham. While in that position at MCI Framingham, I received my Masters of Arts in Business Administration from Framingham State College in 1994. Subsequently, in 1996, I became the Deputy Superintendent of Treatment at MCI Concord, a position I held until I was promoted to my present position as Treatment Center Superintendent.

3.      As Superintendent, I am responsible for the overall operation of the Treatment Center, including the care, custody and control of residents, the physical plant of the institution, and the safety of staff, visitors and the public. The Treatment Center is a level four security facility administered by DOC. The Treatment Center currently houses three populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDP's") and committed for an indefinite period of one day to life pursuant to G.L. c. 123A; (ii) inmates committed to DOC's custody who are participating in DOC's voluntary sex offender treatment

- 2 -

program ("SPI's"); and (iii) persons awaiting adjudication as SDP's pursuant to G.L. c. 123A, §§ 12-14.

4.     As a result of the Superior Court's decision in <u>Durfee v. Maloney</u>, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, issued in July, 2001, DOC decided to change its management of the Treatment Center to keep SDP's and SPI's separate and apart at all times. On December 10, 2001, DOC implemented its "separate and apart" management policy at the Treatment Center.

5.     The implementation of the "separate and apart" management policy necessitated that the two populations be divided for purposes of access to the common areas of the facility (such as the gym, exercise yard, visiting room and library), in which they previously had the opportunity to commingle. Where possible, SDP's continue to receive priority in terms of access to the Treatment Center's common areas.   Due to staffing and other administrative considerations, access to the library was divided between the two populations.  As a result of the implementation of the "separate and apart" management plan, SDP's now have access to the library approximately 12 ½ hours per week (with an additional two hours of access to the book mobile).  Previously, the population had access to the library approximately 22 hours per week (with each population having an additional two hours of access to the book mobile).

6.     Access to computers and typewriters are available during general movement hours. However, SDP's must sign up in advance for time in the computer lab.

7.     As a result of the implementation of the "separate and apart" management plan, SDP's now have access to either the gym or the yard 13 hours per week, the gym an additional 6 hours per week, and to the yard an additional 5 hours per week. Access to the gym and the yard is available every day of the week.

8.     Visitation to SDP's is available five days a week. On Mondays, Wednesdays and Fridays, visiting hours are from 1:00 p.m. to 8:30 p.m. On Saturdays, visiting hours are from 6:00 p.m. to 8:30 p.m.  On Sundays, visiting hours are from 1:00 p.m. to 5:00 p.m.

9.     There are no free weights available in the gym. However, both "Universal" and "Nautilus" weight/exercise machines are available. Games are also available in the gym. Furthermore, games are available for the common areas of the living units.

10.     Native American religious services are offered at the Treatment Center. Such services are allowed weekly. On the day of the services, participating SDP's are given access to the Native American ceremonial pipe, a lighter, smudge shell, and sage and sweet grass compound. The Treatment Center has a written policy detailing the availability and procedure for these ceremonies, a copy of which is attached. Additionally, a compact disc player is made available for the services. SDP's may request Native American music compact discs, which, within reason, are made available at no expense to the SDP's. Further, SDP's may order books, including Native American literature, in accordance with DOC's property policy, 103 CMR 403,

- 3 -

*Inmate Property*, and the Treatment Center's attachment thereto. Pursuant to these policies, SDP's may order books directly from a publisher or approved vendors. SDP's have requested that a sweat lodge be provided at the Treatment Center. I have passed this request on to the DOC's Religious Review Committee. The request is being studied and a decision from the committee is still pending.

11.     Urine samples are collected from SDP's in accordance with 103 DOC 525, *Inmate Substance Abuse Testing and Sanctions.* 103 DOC 525 is applicable to all DOC facilities. In accordance with that procedure, the subject of the collection must be strip searched prior to the collection of the sample, in accordance with DOC's strip search procedure. 103 DOC 525.02 (I)(A)(8). The procedure also requires that the collecting officer "be in a position to verify that the specimen passes directly from the inmate's body into the collection cup." 103 DOC 525.02 (II)(A)(1). It is the Treatment Center's policy to collect the specimen immediately after the strip search, while the SDP is still unclothed, to further ensure the verification of the validity of the sample.

12.     Strip searches are conducted at the Treatment Center in accordance with 103 DOC 506.04, *Search Policy-Strip Searches.* 103 DOC 506 is applicable to all DOC facilities. The strip search includes a visual inspection of the entire body, including mouth, pubic region and rectum. 103 DOC 506.04 (2)(C).

13.     SDP's are served a standard meal at each mealtime. SDP's requiring a special diet for medical or religious purposes will be provided with special meals. Additionally, SDP's have access to approximately 200 food items for purchase through the canteen. Each housing unit has a microwave oven, a refrigerator and instant hot water dispenser for preparing and storing foods purchased through the canteen. An SDP may also purchase a hot pot for use within their rooms.

14.     SDP's may purchase and possess a number of types of property. The receipt, storage, maintenance, and transfer of property is governed by 103 CMR 403, *Inmate Property Policy,* and the Treatment Center attachment thereto. Lamps are not approved property for any inmate, including SDP's. *See* 103 CMR 403.10 (listing approved items). However, when DOC began administering the Treatment Center, SDP's who already possessed certain items were allowed to maintain, but not replace those items. Therefore, some SDP's were allowed to retain lamps, typewriters with memory and computers. SDP's are allowed to possess or purchase from an approved vendor, subject to certain conditions, televisions, radios, fans, hot pots, "Walkman" radios, headphones, musical instruments, non-memory typewriters, and extension cords. Clothing may also be possessed and purchased by SDP's, subject to color and amount restrictions, through the approved vendor. 103 CMR 403.10.

15.     Showers are controlled by a push button. SDP's have no control over the temperature of the water. However, the Massachusetts Department of Public Health ("DPH") inspects the water temperature for the showers annually to ensure that they fall within the required range. The shower water temperature at the Treatment Center has consistently fallen within the required temperature range while I have been superintendent. Currently, after

- 4 -

pressing the shower control button, the showers run for one minute. The button can then be pressed again to resume the shower. This system is currently being upgraded to allow for a continuous six minute shower.  Additionally, I have never received a grievance from Joseph Blake complaining about the shower water temperature.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14th DAY OF MARCH, 2006.

Robert Murphy, Superintendent
Massachusetts Treatment Center





# COMMONWEALTH OF MASSACHUSETTS
# DEPARTMENT OF CORRECTION
# MASSACHUSETTS TREATMENT CENTER

## NATIVE AMERICAN
## CEREMONIAL PIPE PROCEDURE

**PURPOSE:**   The purpose of this procedure is to establish guidelines for access, storage and utilization of the Native American ceremonial pipe and smudge pot during outside weekly worship services.

**PROCEDURE:**

1.    Inmates/residents may access the Native American ceremonial pipe during their respective scheduled weekly worship services that are held in the chapel.

2.    The Native American ceremonial pipe shall be secured in the religious service footlocker.

3.    During the scheduled worship services the assigned recreation officer will obtain the Native American pipe, lighter, smudge shell, sage and sweet grass compound from the footlocker which is located in the chapel closet.

4.    The recreation officer will issue the compound, smudge shell, and pipe to the designated inmate/resident.

5.    The inmates/residents will proceed to C- yard with the above items.  The inmate/resident will light the smudge pot and pipe and return the lighter to the recreation officer.  The recreation officer will return the lighter to the footlocker in the chapel closet.

6.    The south corridor OIC will open the door to the C – yard.

7.    The inmates/residents will remain in the C- yard for ten to fifteen minutes to complete the ceremony.  The pipe and smudge pot must be extinguished and the ashes must be emptied into the fire resistant receptacle.

8.    The inmates/resident will then enter the chapel to continue their scheduled worship service.

9.    At the conclusion of the worship service, the recreation officer will collect the pipe and smudge shell from the inmates/residents and secure them in the footlocker in the chapel closest.

10.    The recreation officer will inventory the religious items after each weekly service.

Superintendent                                                    Date

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

103 DOC 506

SEARCH POLICY


TABLE OF CONTENTS

506.01   Superintendent's Search Authority.......................2
506.02   Institution Search Plan.............................2
506.03   Institution Search Plan For Facilities Operating The
         IMS Database..........................................5
506.04   Strip Searches........................................7
506.05   Fully Clothed Searches (Pat Search)....................10
506.06   Housing Area Searches.................................11
506.07   Shop, Program and Activity Area Searches...............14
506.08   Vehicle and Supply Searches...........................15
506.09   Seizure of Contraband/Evidence........................18
506.10   Storage of Contraband/Evidence........................18
506.11   Disposal of Contraband/Evidence.......................20
506.12   Crime Scene Search and Investigation..................22

ATTACHMENT   A................................................23
             B................................................24
             C................................................25
             D................................................27
             E................................................29
             F................................................33
             G................................................34

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: POLICY DEVELOPMENT AND COMPLIANCE UNIT |
|---|---|
| TITLE: SEARCH POLICY | NUMBER: 103 DOC 506 |

**PURPOSE:** The purpose of this policy is to establish internal Departmental Procedures for searching person(s) and/area(s) within the legal boundaries of each institution. Searches are conducted to detect and prevent the introduction of contraband, recover missing or stolen property, to prevent escapes and other disturbances.

**REFERENCES:** M.G.L. Chapter 124, Section 1 (a), (b) and (q)
DPH Drug Destruction Protocol

**APPLICABILITY:** Staff/Inmates          **PUBLIC ACCESS:** Yes

**LOCATION:** DOC Central Policy File
Institution/Superintendent Central Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
- Director of the Policy Development and Compliance Unit
- Superintendents

**PROMULGATION DATE:** 10-7-03          **EFFECTIVE DATE:** 11-6-03

**CANCELLATION:** This policy cancels all previous department policy statements, bulletins, directives, orders, notices, rules and regulations regarding planning which are inconsistent with this policy.

**SEVERABILITY CLAUSE:** If any part of this policy is for any reason held to be in excess of the authority of the commissioner, such decision will not affect any other part of this policy.

## 506.01     SUPERINTENDENT'S SEARCH AUTHORITY

The superintendent or his/her designee may order the search of any person entering or confined in an institution, in or on state property, including parking areas, in order to ensure the security and safety of that institution, its inmates, employees, and visitors.

Staff, inmates and visitors shall be notified in writing (e.g., handbooks, posting, etc.) of the general institution policy regarding searches and items considered to be contraband.

## 506.02     INSTITUTION SEARCH PLAN

1.  Each superintendent shall develop and annually update an institution search plan which will include frequent unannounced searches of inmates, inmate quarters and every other area of the facility as often as necessary to ensure the safety and security of the facility. Searches are conducted for the following reasons:

    A.  To prevent introduction of weapons and other dangerous contraband into an institution.

    B.  To detect the manufacture of weapons, escape devices, etc. to prevent against escape or other disturbances.

    C.  To discover and suppress trafficking between inmates as well as between employees and inmates, and inmates and visitors.

    D.  To discourage theft and trafficking in institution stores and property.

    E.  To check malicious waste or destruction of state property.

    F.  To discover hazards to health and safety that may go unnoticed during a more routine inspection.

    G.  To recover missing or stolen property.

    H.  To discover suicide and homicide attempts or potential suicide and homicide attempts by detecting excess items such as shoelaces, metal,

plastic bags, medications, etc., within an inmate's cell/room. When searching an inmate's cell/room his/her mental status should be considered

2. <u>Institution search plans shall include the following</u>:

   A. Level 4, 5, and 6 Facilities:

      I. <u>Frequency of Searches</u>

         Housing Units- All cells/bed areas shall be searched at a minimum of once per month.

         Non Housing/common areas (inmate access) - All non-housing/common areas that have routine access by inmates shall be searched at a minimum of once per month, i.e., library, gym, work areas, etc.

         Non housing areas - All non-housing areas that are not routinely accessible to inmates may be searched at a minimum of once per quarter.

      II. <u>Posts for Routine Searches</u>

         Post assignments shall be identified that require the searching of inmates, visitors, and staff. The plan should also cite the strategic advantages and purpose for such post assignment duties, including the type of search technique generally employed.

   B. Level 1, 2, and 3 Facilities:

      I. <u>Frequency of Searches:</u>

         Housing Units - All inmate rooms/bed areas shall be searched at a minimum of once per quarter.

         Non Housing/common areas - All non housing/common areas shall be searched at a minimum of once per month.

Inmates - All inmates shall be strip searched and pat searched at a minimum of once per quarter. These searches are above and beyond those searches that occur on a routine basis.

II.  Posts for Routine Searches

Post assignments shall be identified that require the searching of inmates, visitors, and staff.  The plan should also cite the strategic advantages and purpose for such post assignment duties, including the type of search technique generally employed.

C.  All facilities:

I.  Departmental Property List

This list shall be attached to the institution search plan.  All items not listed shall be considered contraband.

II.  Record Keeping

Each superintendent shall develop a tracking system that provides a ready means of ensuring that no particular area of the facility is either ignored or over saturated with searches.

Tracking systems shall identify each area of the entire facility and identify staff responsible for searching each area.

III. Documentation of Searches

Each search plan shall establish standardized forms which should include the date, time, cell number, or area of the facility, the person conducting the search, remarks, inmate's name and number, contraband found.

IV.  Reporting

The superintendent must also establish standard reporting periods for cyclical searches.

V.    <u>Metal Detector Guidelines</u>

Each superintendent shall develop institutional procedures respecting the use of hand-held and walk-through metal detectors in order to safeguard against the risk posed to individuals with automatic implantable cardioverter defibrillator and/or pacemakers.

At a minimum, the following sign shall be posted permanently in any institutional area where such searches are commonly done:

"Use of hand-held and walk-through metal detectors may interfere with the operation of an automatic implantable cardioverter defibrillator and/or pacemaker.    Notify staff if you have such a device and an alternative search procedure will be used."

**506.03    INSTITUTION SEARCH PLAN FOR FACILITIES OPERATING THE IMS DATABASE**

1.    Superintendents of facilities utilizing the IMS database shall be responsible for the development of facility search procedures which shall include, but not be limited to, the following:

   A.    A tracking system to allow staff review of what searches have been conducted to date and to plan for the assignment of future searches, of areas or inmates, in advance, as appropriate.

      1. The Schedule Cell Searches screen should be utilized to schedule specific cell or bed searches, to schedule cells that are still outstanding for the month (or quarter for level 1, 2, and 3 facilities), or to use IMS to randomly schedule a selected number of cells to be searched. The Schedule Cell Searches (Auto) screen should be utilized to automatically

schedule cells or beds to be searched for a specified time period and frequency by shift.

2. Common area searches shall be scheduled utilizing the Schedule Common Area Searches screen.

3. Inmate searches for level 1, 2, and 3 facilities shall be scheduled utilizing the Schedule Inmate Searches screen.

4. The tracking system shall ensure that no particular area of the facility is either ignored or over saturated with searches.

B. A system by which search results are entered into the IMS database.

1. The results of all prescheduled searches shall be documented in the Cell Search Results, Common Area Search Results, or Scheduled Inmate Results screens, as applicable.

NOTE:   All fields must be completed within the IMS Search Results screens (the only exceptions being the search comments and items confiscated areas if the search results were negative).

2. The results of unscheduled inmate searches shall be documented as follows:

a) Routine random inmate searches (i.e. searches of random inmates after a meal period, searches of inmates returning from outside work crews, etc.) need not be normally documented. However, if during the course of a routine random search contraband is discovered, the information shall be documented in the Unscheduled Inmate Search Results screen.

b) Unscheduled inmate strip searches of level 1, 2, and inmates conducted in addition to those required by 103 DOC 506.02 (B) shall be documented in the Unscheduled Inmate Search Results screen.

NOTE: The routine random search type (pat search or strip search) of the group must be entered in the "Unscheduled Searches" section of the screen. If the search type for the group is identified as a pat search and a particular inmate is subsequently strip searched, the 'strip' flag shall be checked in the "Inmates Searched" section of the screen.

3. Unscheduled searches of common areas (i.e. searches of the visiting room before and after visits, yard area searches prior to opening the yard, etc.) shall be documented in the appropriate IMS Activity Log.

4. Searches of staff members and visitors (i.e. search of the day, etc.) shall be documented in the appropriate IMS Activity Log or logbook.

The form shall be turned into and tracked by the appropriate supervisor.

C.    Posts for routine searches shall be identified in the facilities procedures and will include areas that require the searching of inmates, visitors, and staff.    The plan should also cite the strategic advantages and purpose for such post assignments duties, including the type of search technique generally employed.

D.    Facilities utilizing the IMS database will adhere to the same search frequencies as dictated by 103 DOC 506.02(2)(A) and (B).

## 506.04    STRIP SEARCHES

1. General - Strip searches should be employed, when necessary, for the close scrutiny of an inmate's person in determining if that inmate is carrying an item(s) considered to be contraband.    Strip searches shall be employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband.    Specific situations in which strip searches may be employed, include but are not limited to: entrance or exit from a secure perimeter and area,

before and after court, medical trips, or visits;
after the detection of an alleged disciplinary
infraction; when custodial staff have reason to
believe a person may possess contraband; after an
escape or attempted escape; placement in segregation
from the general population; routine searches of
housing or work areas; transfer to a new institution.

Note: When strip searching an inmate, make notes on
observations of tattoos with sketches if possible and
send information to your institution's inner perimeter
security unit. At facilities fully utilizing IMS,
pictures of the tattoos shall be obtained and the
Marks, Scars, Tattoo screen shall be completed, if not
previously documented on the screen.

2.    Recommended Strip Search Techniques

A.    Strip searches of individual inmates should be
conducted in relative privacy usually by two
security personnel, rendering as much dignity to
the situation as possible. Strip searches by
members of the opposite sex shall not be
permitted, except under extraordinary or
emergency situations.

B.    In conducting a strip search, the following
procedures should be followed: the inmate should
remove his/her clothing, place each article in
one location and then move at least five feet
from that location.

C.    The custodial staff member should conduct a
visual examination of the nude inmate, including:
hair, ears, nose, hands, fingers, under the
tongue, armpits, pubic region, rectum, vaginal
area, inner portion of the legs, between the
legs, between the toes, and soles of feet. Any
casts, bandages, or artificial limbs shall be
scanned by a non-intrusive device if available.

D.    The inmate should be given verbal instruction, on
removing the false teeth so item(s) and mouth
area can be visually inspected, or on any other
articles to be removed to expedite the situation.

      E.    An examination of the inmate's clothing should follow, including: turning clothing inside out, checking linings, cuffs, waistbands, seams, patches, collars, and shoe heels, soles and interior. Eyeglass cases, cigarette packages, watches and any other item found on the inmate's person shall be checked for contraband.

3.    Intrusive body cavity search procedure:

      1.    There will be no intrusive body cavity searches; manual or instrumental, for security reasons unless all of the following have occurred.

            a.    Probable cause has been determined through reasonable belief that the inmate is carrying contraband or other prohibited material.

            b.    Authorization has been given by the superintendent.

            c.    Search warrant has been obtained.

      Note: The inspection shall be done by medically trained personnel or correctional personnel thoroughly trained by a health care personnel and is conducted in private.

4.    Rectal exams performed for medical reasons will be performed for medical cause, in private, by medical personnel, with consent and with the standard medical privacy and confidentiality in effect.

5.    Fecal search procedure: The following procedure is to eliminate or minimize the employees exposure to all body substances while carrying out his tour of duty.

      A.    The following equipment shall be supplied to conduct the fecal search:

            1.    Disposal latex gloves.
            2.    Disposable resistant surface barrier.
            3.    Plastic or wooden utensils.
            4.    Puncture proof fluid resistant container with biohazard label.

     5.    Red plastic bag for garbage.
     6.    Antimicrobial soap.
     7.    High level disinfectant for cleaning work surface.

PROCEDURE:

     1.    Cover work surface with protective padding.
     2.    Glove or double glove if preferred.
     3.    Using utensils cut or mash excreta as needed.
     4.    If evidence is found, it is placed in fluid resistant container with biohazard label.
     5.    When done, roll up protective padding with all contents inside and dispose infectious waste.
     6.    Take gloves off and wash hands with an antimicrobial soap.
     7.    Spray surface with high-level disinfectant, wipe it down and spray again to leave a residue on surface.

## 506.05     FULLY CLOTHED SEARCHES (PAT SEARCH)

1.    General - Fully clothed searches (pat search) should be employed for the relatively quick scrutiny of an inmate's person.  Situations where fully clothed searches may be employed include, but are not limited to: egress and ingress to housing units, work sites, dining areas and recreation areas.

2.    Recommended Fully Clothed Search Techniques

    A.    When searching a group of inmates, efforts should be made to keep searched and unsearched inmates separate.  Prior to the actual search, the inmate shall be instructed to remove outer garments such as jacket, sweater, hat, gloves, etc.  Then with arms extended to the side at a right angle to the inmate's torso and feet apart at least 20 inches, the search should commence.

    B.    Approaching the inmate from the rear or front, the custodial staff member shall remove all

contents from the inmates pockets, then custodial
staff member will start at the bottom of the
head, using both hands, touch or pat a direct
course across the bottom of the arms to the
armpits and then proceed to the bottom of the
shoulders.

C.   Returning hands to the original starting
     position, pat the shoulders and then down the
     back and sides to the belt line.  Search the
     belt line, all pockets and then up to the top of
     the chest area.

D.   At the back of the waistline, proceed down the
     back and sides of the legs to the shoe tops.
     Check the shoe tips, cuffs and socks and then the
     front and inside of the legs to the shoe tops.
     Check the shoe tips, cuffs and socks and then the
     front and inside of the legs up to the groin
     area.

E.   Observation should be made of the hair, ears,
     mouth, as well as any article carried or worn by
     the inmate.

F.   Special care should be exercised in the
     examination of necklaces and jewelry.

### 506.06    HOUSING AREA SEARCHES

1.  General - In conducting searches of housing areas as
with other types of searches two basic objectives are
sought: identification of contraband and the detection of
future escape attempts.  As a result, efforts should be
made to be thorough in conducting searches of these areas.
Care should be taken not to damage an inmate's property or
unnecessarily disarrange same.  All housing area searches
shall be documented on a standardized reporting form.  The
form shall be turned into and tracked by the appropriate
supervisor. Facilities operating the IMS database shall
document all housing area searches in the Cell Search
Results and Common Area Search Results screens.  Mechanisms
shall be established for tracking all types of searches by
the designated supervisor, e.g., utilization of the IMS
search reports, Morning Report, etc.

2.  Searching cells is a time consuming operation, so it is important to proceed systematically. Searches of cells having two bunks shall entail the search of the entire room, including both bunk areas each time the room is searched.  For multiple bunk dormitory areas, facility procedures shall detail the approach to be taken, i.e., the number of bunks and which areas will be searched at one time and should consider the manageability of the task.  The following is recommended techniques for searching housing areas.

   A.  Staff should search cells the same way each time until it becomes automatic; this will promote efficiency and thoroughness.

   B.  Remove the inmate from the cell/area, strip search and escort him or her to another secure area.  When the search is complete, strip search the inmate again before he or she returns to the cell.

   C.  Before entering the cell, secure the cell door in the open position to avoid being accidentally locked in the cell.

   D.  Before searching the cell, look at the items that are about to be searched.  See if anything is out of the ordinary.  If so examine that item carefully.

   F.  Start the search with the bed and use it as a workbench when finished searching it.  Remove the mattress and other bedding and examine above and below the bunk and in any crevices between the bunk frame and the wall. Look under the bed and check for items suspended from springs or fastened to the bed frame.  With the mattress removed, examine the upper side of the bed frame and springs.  Examine the bed frame supports to ensure that they have not been partially sawed through for easy removal.

   G.  Examine the mattress and pillows by rolling them lengthwise.  Check the sides and ends for cuts and tears in the covering.  Any indication of

resewn seams calls for a more careful examination, including opening the seams for extensive probing. A hand held metal detector is very effective in finding metallic contraband in these items.

H.   Examine the remaining bedding. Pay special attention to any seams or double thickness of cloth.

I.   Search the foot/wall locker next, one shelf at a time, and return all items to their original positions. Examine all surfaces of the locker. Contraband may be taped to the underside of shelves or concealed in shelf ledges, supports, legs, or false sides or backs of the shelves. Also, examine any paper used to line shelves.

J.   Check all clothing (including dirty laundry) piece by piece. Pay special attention to seams, double thickness of material, and pockets.

K.   Open and check every item (letters, books, magazines, toilet articles, and so forth)

L.   Examine coat hangers; certain types of plastic hangers are excellent places to conceal contraband.

M.   Check all footwear, including linings, soles, and heels: feel inside shoes all the way to the toe and remove inner soles and any removable arch supports.

N.   Shake talcum powder containers and squeeze toothpaste tubes. Remove a small contents of commonplace items to check for illegal substitutions. Check to see that cakes of soap have not been hollowed out.

O.   Look in, under, and behind the wash basin and in the drain, overflow, and gooseneck water seal (if accessible). Contraband may be suspended in the pipes or hollows on wires or threads, or stuck on with glue or tape.

P.  Examine the toilet carefully, inside and out.
    Check under the base of the toilet, Behind the
    toilet where it connects to the wall, and the
    toilet drain.

Q.  Examine the toilet paper holder and all rolls of
    toilet paper to make certain that currency or
    other contraband is not rolled up within the
    roll.

R.  If there are electrical outlets or other similar
    access panels in the room, remove them and
    inspect the cavities.

S.  If there are appliances, examine them carefully.
    Remove backs if applicable, check battery wells,
    examine electrical cords, and confiscate items
    with tampered property seals or appear to have
    been altered so the insides can be searched by
    designated individuals prior to return to the
    inmate.

T.  Carefully remove any pictures from frames and
    examine the frame and backing material.  Remove
    all wall coverings to see if their are any cuts
    in walls.

U.  Carefully scrutinize the walls, ceiling and floor
    for indications of sawing, digging, cutting,
    defacing or other possible signs of an escape
    attempt.

V.  Look for indications that mortar has been removed
    and replaced with a substitute.  If the concrete
    is of poor quality, it is easy for the inmate to
    gouge out holes as hiding places for contraband.

W.  Check heat or ventilation duct openings for
    indications of tampering or concealed contraband.
    Look for strings, thread, or wire holding
    something suspended in the duct.

X.  Look around interior and exterior window frames
    and the outside window ledge.  If ledges have a
    covering of any sort, be sure that nothing is
    concealed beneath them.

Y.  Examine window bars for evidence of tampering. Be alert for any wires, strings, or thread fastened to the bars and suspended outside the window.

Z.  Carefully examine the cell door or grille, and the wall in which it is set. Pay particular attention to the areas above eye level. Examine the bars and cell door locking device for signs of tampering, and check the area with the door in both the open and closed positions.

**506.07   NON-HOUSING, SHOP, PROGRAM AND ACTIVITY AREA SEARCHES**

The following is recommended search techniques for these areas of a correctional facility:

A.  Common-areas of the institution (including areas in housing units, shops, and program areas) should be inspected at a minimum of monthly.

B.  When performed by security staff, searches in other areas of the institution ideally should be conducted in the company of the department head or manager of that section. This facilitates access to otherwise secured areas and assists in advising the staff conducting the search on questionable items.

C.  Visiting areas (including trash, furniture, shakedown areas, and toilet areas) should be thoroughly searched before and after visits. Trash removal should be completed by staff only.

D.  An element of the daily perimeter checks should include searching for items hidden next to or under fences etc.

E.  Yard areas should be inspected daily prior to opening. An element of the search plan should include that all yards on a monthly basis are scanned by a metal detection device to locate buried weapons or other contraband. Yards adjacent to roadways should be carefully searched for items thrown over the wall/fence.

F.  All institutional buildings when searched should be checked for evidence of tunnels.

G.  The vicinity of all visitor traffic points should be searched daily to discover items that are hidden or thrown by visitors that are intended for inmates.  Visitor holding areas and gates should be scrutinized carefully.

H.  The ductwork and plenums (air chambers) that carry air to and from the building and into individual rooms, should be searched, not only for breaches in security, but for signs that they are being used as places of concealment for contraband.

I.  Tunnels, utility corridors, and plumbing chases should be searched.

J.  Areas outside the secure perimeter should be searched for contraband to help stem the flow of contraband into the facility.

K.  Shops, vocational training and industrial areas have a wide range of possible contraband hiding places.  Vents, block and brick walls, workbenches, machinery, bins, toolboxes, covered openings, elevator shafts, outbuildings, lockers and staff only areas.

## 506.08    VEHICLE AND SUPPLY SEARCHES

1.  All vehicles and supplies entering and exiting an institution within a secure perimeter shall be thoroughly searched in accordance with 103 DOC 501, Vehicle Trap.

A.  Special provisions shall be made to include the searching of all materials, stores, provisions and equipment delivered to the confines of a secure perimeter.  Use of electronic sensing devices is encouraged after a physical and visual search.

B.  All supplies and food stocks delivered to the institution shall be locked in secure storage areas prior to being inspected.

C.    In cases where the owner/operator refuses to submit to the search, and the search is without probable cause the vehicle shall be permitted to leave state property.  If the search was based on probable cause, the following  guidelines must be followed:  see 506.08 #2 (E).

2.    Vehicle Searches (outside the secure perimeter):

A.    It is recognized there may be instances when it is necessary to conduct searches of all vehicles on or entering institution property outside the secured facility.  For the purpose of these searches the following guidelines must be adhered to.

B.    All vehicle entrances to institutional property must be clearly marked with signs posted in both English and Spanish, stating that all vehicles entering upon correctional institutional property are subject to a search (use of K-9 patrols, etc).

Note:  All visitors refusing to comply with the Search will be denied visiting privileges for that day.(Should be adapted to the institutional visiting rules and procedures).

C.    For the authorization to search vehicles not owned by the department of correction, on institutional property, one of the following requirements must be met:

The owner/operator of the vehicle to be searched, must consent and sign to the provisions according to Permission to Search Waiver.  (See Attachment A)

In cases where the owner/operator refuses to submit to the  search, the following actions maybe taken:

D.    If the search requested, is without probable cause, the owner/operator may refuse the vehicle search and shall be permitted to leave the property.

E.   If the search requested, is based upon probable cause, the following actions will be taken:

   1.   Consultations with the district attorney's office or attorney general's office is recommended.

   2.   If the vehicle to be searched cannot be secured, and if the suspected items would be considered to be hazardous in nature, or the immediate seizure is required to preserve evidence that might otherwise be destroyed, a search warrant would not be needed.  Once the seizure of a vehicle has been authorized the department of correction seizure inspection report and vehicle inventory sheet be completed.  A copy of the D.O.C. seizure inspection report must be maintained at the institution and one copy shall be given to the owner of the vehicle.  (See Attachments B and C).

   3.   If the vehicle to be searched can be secured, and the  evidence can be preserved a search warrant must be attained.  Only officers appointed as Special State Police Officers under the provisions of M.G.L. c. 127, § 127, shall complete the affidavit required to apply for a search warrant. Once this search warrant has been approved and when the seizure of a vehicle has been authorized the department of correction seizure inspection report, vehicle inventory sheet must be completed.

       A copy of the D.O.C. seizure inspection report must be maintained at the institution and one copy shall be given to the owner of the vehicle. (See Attachments B and C).

Note:  This affidavit shall be made readily available at the institutions.  In the event that the affidavit is not available the local state police can provide you with the affidavit, application and search warrant form to be filed under the general laws chapter 276, §§ 1-7.  When  applying for a search warrant, the

warrant must be based on probable cause, the application must provide in detail: reasons for warrant, including property and places to be searched and the person/persons to be searched.

3.   Parking Lot Areas:

The use of K-9's and patrol officers to conduct random searches of vehicles in institutional parking areas is permitted. These searches are to insure that vehicles are locked and no valuables are left in the open according to D.O.C. visiting policy. In the event, a certified drug K-9 unit reacts to a vehicle, or through the officer observation, may provide probable cause. The owner/operator will be requested to submit to a search of his/her vehicle(s). If the request of the search refused, the following procedures shall be followed is 506.08 #2, (D)(E).

## 506.09     SEIZURE OF CONTRABAND/EVIDENCE

A.   When searches result in the seizure of contraband/evidence to be used for the purpose of evidence in either disciplinary proceeding or prosecution the following procedure must be followed:

1.   The officer who seized the evidence must seal the evidence in an evidence bag with an evidence custody form attached to the bag.

2.   Once the evidence has been tagged the evidence should be turned over to the custody of the assigned evidence officer to be logged and placed in the designated evidence locker. If the evidence was seized during times where the evidence officer is unavailable it will be placed in a secured area designed for the purpose of storing evidence until custody has been turned over to the evidence officer.

3.   A disciplinary report or incident report shall be turned in to the shift commander prior to the end of that tour of duty by the officer in charge of the search. (see 103 CMR 430, Disciplinary Actions)

## 506.10    STORAGE OF CONTRABAND/EVIDENCE

1.    The following guidelines shall be utilized to ensure secure storage and accountability of evidence and seized controlled substances.

   A.    The superintendent shall designate one staff person to be the evidence officer and another staff person to be the assistant evidence officer.

   B.    All evidence including common area finds shall be stored in a locked cabinet within a secure room with access to the room being limited.  Access to the cabinet shall be limited to only the evidence officer and the assistant evidence officer.

   C.    1.  Evidence/contraband considered a controlled substance and or associated paraphernalia shall be stored in a locked cabinet within a secure room with access to the room being limited. Access to the cabinet shall be limited to only the evidence officer and the assistant evidence officer.  The cabinet shall have two separate locks on it.  The evidence officer maintains the key to one lock and the assistant evidence officer maintains the key to the other lock. These keys shall not be given to any other persons or interchanged between the evidence officers.  This method insures that two persons are present each time the cabinet is opened.

   2 A. Suspected controlled substances found when the evidence and assistant evidence officer are not available shall be placed into a fixed steel drop box, which is secured by two locks.  Access to the locks shall be restricted.  The evidence officer shall be issued the key to access one lock and the assistant evidence officer shall be issued the key to access the other lock.  When both officers are present the substance shall be removed and placed into the evidence locker.

   B.    All drops made into the box and items removed shall be documented with the staff name(s), date and time.

D.   A bound log shall be maintained in a secured
     location on all evidence including common area
     finds as well as controlled substances. Each
     item shall be logged and each entry should
     include:

     - Suspects name;
     - date of recovery;
     - location of recovery;
     - arresting and/or finding officers name;
     - detailed description of item;
     - case number;
     - inventory number;
     - storage location;
     - chain of custody;
     - disposition; and
     - logging officer's name.

E.   A separate in/out log shall be maintained on the
     controlled substance evidence and is to be sorted
     inside the controlled substance cabinet. Any
     evidence that leaves the controlled substance
     cabinet for any reason (i.e., state police lab)
     shall be logged in and out.

F.   With each piece of evidence a separate "evidence
     custody form" shall be filled out and kept with
     the piece of evidence. (See attached sample
     evidence custody form)

## 506.11    DISPOSAL OF EVIDENCE/CONTRABAND

1.   Evidence not associated with any disciplinary or legal
     matter shall be maintained at the institution where it
     was recovered no longer than six months.

2.   Final disposition of all evidence shall be approved in
     writing by the director of security. Final
     disposition of evidence relating solely to a
     disciplinary or civil matter and not involving any
     possible criminal prosecution shall be approved in
     writing by the department's general counsel. All
     evidence related to a disciplinary matter shall be
     held for three years from the initial sanction date to
     ensure that no civil action has been brought against
     the department. Thus, evidence relating to a
     disciplinary matter that is less than three years from

the initial disciplinary sanction date, shall not be submitted to the department's general counsel for approval. After the three year period has lapsed, then approval to destroy evidence through the general counsel shall be obtained. Final disposition of evidence relating to a criminal matter must be approved in writing by the district attorneys office. Once the DA's approval is obtained, the evidence shall be reviewed and approved by the general counsel to ensure no civil or potential civil litigation can be brought against the department.

3.   Once approved, the evidence officer will return evidence to its rightful owner.

4.   Evidence that is considered a controlled substance will be transported to a regional site for disposal with all accompanying documentation. All control substance evidence transported to the regional site must be accompanied with the required disposal forms filled out as required by the Department of Public Health's drug destruction protocol.

5.   Disposal of evidence will be conducted regionally. Each region will have one facility designated as the regional evidence site. There are four regions which are as follows:

| REGION 1 | REGION 2 | REGION 3 | REGION 4 |
|----------|----------|----------|----------|
| **MC-CJ** | **OCCC** | **SHIRLEY(4)** | **COMM.CORR.** |
| MCI-CJ | OCCC | SHIRLEY(4) | LSH |
| MCI-N | BSH | NCCI | BSPRC |
| BSCC | MTC | MCI-C | |
| PCC | MASAC | NECC | |
| MCI-F | PLYMOUTH | SBCC | |
| SMCC | | | |

6.   The evidence officer at the regional site will be responsible for the final disposal of evidence (for their institution as well as for the institutions within their region). Disposal of controlled substance evidence will be arranged through the Massachusetts Food and Drug Administration. Any evidence transferred to the regional sites will not be maintained for longer than six months.

7.  The evidence officer at the regional site shall sign a receipt acknowledging the change of custody. This receipt will then be maintained on file at the sending institution. The evidence officer of the sending institution shall be responsible for all appropriate documents including log entries.

8.  The regional evidence officer shall be responsible for maintaining documentation on all evidence received and all evidence disposed. The regional evidence officer shall also submit an annual report to their respective assistant deputy commissioner detailing all evidence received and disposed.

9.  The regional evidence officer shall ensure proper log notations are be made on evidence disposal and the evidence custody documents shall be complete and kept on a permanent file.

10. Quarterly audits shall be conducted by a supervisory staff person on evidence storage and the log books to ensure the accountability of the evidence. These audits shall be conducted at all facilities.

## 506.12    CRIME SCENE SEARCH AND INVESTIGATION

1.  When an incident occurs that may possibly result in criminal prosecution, the superintendent or his/her designee should be notified immediately after the incident has been contained or neutralized. Each superintendent shall ensure that the following procedures are adhered to as described in attachment E. Crime scene search and investigation should be conducted in such a manner so as to ensure the legal protection of the rights of the inmate(s) and the preservation of evidence for the commonwealth.

MASSACHUSETTS DEPARTMENT OF CORRECTION

INMATE SUBSTANCE ABUSE TESTING AND SANCTIONING

103 DOC 525

TABLE OF CONTENTS

525.01    SUBSTANCE ABUSE TESTING AND SANCTIONING POLICY........2

525.02    SUBSTANCE ABUSE SURVEILLANCE.........................11

525.03    ALTERNATIVE TESTING/COLLECTION PROCEDURES...........14

525.04    SUBSTANCE ABUSE SCREENING PROCEDURES................16

525.05    STORAGE/TRANSFER/DISPOSAL OF URINALYSIS
          SAMPLES/BOTTLES.....................................23

525.06    REFUSAL TO TAKE A SUBSTANCE ABUSE MONITORING TEST....24

525.07    DISCIPLINARY PROCEEDINGS/SANCTIONS..................24

525.08    TREATMENT INTERVENTIONS.............................28

525.09    TRAINING............................................28

525.10    RECORD KEEPING......................................28


ATTACHMENTS:
I     SUBSTANCE ABUSE MONITORING TEST TYPES....................30
II    INMATE SIGN OFF SHEET....................................31
III   SUBSTANCE ABUSE CHAIN OF EVIDENCE FORM...................32
IV    INMATE TRACKING REPORT...................................33
V     SUBSTANCE ABUSE MONITORING SUMMARY.......................34
VI    WAIVER OF CONFIRMATORY SCREEN............................35
VII   SUBSTANCE ABUSE QUARTERLY/ANNUAL REPORT..................36

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: ADC NORTHERN SECTOR |
|---|---|
| TITLE: INMATE SUBSTANCE ABUSE TESTING AND SANCTIONING | NUMBER: 103 DOC 525 |

**PURPOSE:** The purpose of this document is to establish Department of Correction policy governing substance abuse testing of inmates by means of urinalysis, breathalyzer, dry cells, oral fluids, or hair analysis and outline graduated sanctions invoked as a result of abuses.

**REFERENCES:** M.G.L. Chapter 124, Section 1 (b), (m) and (q).

**APPLICABILITY:** Staff          **PUBLIC ACCESS:** Yes

**LOCATION:** DOC Central Policy File/Institution Policy File/Inmate Library.

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**

> Department - Assistant Deputy Commissioner, Northern Sector
> Institutions - Superintendents

**EFFECTIVE DATE:** 03/30/2006

**CANCELLATION:** This policy cancels all previous department policies and procedures governing the substance abuse monitoring of inmates.

**SEVERABILITY CLAUSE:** If any part of this policy is, for any reason, held to be in excess of the authority of the Commissioner, such decision will not affect any other part of this policy.

**525.01**      <u>**Substance Abuse Testing and Sanctioning policy.**</u>

I.     The Department of Correction is committed to drug/alcohol testing, sanctions, and treatment of all inmates within our custody and shall maintain a zero tolerance for drug and alcohol use. Although urinalysis is the primary method of testing for drugs and alcohol within the Department of Correction a superintendent may utilize a variety of testing methods to include urinalysis, breathalyzers, oral fluid screens and hair analysis.

II.     In cases where inmates have a mental health condition and/or a physiological medical condition preventing urinalysis testing, use of a dry cell as well as oral fluid or hair analysis may be utilized as an alternative testing method.

III.     This substance abuse surveillance procedure shall be conducted for both security and treatment purposes. All incidents of positive drug and/or alcohol tests shall result in a disciplinary report and a scale of graduated sanctions shall be applied consistent with department disciplinary regulations.

IV.     For purposes of disciplinary proceedings, sanctions, security and other Department statistics and record keeping, a "substance abuse violation" shall be defined as any offense or violation involving alcohol, narcotics, hallucinogens, or other drug or illicit substance. Such violations may be found in, but are not limited to, cases including possession, use, manufacture, distribution or introduction into an institution of such substance or associated paraphernalia, refusal to provide a specimen sample of any type for substance abuse testing, or instances where an inmate's initial substance abuse screening yields a positive result which medical records cannot justify.

V.     Substance abuse monitoring and treatment records for inmates being released on Probation or Parole shall be shared with Probation and Parole agents by the Superintendents' designee, in order that

they may consider denial of release and/or develop an appropriate continuum of treatment and monitoring plan following the inmate's release from incarceration. Parole information shall be communicated via the Institutional Parole Officer while Probation information should be communicated with Probation staff at the court with supervision responsibilities.

VI.   A continuum of monitoring shall also be in place for appropriate inmates within the department, as the inmate's release date nears, in the best interest of public safety.

VII.  This policy shall include testing for cause, target high risk offenders, regular interval testing for all inmates participating in the Department's residential substance abuse treatment program, regular interval testing of all inmates in level 1-3 institutions (Community Corrections) and random testing of inmates not included in any of the above categories. Selection of inmates for testing in all categories shall be supported by appropriate documentation and shall not be based on the race, color, religion, gender, age, or national origin of the inmate.

VIII. Every effort shall be made to provide a drug free and safe correctional environment. Through the aggressive management of this policy, the Department seeks to eliminate drug and alcohol use among inmates, improve accountability, maintain institutional order/security, and contribute to the overall mission of the department, "to protect the public safety", by reducing inmate recidivism.

IX.   Each superintendent shall develop institution procedures governing who gets tested, frequency, and for what substances consistent with the following mandatory standards:

   **A.   Level 4-6 Institutions:**

      1.   All inmates entering a Department of Correction institution shall be

screened by the Substance Abuse Monitor to ascertain previous testing status, if any, to determine current test monitoring needs, e.g. twice monthly testing associated with disciplinary sanctions, Correctional Recovery Academy (CRA) Therapeutic Community Phase (TCP) participation, etc. At full Inmate Management System (IMS) sites, screens to be reviewed include the Disciplinary Query, Mental Health/Substance Abuse History, Medical Orders, Recidivism Risk Assessment, Needs Assessment (substance abuse need area), Risk Reduction Plan, and Program Query.

2.  All inmates participating in the Correctional Recovery Academy (CRA) therapeutic community phase (TCP) and the Massachusetts Alcohol and Substance Abuse Center (MASAC) shall be tested within (24) hours of admission into that phase, and on a monthly basis thereafter. The CRA admission urine shall be scheduled, on the IMS Collection Schedule screen, under the "Status" of CRA-24. The MASAC admission urine shall be scheduled on the Collection Schedule screen, under the "Status" of Admit-24. To determine new admissions to MASAC, the IMS New Inmate List report or Morning Report screen should be utilized.

3.  A monthly suspect list shall be developed to include a minimum of 10% of the institution's inmate population. This listing shall represent those inmates, who in the opinion of the Superintendent/designee's may pose the greatest threat to abuse drugs and alcohol. This list shall be developed via the IMS Status Roster screen, using the "Status" of suspect. In developing this listing, the

Superintendent/designee's      should include a review of:

a.    Inmates who scored moderate to high on the risk/needs assessment with a strong need in the area of substance abuse;

b.    Inmates who have been recommended for the Department's intensive substance abuse program but have failed to participate;

c.    Inmates participating in substance abuse support programs;

d.    Inmates who have tested positive or refused to provide a sample for substance abuse testing and have recently completed sanctions; and

e.    Inmates who have been identified as high risk substance abusers through institution incidents, intelligence information, and/or observations, etc. At Full IMS sites, the Incident Query screen shall be reviewed to assist in the identification.

Superintendents/designee's      may remove any inmate from this list following three months of testing without a positive result. Inmates shall be removed via the Status Roster screen. Notwithstanding the above, inmates placed on the listing as a result of being found guilty of a positive substance abuse screen or refusing to participate in substance abuse testing must remain on the list for the duration of their sanction. Inmates who appear on this list shall be tested monthly.

In the event Superintendents /designee's feel that it is necessary to exceed 10% of the overall population on this listing, the Superintendent shall seek the authorization of their respective Assistant Deputy Commissioner, to ensure appropriate funding is available.

**Note:** Inmates participating in the Correctional Recovery Academy (CRA) therapeutic community phase (TCP) should not appear on the suspect list. The Substance Abuse Monitor should compare the CRA list to the suspect list on the Status Roster screen in order to identify inmates duplicated on the lists. Duplicated inmates should be removed from the suspect list while participating in the CRA.

4.  10% of the inmate population (including those tested by 103 DOC 525.01 (IX)(A)(2)&(3), housed within a secure facility shall be randomly tested quarterly. Random testing shall be based on an IMS generated selection as follows:

    a.  The Substance Abuse Monitor or other employee designated by the Superintendent shall generate a random schedule of urines via the Collection Schedule Screen to ensure that 10% of the population is tested each quarter.

    b.  The Collection Schedule screen under the status of random must be maintained under the "period" drop-down box by quarter only. During any given quarter, IMS will generate the random roster as random collections are scheduled. It is the responsibility of the

user to assure that the status statistics section of the collection screen indicates that the percentage tested is 10% by the end of a quarter.

Finally, each time an inmate's name appears on the Collection Schedule screen list, the inmate shall be tested, regardless of how often the name is selected.

5. Testing for cause may be authorized as outlined in 525.01(IX)(6)(7)&(8) below.

6. Any inmate who assaults a staff member through the use of a weapon, bodily fluids and/or a physical assault shall be tested for substance use within 24 hours of the incident. At full IMS sites, staff assault incidents may be identified via the Morning Report, Institutional Overview, Disciplinary Query and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule Screen.

7. Any inmate who sustains an injury requiring medical attention that was not witnessed by staff shall be tested for substance use at the superintendent/designee's discretion. Such incidents shall be documented in an incident report. At full IMS sites, inmate injuries may be identified via the Morning Report and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule screen.

8. Any inmate who returns to MCI-Concord or MCI-Framingham subsequent to an escape shall be tested for substance use upon admissions.

B. **Level 3 Institutions:**

1.  All inmates entering a Department of Correction Institution shall be screened by the Substance Abuse Monitor to ascertain previous testing status, if any, and to determine current test monitoring needs, e.g. monthly testing associated with disciplinary sanctions, Correctional Recovery Academy (CRA) therapeutic community phase (TCP) participation, etc. Previous testing status shall be determined via a review of the Test Results screen and/or the Inmate Tracking report (Attachment IV). At full IMS sites, current test monitoring needs shall be determined via a review of the screens noted in 525.01(VII)(A)(1).

2.  All inmates participating in the Correctional Recovery Academy (CRA) therapeutic community phase (TCP) shall be tested within (24) hours of admission into that phase and monthly thereafter.

3.  All Level 3 inmates shall be tested on a quarterly basis. On the Collection Schedule screen, the Substance Abuse Monitor shall use the "Status" of Interval when generating the roster.

4.  A monthly Suspect list shall be generated via the Status Roster screen to include a minimum of 10% of the institution inmate population, consistent with 525.01 (IX)(A)(3) above;

    Note: Inmates participating in the Correctional Recovery Academy (CRA) therapeutic community phase (TCP), should not appear on the suspect list. The Substance Abuse Monitor should compare the CRA list to the suspect list on the Status Roster screen in order to identify inmates duplicated on

the lists. Duplicated inmates should be removed from the suspect list while participating in the CRA.

5.  10% of the inmate population (including those tested by 103 DOC 525.01(IX)(B)(2)(3)&(4), housed within a Level 3 facility shall be randomly tested monthly. Random testing shall be based on an IMS generated selection as follows:

   a.  The Substance Abuse Monitor or other employee designated by the Superintendent shall generate a random schedule of urines via the Collection Schedule Screen to ensure that 10% of the population is tested each month.

   b.  The Collection Schedule Screen will indicate the total number of inmates in the random pool and will produce a random listing of 10% of this population.

   c.  Superintendents shall identify who will generate this list, and all those individuals who have access to it. Every effort shall be made to keep access to this list to a minimum until the time of testing. Finally, each time an inmate's name appears on the Collection Schedule Screen list, the inmate shall be tested, regardless of how often the name is selected.

6.  Testing for cause may be authorized as outlined in 525.01 (IX)(7)&(8) below.

7.  Any inmate who assaults a staff member through the use of a weapon, bodily fluids and/or a physical assault shall be tested for substance use within 24 hours of the incident. At full IMS sites, staff assault incidents may be

identified via the Morning Report, Institutional Overview, Disciplinary Query and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule screen.

8. Any inmate who sustains an injury requiring medical attention that was not witnessed by staff shall be tested for substance use at the superintendent/designee's discretion. Such incidents shall be documented in an incident report. At full IMS sites, inmate injuries may be identified via the Morning Report and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule screen.

C.  **Level 1 and 2 Institutions and/or Units:**

1. All inmates entering a Department of Correction Institution shall be screened by the Substance Abuse Monitor to ascertain previous testing status, if any, and to determine current test monitoring needs, e.g. monthly testing associated with disciplinary sanctions. If an inmate participates in, Correctional Recovery Academy (CRA) therapeutic community phase (TCP), the inmate shall be tested within (24) hours of admission into that phase and monthly thereafter. Previous testing status shall be determined via a review of the Test Results screen and/or the Inmate Tracking report (Attachment IV). At full IMS sites, current test monitoring needs shall be determined via a review of the screens noted in 525.01 IX A. 1.

2. All Level 1 and 2 inmates shall be tested on a monthly basis. On the Collection Schedule screen, the Substance Abuse Monitor shall use the

"Status" of Interval when generating the roster.

3.  A monthly Suspect list shall be developed to include a minimum of 10% of the institution's inmate population consistent with 525.01(IX)(A)(3) above.

4.  10% of the inmate population (including those tested by 103 DOC 525 (IX)(C)(1)(2)&(3), housed within a Level 1 and 2 facility shall be Randomly tested monthly. While it is appropriate to randomly test inmates in-house, a major focus should include returns from community releases, particularly nights, weekends, and holidays. Random testing shall be based on an IMS generated selection as follows:

    a.  The Substance Abuse Monitor or other employee designated by the Superintendent shall generate a random schedule of urines via the Collection Schedule Screen to ensure that 10% of the population is tested each month.

    b.  The Collection Schedule Screen will indicate the total number of inmates in the random pool and will produce a random listing of 10% of this population.

    c.  Superintendents shall identify who will generate this list, and all those individuals having access to it. Every effort shall be made to keep access to this list to a minimum until the time of testing. Finally, each time an inmate's name appears on the Collection Schedule Screen list, the inmate shall be tested, regardless of how often the name is selected.

5. Testing for cause may be authorized as outlined in 525.01(IX)(6)&(7) below.

6. Any inmate who assaults a staff member through the use of a weapon, bodily fluids and/or a physical assault shall be tested for substance use within 24 hours of the incident. At full IMS sites, staff assault incidents may be identified via the Morning Report, Institutional Overview, Disciplinary Query and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule screen.

7. Any inmate who sustains an injury requiring medical attention that was not witnessed by staff shall be tested for substance use at the superintendent/designee's discretion. Such incidents shall be documented in an incident report. At full IMS sites, inmate injuries may be identified via the Morning Report and/or Incident Query screens. All testing for cause urine samples shall be scheduled on the Collection Schedule screen.

X. A minimum of three different substance abuse urine screens shall be conducted for each substance abuse sample collected/tested. A Breathalyzer screen may be substituted (if appropriate) for one of the three urinalysis substance screens. Breathalyzer screens shall be documented on both tabs of the Test Results screen and the collection officer's name shall be entered into the Collection Officer field. Focus shall be based on random selection, intelligence as to the availability of illegal substances in the facility/community, and the inmate's substance of choice as determined from a review of records. Additional tests may be performed if, in the opinion of the Superintendent and/or designee, there is justifiable reason. Such incidents shall be recorded on an institutional information/incident report.

XI.   Superintendents may order testing for cause to respond to those situations that present themselves where it appears an offender is under the influence of an illegal substance. Situations resulting in testing for cause may include but not be limited to:

    A.   An inmate is found in possession of suspected illicit drugs, or drug paraphernalia are found in an area occupied or inhabited by the inmate;

    B.   An inmate is observed to be in possession of or using illicit drugs, but correctional staff are unable to obtain a sample of the substance;

    C.   Staff receives information of suspected drug/alcohol use;

    D.   An inmate returns late from a community release.

Institutional procedures shall indicate who has the authority to order such test and any additional approval required.

XII.  Urinalysis samples for all status types shall be collected on all shifts, seven days a week, to prevent predictability of testing patterns. The exception is at MCI-Framingham and South Middlesex Correctional Center, where no urinalysis samples will be collected on the 11x7 shift.

XIII. It should be noted that urinalysis detects the past use of drugs, and testing too soon after use may result in a false negative finding, e.g., while tests for alcohol must be taken within hours after use, tests for the other commonly tested drugs are more apt to detect the drug's presence between 24-72 hours after use.

XIV.  Each Superintendent shall appoint a Substance Abuse Monitoring Coordinator who will be given the authority necessary to ensure that the

institution's substance abuse monitoring plan is fully implemented and maintained in accordance with this policy.

XV.   Each superintendent shall designate specific collection site(s) for all sample collections.

**525.02    Substance Abuse Surveillance**

The following procedures for substance abuse surveillance shall be followed:

I.    **Pre-Collection Activities**

A.    Prior to an inmate providing a urine sample, the collection officer shall:

1.    Ensure the IMS generated Inmate Sign Off Sheet (Attachment II) is obtained.

2.    Ensure that the collection site is clean, well lighted, and used solely for urinalysis testing during the collection process, affording the inmate reasonable privacy. A toilet stall of a rest room, holding cell, etc., are preferred locations;

3.    Ensure that all objects, which could be used to adulterate the sample, are removed from the collection site.

4.    Ensure that all required personnel and materials are available;

5.    Request photo identification from the inmate providing the sample;

6.    Label the urine specimen entering all information identifying the specimen on the collection cup, to include:

a.    date;

b.    collector's initials;

c.    specimen number; and

          d.    initials   of   inmate   providing specimen.

7. Ensure that the inmate providing the sample removes all unnecessary garments, e.g., coat, hat, etc., and leaves these items outside the collection area;

8. The collection officer shall strip search the inmate before collecting the sample. All searches shall be conducted in accordance with 103 DOC 506, Search Policy; and,

9. Ensure that the hands of the inmate are washed and dried prior to providing the sample, and conduct a visual inspection under the inmate's fingernails for any foreign material.

## II. Collection of Sample

A. The collection officer shall be of the same gender as the inmate providing the sample and shall:

1. Be in a position to verify that the specimen passes directly from the inmate's body into the collection cup;

2. Take possession of the urinalysis sample from the inmate, and direct the inmate to wash hands after urination. Staff should wear gloves during the handling of the sample;

3. Keep specimen in full view of the inmate at all times prior to it being sealed and labeled;

4. Ensure 60 ml. of urine is collected in the collection cup. If the inmate provides less than 60 ml., the collection officer shall maintain possession of the incomplete specimen

cup in full view of the inmate or seal the specimen in the presence of the inmate in accordance with 525.02 (II) (5) below and store the partial sample in a secure area designated for urinalysis samples only. When the inmate is able to provide an additional sample, it shall be collected in a separate bottle, and the partial specimens combined at the end of the collection in the presence of the inmate;

5. An inmate unable to provide a specimen shall remain at the collection site until 60 ml. of urine is collected. The inmate may be given eight (8) ounces of liquid (i.e., water, coffee, or soft drink) to drink every thirty minutes. When collecting the additional sample, the collection officer shall adhere to above steps (See 525.02 (I)(A)(1-8)).

6. Notwithstanding the above, the inmate shall be asked the reason for refusing to provide a sample. The inmate's specific reason shall be documented in the disciplinary report if it is determined that the inmate is refusing to provide a substance abuse sample. The Substance Abuse Monitor shall also enter a flag in the "Inmate Refused" checkbox on the Test Sample tab of the Test Results screen, and enter the date, time and his/her name.

If a specimen is not provided within two (2) hours of being ordered to do so the inmate shall be considered to be refusing to provide a specimen (refer to 525.06).

7. Place a tamper proof seal over the specimen bottle's cap.

## III. Post Collection Activities

A.  The collection officer, now in possession of the urinalysis specimen, shall keep the specimen in full view of the inmate providing the specimen and shall:

1.  Ensure the lid and/or opening to the specimen cup has been sealed.

2.  Review all information identifying the specimen, as noted on the collection cup, and on the Inmate Sign Off sheet (Attachment II)

3.  Ensure inmate providing the specimen signs the Inmate Sign Off Sheet (Attachment II) certifying that the specimen identified as having been collected is, in fact, that specimen provided. In addition, the collection officer must print his/her name. The "Collection Officer", "Collection Date" and "Time" (sample was obtained) fields shall be completed in the Test Sample tab on the Test Results screen. After the inmate and collection officer sign the Inmate Sign Off Sheet (Attachment II), a flag shall be entered in the "Inmate Signed" checkbox. The "User" (collection officer's name) and "Date" fields shall also be completed. In the event the inmate refuses to sign the Inmate Sign Off Sheet (Attachment II), an incident report shall be written by the collection officer, the refusal witnessed by a second staff member and documented in the incident report. The Substance Abuse Monitor shall enter a flag in the Inmate Provided but Refused to Sign check box on the Test Sample tab of the Test Results Screen.

4.  If the specimen is not immediately tested upon collection, complete the Substance Abuse Chain of Evidence Form (Attachment III) and place the specimen in a secure refrigerator designated specifically for substance abuse test

specimens. Access to the secure
refrigerator shall be limited to the
Shift Commander and designated staff
responsible for the testing of these
specimens. Each and every individual
who handles the sample, noting reason
for handling, from the time the sample
is collected, to the time the sample is
disposed of shall sign the chain of
evidence form. In the case of a
positive result, the institution's
Substance Abuse Monitor shall maintain
all chain of evidence forms on file for
one (1) year.

**525.03    Alternative Testing/Collection Procedures**

I.    In the event an inmate claims that they are
unable to provide a urinalysis sample due to a
documented or undocumented mental health and/or a
physiological medical condition or the
Superintendent, based on security concerns,
determines that an alternative method of
substance abuse testing is appropriate, the
following guidelines shall be followed:

A.    If the condition is reported to be a mental
health condition, the collection officer
shall proceed to 525.03 I(C) below and
conduct an alternative test;

B.    If the condition is reported to be a
physiological medical condition, the
collection officer shall proceed to 525.03
I(C) and conduct an alternative test;

1.    Upon receipt of a report of a
physiological medical condition, and
after an alternative test has been
administered, an appointment shall be
scheduled with the appropriate medical
personnel to assess whether there is a
physiological medical condition
preventing the inmate from providing a
urine sample in a timely fashion;

2.    If, after consultation with the

Department's medical personnel, the Department is unable to document a physiological medical condition that could prevent the inmate from providing a urine sample in a timely fashion, the inmate shall be responsible for the cost incurred by the Department in administering the alternative test. This cost shall be calculated as the difference between the cost of the alternative test used, and the cost of a routine urine test. In addition, the inmate shall be held to the normal standard of substance abuse testing as outlined in 525.02 (I) and (II) above, for all future testing.

C.    The inmate shall be secured in a dry cell and the Superintendent or designee shall be immediately notified.

D.    A dry cell, for the purpose of this policy, shall be considered a secured cell with no running water and no toilet/urinal. Dry cell testing should be considered as a first option to our primary collection methodology as it utilizes the same testing equipment and can be performed immediately in house. If it is determined that the dry cell is not the most effective method of alternative testing, the superintendent may choose the use of an oral fluids screen or hair testing. The collection and screening methods of these two tests are described in 103 DOC 525.04 Substance Abuse Screening Procedures. If a dry cell is chosen the collection officer shall:

1.    Search the dry cell and ensure it is cleaned of any potential contaminants.

2.    The inmate shall be strip-searched, and placed in the cell wearing nothing more than undergarments and provided with a urinalysis specimen cup. In addition, the inmate may be given eight ounces of liquid (i.e., water, coffee, or soft

drink) to drink every thirty minutes.

3.  The inmate shall be instructed to notify staff immediately upon providing the urine specimen.

4.  The collection officer shall take custody of the sample, check the temperature to ensure that it falls in the appropriate range (between 90.5 and 99.8 degrees Fahrenheit). NOTE: The temperature of the specimen shall be checked by affixing a temperature gauge to the test cup containing the specimen and checking the temperature within four (4) minutes of the sample being provided.

5.  In each and every case of a dry cell sample, after checking the temperature, the sample shall be tested via an Adultachek stick to ensure said sample has not been adulterated.

6.  In the event the Adultachek indicates the sample has been adulterated, the inmate shall be required to submit to a second alternative testing method. The alternative testing method shall be determined in accordance with 525.03 (I) (C).

7.  In the event the Adultachek indicates the sample has not been adulterated, the collection officer shall proceed in accordance with 525.02 (III) (A) (1-5) post collection activities.

8.  If a specimen is not provided within two hours of being placed in a dry cell, the Superintendent may order the use of another alternative testing method.

**525.04    <u>Substance Abuse Screening Procedures</u>**

The Department of Correction shall employ four

distinct screening procedures for testing substance abuse specimens, conducted within as follows:

**I.   Urinalysis screens (witnessed/dry cell)**

    A.   Initial Screen

        1.   All first screens shall be conducted by institution staff trained in appropriate procedures and certified as qualified operators by the contractor or designated institutional training officers. Health Service staff shall never be used for this purpose.

        2.   All testing materials shall be up-to-date and function properly.

        3.   All screened samples shall be properly labeled as to time, date and tester.

        4.   All procedures defined by the screening contractor shall be properly implemented.

        5.   All tests shall be conducted in a secure environment, and care must be exercised in maintaining the chain of evidence.

        6.   Staff shall wear rubber gloves during handling of specimens. Eye goggles should also be made available to staff. Their use is optional.

        7.   There shall be no eating or drinking in the test site.

        8.   No refrigeration of food should take place where chemicals/specimens are stored.

        9.   Samples inappropriately labeled, those whose numbers do not match the information on the Inmate Sign Off Sheet or where the sample seal has been broken or leakage observed, shall be

rejected for testing. In all such cases where a sample is rejected, an entry shall be made in the Test Results screen. The sample shall be disposed of in accordance with 525.05 below, and a new sample shall be ordered from the inmate who provided the initial sample.

10. If the results of all tests are negative, the Substance Abuse Monitor shall ensure the "Test Completed" checkbox is flagged on the Test Results screen.

11. When a positive result is obtained from the initial test, the staff member conducting the test shall contact medical staff for information regarding any medication the inmate had been prescribed prior to the test. If the inmate was taking medication the collection officer shall contact the State Pharmacy for a decision as to whether or not the medication could have caused a positive test result.

If none of the medications would produce a positive result, absent an admission of use on the part of the inmate, a second test (confirmation) must be conducted to support the findings of the initial screen as referenced in 525.04, section (I)(B). If State Pharmacy Personnel confirm that an inmates prescribed medication may have caused the positive finding, State Pharmacy personnel shall advise correctional personnel of the time that must elapse following completion of medication to prevent a positive result associated with that medication.

If the State Pharmacy indicates that the prescribed medication(s) would produce a positive result, but institution staff possess information that leads them to believe that the

inmate has been abusing an illegal substance, a second test (confirmation) may be conducted as referenced in 525.04 (I) (B).

12. A superintendent may determine that a urine sample be collected from an inmate and sent directly to an outside laboratory for testing purposes without going through an initial screen. This could occur when the superintendent or designee suspects that an inmate used a substance that is not listed on Attachment I or if the facility has no on site test availability or in the event an inmate has a positive initial breathalyzer screen. In these cases a GC/MS(Gaschromatography/Massspectrometry) screen will be conducted. This single test is the only test required when an initial on-site test is not administered.

B.   Confirmatory Screen

1. In all cases where a confirmatory screen has been deemed necessary and/or appropriate, the institution shall contact the approved department contractor to arrange for the pick-up of the sample. Care shall be taken to ensure that the chain of evidence is properly maintained at all times.

2. All confirmation tests shall be conducted utilizing an alternative methodology of testing.

3. All positive results shall be immediately reported to the sending institution by the contractor, via telephone or by fax. A written confirmation of such results will follow. All applicable IMS screens shall be updated with the confirmation results.

4.   The Substance Abuse Monitor shall ensure that the "Test Completed" checkbox is flagged on the Test Results screen.

## II.  Oral Fluid Screen

A.   Oral Fluid Testing may be chosen at the Superintendent or designee's discretion or in cases where it is believed substances, i.e. Cannabinoids, Cocaine, or Opiates, were ingested in close proximity to the time of the test. If chosen the officer collecting the sample shall also be qualified to perform the test as the testing of the sample occurs immediately following collection. The collection officer shall:

1.   Ensure the collection site is secured, clean, well lighted, and used solely for oral sample collection during the collection process;

2.   Ensure that all objects, which could be used to adulterate the sample, are removed from the collection site;

3.   Ensure that all required personnel and materials are available;

4.   Request photo identification from the inmate providing the sample;

5.   Ensure that the inmate providing the sample removes all unnecessary garments, i.e., coat, hat, etc. and leave these items outside the collection area;

6.   The collection officer shall strip search the inmate before collecting the sample. The inmate shall be allowed to dress upon completion of the strip search and prior to providing the oral sample. All searches shall be conducted in accordance with 103 DOC 506, Search Policy;

7.   Ensure that the hands of the inmate providing the sample are washed and dried and conduct a visual inspection under the inmate's fingernails for any foreign material;

8.   Ensure that all testing materials shall be up to date and function properly.

9.   Ensure that the inmate being tested has had nothing in their mouth for a least five minutes prior to the sample collection.

10.  The collection officer shall follow all manufacturers specification on collecting the sample including wearing gloves.

11.  After collecting the sample the collection officer shall ensure that the inmate providing the sample signs the Inmate Sign Off Sheet certifying that the sample identified as having been collected, is, in fact, that sample provided. In addition, the collection officer must print and sign name.

12.  The collection officer must ensure that the chain of evidence is maintained.

13.  When a positive result is obtained from the initial test, the staff member conducting the test shall contact medical staff for information regarding any medication the inmate had been prescribed prior to the test. If the inmate was taking medication the Substance Abuse Monitoring Coordinator shall contact the State Pharmacy for a decision as to whether or not the medication could have caused a positive test result.

If none of the medications could produce a positive result absent an admission of use on the part of the inmate, a second test (confirmation) must be conducted to support the findings of the initial screen as referenced in 525.04, Section (II) (B). If State Pharmacy Personnel confirm that an inmate's prescribed medication may have caused the positive finding, State Pharmacy personnel shall advise correctional personnel of the time that must elapse following completion of the medication to prevent a positive result associated with that medication.

B.  Confirmatory Screen

1.  If a confirmation test is necessary the collection officer shall follow all steps as outlined in 103 DOC 525.04 (II) (A) (1-13) and follow all manufacturers specification.

2.  All confirmation tests will utilize the GC/MS(gaschromotography/massspectrometry) method of testing.

3.  All applicable IMS screens shall be updated for initial and confirmatory screens.

**III. Hair Testing**

A.  The Department may employ the use of Hair Testing, as an alternative testing method if approved by the superintendent.

B.  Hair sample collection shall be conducted by correctional personnel who have been trained in the collection procedures, as outlined by the vendor, by designated institution training personnel.

C.  All collection materials shall be up-to-date and function properly.

D.  All samples shall be properly labeled as to time, date and tester.

E.  All procedures defined by the screening contractor shall be properly implemented.

F.  All collections shall be conducted in a secure environment, and care must be exercised in maintaining the chain of evidence.

G.  When a facility ships a hair sample to the approved department contractor for testing the Office of the Deputy Commissioner shall be notified on the next business day. Information provided shall include the inmate name, institutional number, hair sample bar code number, date shipped, facility and contact person for reporting results to.

H.  When a positive result is obtained from the screen, the Substance Abuse Monitor shall contact medical staff for information regarding any medication the inmate had been prescribed prior to the test. If the inmate was taking medication the collection officer shall contact the State Pharmacy for a decision as to whether or not the medication could have caused a positive test result. If State Pharmacy Personnel confirm that an inmate's prescribed medication may have caused the positive finding, State Pharmacy Personnel shall advise correctional personnel of the time that must elapse following completion of medication to prevent a positive result associated with that medication.

I.  If none of the medications would produce a positive result, a disciplinary report shall be written on the inmate. Due to the elaborate screening methods employed by the outside lab there is no need for a confirmation test if the sample is deemed positive.

J.  All positive results from a hair sample shall be immediately reported by the approved contractor and to the Office of the Deputy Commissioner, who in turn will notify the appropriate institution. A written confirmation of such results will follow. All applicable IMS screens shall be updated with the confirmatory results.

K.  The Substance Abuse Monitor shall ensure that the "Test Completed" checkbox is flagged on the Test Results screen.

## IV.  Breathalyzer Screens

A.  Superintendents may, based on institutional needs, utilize a breathalyzer instrument to monitor an inmate's abstinence from alcohol use. Superintendents at Level 2 and 3 facilities are encouraged to utilize a breathalyzer on all returning inmates from facility/community work crews, work release, educational release and program related activities. In all cases where such an instrument is utilized, the following procedures shall be followed:

1.  Only staff trained in the use of this instrument shall perform tests. Training shall be required at least annually.

2.  Tests shall be performed on inmates suspected of, or randomly monitored for, alcohol use.

3.  All procedures outlined by the vendor for the use of this instrument shall be strictly adhered to.

4.  All positive findings, absent an admission of use by the inmate or documentation by the reporting officer, e.g., slurred speech, odor of alcohol, etc., must be supported by a positive urinalysis confirmatory screen performed by an outside laboratory. All

applicable IMS screens shall be updated for initial and confirmatory screens.

5. The breathalyzer test shall be entered into the IMS Test Sample tab on the Test Results screen including the time, date of sample and collection officer's name. The drug (ethanol), result type, result, date of the test and collections' officer's name shall also be entered.

6. If the results are negative, the Substance Abuse Monitor shall ensure that the "Test Completed" checkbox is flagged on the Test Results screen. If the results are positive he/she shall ensure that the checkbox is flagged once the disciplinary process is completed.

7. Any confirmatory test shall be entered in the applicable IMS screens.

**525.05    Storage/Transfer/Disposal of Urinalysis Samples**

I. All urinalysis samples resulting in negative results may be disposed of immediately in accordance with section (IV) below.

II. All urinalysis samples resulting in positive findings shall be maintained through completion of the disciplinary process, to include the appeal process. All such urinalysis samples stored for this purpose shall be frozen after three days. However, in the event that the sample is transferred to an outside laboratory pursuant to 103 DOC 525.05 (III) below for a confirmatory test or for any other reason, the storage and maintenance requirements in 103 DCO 525.05 (II) paragraph will no longer apply.

III. Transfer of urinalysis samples to the outside laboratory shall occur with the use of an insulated container under the direct supervision of a correctional staff member, or in the case of transfer to an outside lab, an employee of the

laboratory. Special care should be taken to ensure the Chain of Evidence Form (Attachment III) is properly maintained and that neither inmates, nor unauthorized staff, have access to the samples at any time during storage or transfer.

IV.  At the close of the urinalysis screening process or disciplinary appeal process as is appropriate, samples shall be disposed of via a toilet receptacle. The specimen cup shall be rinsed with 2 ml. of bleach, and then may be disposed of in any trash receptacle.

525.06     **Refusal to Take a Substance Abuse Monitoring Test**

Inmates who refuse to provide a urine specimen, breathalyzer test, oral fluid, and/or take a hair sample shall be subject to disciplinary proceedings as indicated in 103 CMR 430.24 (12) "Refusal to take a breathalyzer test or to provide a urine specimen". No waiting period or extra time need be allowed for an inmate who directly and specifically refuses to provide a urine sample. Inmates who do not provide a specimen within two (2) hours of being ordered to do so shall be considered to be refusing to provide a specimen, with the exception of those inmates presenting medical and/or mental/psychological problems as outlined in 525.03.

Notwithstanding the above, the inmate shall be asked for the reason as to why they are refusing to provide a sample. The inmate's specific reason shall be documented in the Comments field on the Test Results screen. The reason shall also be documented in the disciplinary report issued to the inmate for refusing to provide a substance abuse sample.

525.07     **Disciplinary Proceedings/Sanctions**

The following disciplinary procedures shall be implemented when an inmate's initial screening yields a positive result which medical records cannot justify; (or) an inmate refuses to provide a specimen sample of any type; (or)an inmate has been found to have intent to manufacture, introduce, use, or be in

possession of any controlled substance, alcoholic beverage or associated paraphernalia:

I.   A disciplinary report shall be filed.

II.  Institutional staff shall inform the inmate of the result of the positive initial screen and ask the inmate if he/she wants to waive his/her right to a confirmatory screen and admit to the use of the illegal substance(s), or pursue the confirmatory screen. In the event the inmate chooses to admit to the use of illegal substance(s), staff shall have the inmate sign the Waiver of Confirmatory Screen form, which shall be generated via the Test Results screen. (Attachment VI). Two staff members shall witness the signing. This waiver shall accompany the inmate's disciplinary package regarding this matter.

III. If the inmate chooses to not plead guilty and the positive initial screening is to be introduced as evidence, a confirmatory screen must be conducted.

IV.  If the confirmatory screen confirms the positive initial screening, the inmate may be held responsible for restitution regarding the cost of the confirmatory test, as part of the sanctions issued following a guilty finding at the disciplinary hearing pursuant to 103 CMR 430.00.

     Note: If multiple substance confirmation tests were conducted on a single sample, the inmate may be held responsible for restitution regarding the cost of the confirmatory testing for each test that was confirmed positive.

V.   All guilty findings shall result in the inmate's placement on substance abuse monitoring ("suspect" list) for one year (first offense), two years (second offense) or three years (third offense), with two mandated tests conducted each month at the inmate's expense. The inmate shall be charged in the form of restitution for the full period of testing as part of the disciplinary process.

VI.   In the event a mandatory test is not conducted due to staff error, administrative, or security reasons (i.e., facility lockdown, etc.), the inmate will not be charged for the cost of the missed test. Inmates discharged/released from custody before the completion of any mandatory testing period shall be reimbursed for the cost of any tests not conducted.

VII.  The institutional substance abuse monitor shall notify the treasurer whenever a mandatory test has not, or will not be conducted on an inmate. The treasurer will ensure the inmate's account is credited for the cost of the test(s) not conducted.

VIII.   Any sanctions imposed as a result of the disciplinary process shall be in accordance with 103 CMR 430.00.

IX.   The Disciplinary Officer shall notify the Substance Abuse Monitor of any guilty findings and sanctions associated with a substance abuse-related disciplinary report. The Substance Abuse Monitor shall track said disciplinary report on the Test Results screen by entering the disciplinary report number and any related disciplinary sanctions. If an incident report was written regarding the substance abuse test, the number shall be entered in the "Incident Number" field.

X.    The Substance Abuse Monitor shall be responsible for notifying the Director of Treatment or the Director of Classification of the need to update the intervention referral section of a specific record by providing the inmate commitment number and specimen number. The Director of Classification or Director of Treatment shall note all interventions on the Test Results screens.

XI.   Notwithstanding 103 DOC 525.07(IV, V, VI), continued use of drugs and alcohol (3 positive samples in a two year period) may result in loss of earned good time credits (if available), and

as this information shall be communicated to the parole board, may also result in denial of parole.

XII. In all cases where an inmate is found guilty of a disciplinary report for a substance abuse violation, an interview shall be conducted by the institution IPS Team, or other appropriate staff designated by the Superintendent, in an effort to determine the source of the drugs and/or alcohol. All such interviews shall be documented. Findings of these interviews shall be reported to the Superintendent of the institution where the positive sample originated.

**525.08    Treatment Interventions** – Refer to 103 DOC 445

**525.09    Training**

I.   All correctional personnel shall be trained initially during basic training. Such training shall also be incorporated into their annual training program. At a minimum, all components outlined in 103 DOC 525 shall be covered.

II.  All correctional personnel designated to collect substance abuse samples shall be trained by the institutions' training officer and/or the substance abuse monitor (if Training for Trainers certified) in the process, on an annual basis, as outlined in 525.02 (I) (II) (III).

III. All correctional personnel designated to test inmates for drug/alcohol use must be certified in the use of all instruments including urinalysis, breathalyzers, oral fluid screens and hair testing prior to conducting tests.

IV.  All correctional personnel designated to enter data into the IMS shall be trained by appropriate staff on the use of this database.

**525.10    Record Keeping**

I.   The Substance Abuse Monitor shall enter all inmates deemed as suspects in accordance with

525.01 (A) (3), (B) (4), (C) (3) into the IMS substance abuse module on the status roster screen.

II.  The Substance Abuse Program Coordinator or the facility Substance Abuse Monitor shall ensure all inmates participating in the Correctional Recovery Academy (CRA) in accordance with 103 DOC 525.01 (A)(2), (B)(2), (C)(1) are entered in the IMS substance abuse module screen on the day said inmate is admitted into the CRA.

**Note:** The Substance Abuse Program Coordinator shall ensure the Substance Abuse Monitor is notified of all new CRA admissions on a daily basis in order for the IMS Status Roster Screen to be updated in accordance with 103 DOC 525.01 (A)(2), (B)(2), (C)(1).

III. The Substance Abuse Monitor shall input relevant data into the substance abuse section of IMS on the Status Rosters and Collection Schedule screens. All signed Inmate Sign Off Sheets shall be maintained on file by the institution's substance abuse monitor

IV.  The Substance Abuse Monitor shall input relevant data into the Test Results screen on the applicable tabs. On the Test Sample tab, the Substance Abuse Monitor will enter in the three drugs, drug reason, method, method reason and any comments. On the Test Results tab, the substance abuse monitor will enter the drug, results type, result, result date and tested by name.

**Note:** In the event an inmate is transferred from one facility to another, it is the responsibility of the receiving institution's Substance Abuse Monitor to keep the SDU roster up-to-date by clicking on the refresh button located on the IMS status roster screen. This will ensure future testing of an inmate who is tested as a result of substance abuse sanctions.

V.   The Substance Abuse Program Coordinator shall input relevant data into IMS on the Test Results screen. Data including the intervention referral

date, intervention referral type, and
intervention referral status, if any, shall be
entered. This information should be updated as
needed and/or in conjunction with classification
reviews.

VI.   Any necessary inmate tracking reports shall be
      compiled via the Inmate Tracking report
      (Attachment IV) generated via the Test Results
      screen.

VII.  The Substance Abuse Monitoring Coordinator shall
      have the ability to retrieve a Substance Abuse
      Monitoring Summary by utilizing the Monitoring
      Summary Report located on the Test Results screen
      for the institution or DOC wide. Data including
      the desired beginning and ending dates of the
      summary shall be entered.

VIII. The Substance Abuse Monitoring Coordinator shall
      have the ability to create, update and review all
      IMS substance abuse module screens and report.

IX.   The Office of the Assistant Deputy Commissioner,
      Northern Sector shall have the ability to run the
      Quarterly/Annual Report via the Test Results
      screen on the 7th of each quarter, or at any other
      time. Executive Staff, the Department's Substance
      Abuse Program Coordinator and Superintendents
      shall also have access to these reports, which
      may then be utilized in institutional
      intelligence and substance abuse monitoring
      plans. Additionally, the Substance Abuse
      Monitoring Summary (Attachment V) may be run for
      monitoring purposes.

X.    In the event an inmate transfers from one
      facility to another during mandated substance
      abuse sanctions, the Substance Abuse Monitor from
      the sending facility shall fax any information
      not contained in IMS to the Substance Abuse
      Monitor at the receiving facility. This could
      include, but is not limited to, waivers of
      confirmatory screens, outside laboratory
      confirmations, inmate interviews and incident
      reports, the disciplinary report and hearing
      package, documentation of substance abuse

treatment intervention referrals, signed Inmate
Sign-Off Sheets and other documentation deemed
necessary.

ATTACHMENT I

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

SUBSTANCE ABUSE MONITORING TEST TYPES

| TEST TYPE | CODE | RE-TEST<br>(Days elapsed following positive results) |
|---|---|---|
| Amphetamines | 1 | 4 days |
| Barbiturates | 2 | 4 days |
| Benzodiazepines | 3 | 10 days |
| Cannabinoids | 4 | 30 days |
| Cocaine | 5 | 4 days |
| Ethanol | 6 | 4 days |
| Opiates | 7 | 4 days |
| PCP | 8 | 4 days |
| Methamphetamine | 9 | 4 days |

ATTACHMENT II

```
*********************************************
                FACILITY NAME
SUBSTANCE ABUSE TESTING - INMATE SIGN OFF SHEET
                    DATE:
*********************************************
```

Inmate:

Block:           Room:           Bed:

Date:

Time:

Specimen #:

Substances Tested:   1  2  3  4  5  6  7  8  9


Inmate Signature_____

Collector, Printed Name:_____


Inmate Provided, Refused to Sign
            Witnessed by: _____

ATTACHMENT III

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**SUBSTANCE ABUSE CHAIN OF EVIDENCE FORM**

**SAMPLE NUMBER:**

**TEST(S):**

| DATE | RELEASED BY: | RECEIVED BY: | PURPOSE OF CHANGE/REMARKS: |
|------|--------------|--------------|----------------------------|
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |
|      | signature:<br>name: | signature:<br>name: |  |

**ATTACHMENT IV**

Urinalysis Tracking System
Inmate Substance Abuse Tracking Form

| Date of Collection | Specimen # | Reason for Test | Test Inst. | Test Type | Sanctions |
|---|---|---|---|---|---|
| | | | | | |

Commitment #    name Institution

Initial Results:
Intermediate Results:
Confirmation Results:

---

TEST TYPE CODE          REASON FOR TEST                RESULTS

1-Amphetamines          1 Suspect          SUS          Negative          N
2-Barbituates           2 SDU              SDU          Positive          P
3-Benzodiazephines      3 CRA              CRA          Negative Medical   NM
4-Cannabinoids          4 SA Treatment     SAT          Terminated/Tampered T
5-Cocaine               5 CADRE            CDR          Indeterminate      I
6-Ethanol               6 Random           RDM
7-Opiates               7 Interval         INT
8-PCP                   8 Testing for Cause TST
9-Methamphetamines      OUS/PRC Return     PRE
                        Pending Release    REL

**ATTACHMENT V**

Urinalysis Tracking System
Substance Abuse Monitoring Summary

Facility
Beginning Date through Ending Date

CRA Samples Collected:

CRA – 24 Hours Samples Collected:

Pending SDU Samples Collected:

Random Samples Collected:

Interval Samples Collected:

OUS/PRC Return Samples Collected:

Pending Release Samples Collected:

SDU Samples Collected:

Suspect Samples Collected

Testing for Cause Samples Collected:

Total Samples Collected: __
Total Tests Performed on above samples: __

Total Positive Initial Tests: __
Total Positive Intermediate Tests: __

Total Positive Confirmation Tests: __

Total Samples Resulting in Disciplinary Report: __

ATTACHMENT VI

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**

**<u>WAIVER OF CONFIRMATORY SCREEN</u>**


I, _____, admit to using an illegal substance as a result of the test taken on (date)_____. I agree to waive the opportunity to have a confirmatory screen performed on the positive sample (Specimen #_____).


_____
Inmate Name and Number    Date


_____
Witness                   Date


_____
Witness                   Date

ATTACHMENT VII

**MASSACHUSETTS DEPARTMENT OF CORRECTION**
**SUBSTANCE ABUSE MONITORING QUARTERLY/ANNUAL REPORT**

_____
**INSTITUTION**

_____
**PERIOD**

A.    <u>URINALYSIS SCREENS</u>

|  | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Samples Collected |  |  |  |  |  |  |  |
| # of Urinalysis Screens Tests Performed |  |  |  |  |  |  |  |
| # of Samples Sent to Outside Lab for Confirmation |  |  |  |  |  |  |  |
| # of Confirmation Tests Charged to Inmates |  |  |  |  |  |  |  |
| # of Positive Results from <u>all</u> Samples |  |  |  |  |  |  |  |
| # of Positives (Inmate Plead Guilty) |  |  |  |  |  |  |  |
| # of Positives (Confirmed by Outside Lab) |  |  |  |  |  |  |  |
| # of Positives Found to be Negative due to Medical Reasons |  |  |  |  |  |  |  |
| # of Inmates Refusing to Provide Samples |  |  |  |  |  |  |  |
| # of Samples/ Refusals Resulting in Disciplinary Action |  |  |  |  |  |  |  |
| # of Positives For Each Substance Identified: |  |  |  |  |  |  |  |
| Amphetamines |  |  |  |  |  |  |  |
| Barbiturates |  |  |  |  |  |  |  |
| Benzodiazepines |  |  |  |  |  |  |  |
| Cannabinoids |  |  |  |  |  |  |  |
| Cocaine |  |  |  |  |  |  |  |
| Ethanol |  |  |  |  |  |  |  |
| Opiates |  |  |  |  |  |  |  |
| PCP |  |  |  |  |  |  |  |
| Methamphetamine |  |  |  |  |  |  |  |

**B.**    **BREATHALYSER SCREENS**

| | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Samples Collected | | | | | | | |
| # of Positive Results from all samples | | | | | | | |
| # of Positive (Confirmed by Outside Lab) | | | | | | | |
| # of Inmates Refusing to Provide Samples | | | | | | | |
| # of Samples/Refusals Resulting in Disciplinary Action | | | | | | | |

**C.**    **DRY CELL**

| | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Samples Collected | | | | | | | |
| # of Dry Cell Tests Performed | | | | | | | |
| # of Confirmation Tests Charged to Inmates | | | | | | | |
| # of False Positives | | | | | | | |
| # of Positive Results from All Samples | | | | | | | |
| # of Positive (Confirmed by Outside Lab) | | | | | | | |
| # of Refusals/Tampers Associated With Test | | | | | | | |
| # of Samples/Refusals Resulting in Disciplinary Action | | | | | | | |

| Dry Cell (continued) | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Positives For Each Substance Identified: | | | | | | | |
| Amphetamines | | | | | | | |
| Barbiturates | | | | | | | |
| Benzodiazepines | | | | | | | |
| Cannabinoids | | | | | | | |
| Cocaine | | | | | | | |
| Ethanol | | | | | | | |
| Opiates | | | | | | | |
| PCP | | | | | | | |
| Methamphetamine | | | | | | | |

D.    **Oral Fluids Test**

| | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Samples Collected | | | | | | | |
| # of Oral Fluids Tests Performed | | | | | | | |
| # of Confirmation Tests Charged to Inmates | | | | | | | |
| # of False Positives | | | | | | | |
| # of Positive Results from All Samples | | | | | | | |
| # of Positive (Confirmed by Outside Lab) | | | | | | | |
| # of Refusals/Tampers Associated With Test | | | | | | | |
| # of Samples/Refusals Resulting in Disciplinary Action | | | | | | | |

| Oral Fluid (continued)# of Positives for each Substance(s) Identified: | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| Amphetamines | | | | | | | |
| Cannabinoids | | | | | | | |
| Cocaine | | | | | | | |
| Opiates | | | | | | | |

**E.    Hair Analysis**

| | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
|---|---|---|---|---|---|---|---|
| # of Samples Collected | | | | | | | |
| # of Hair Analysis Tests Performed | | | | | | | |
| # of Confirmation Tests Charged to Inmates | | | | | | | |
| # of False Positives | | | | | | | |
| # of Positive Results from All Samples | | | | | | | |
| # of Positive (Confirmed by Outside Lab) | | | | | | | |
| # of Refusals/Tampers Associated With Test | | | | | | | |
| # of Samples/Refusals Resulting in Disciplinary Action | | | | | | | |
| # of Positives for each Substance(s) Identified: | CRA | Cause | Interval | Pre Rel | Random | Suspect | Total |
| Amphetamines | | | | | | | |
| Cannabinoids | | | | | | | |
| Cocaine | | | | | | | |
| Opiates | | | | | | | |
| PCP | | | | | | | |