FILED
UNITED STATES DISTRICT COURT CE
for the
DISTRICT OF MASSACHUSETTS II: 30

JOSEPH E. BLAKE,
                Plaintiff,

U.S. DISTRICT COURT
DISTRICT OF MASSIL ACTION DOCKET
                No. 05 - cv - 10508 - RGS

v.

ROBERT MURPHY, et al.,

        Defendants.

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE DEFENDANT'S MOTION
### TO DISMISS THE COMPLAINT OR IN THE
### ALTERNATIVE FOR SUMMARY JUDGEMENT

I.          **INTRODUCTION**

The pro se plaintiff, Joseph E. Blake, who is not serving
any prison sentence, and who has no history of violence or
escape, has been "civilly" committed due to a "mental abnormality"
to the Nemansket Correctional Center for a day to life.   The
plaintiff has brought this action because he is being held in this
prison with some 500 prisoners still serving their prison
sentences, and because the conditions in this prison are more
restrictive and punitive than the conditions in the prison
where the plaintiff previously completed his prison sentence.
This is not due to some "vagary" in the implementation of the
"civil" commitment statute, M.G.L. c. 123A.   The punitive nature
of c. 123A is a direct and intended result  of the statute,
which mandates commitment to this correctional facility, and
this correctional facility only, under the control of the
Department of Correction.   Plaintiff is entitled to relief.

II.         **STANDARD FOR MOTION TO DISMISS UNDER 12(b)(6)**

The defendants Robert Murphy and Kathleen Dennehy have

moved to dismiss the plaintiff's complaint, in this action,
for failure to state a claim upon which the Court can grant
relief pursuant to Federal Rules of Civil Procedure 12(b)(6).
In deciding this motion, the Court must take all the allegations
in the complaint as true and make all reasonable inferences in
favor of the plaintiff. Rockwell v. Cape Cod Hospital, 26 F.3d
254, 255 (1st Cir. 1994). The Court must liberally construe
the plaintiff's pro se complaint and only dismiss it if the
plaintiff cannot prove any set of facts entitling him to relief.
Id. citing Conley v. Gibson, 355 U.S. 41 (1957); and Estelle
v. Gamble, 429 U.S. 97 (1976).

## III.    ARGUMENT - DISMISSAL UNDER RULE 12(b)(6)

Pursuant to Federal Rules of Civil Prodedure 12(b), the
Court must, if the defendant submits materials outside the
complaint such as affidavits or documentary exhibits — which
it has, either ignore them or convert the motion into a motion
for summary judgement. Miller v. Glanz, 948 F.2d 1562, 1565
(10th Cir. 1991); B.F. Goodrich v. Betkoski, 99 F.3d 505 (2d
Cir. 1996). The defendants' motion references both dismissal
and summary judgement, so plaintiff will address both here in
as a Rule 56(c) motion for summary judgement.

## IV.    STANDARD FOR SUMMARY JUDGEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,
summary judgement should only be granted where (1) there are
no material facts in dispute and (2) the moving party is entitled
to judgement as a matter of law. Plaisance v. Phelps, 845 F.2d
107, 108 (5th Cir. 1988). A party moving for summary judgement

bears the burden of affirmatively demonstrating the absence of a triable issue and that the moving party is entitled to judgement as a matter of law. Matushita Electric Industrial Co., Ltd v. Zenith Radio Corp., 475 U.S. 547, 587 (1986); MTV Networks v. Lane, 998 F.Supp. 390 (S.D.N.Y. 1998).  If the moving party alleges the absence of triable issues, the party opposing the motion must respond and allege specific facts which would establish the existance of genuine issues of material fact for trial. Fed. R. Civ. P. 56(e).  In deciding a motion for summary judgement, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.

**1.  Defendants are not entitled to judgement as a matter of law**

Fed. R. Civ. P., 56(f) allows for the Court to stay or deny the motion pending the completion of discovery.  Various courts have issued rulings supporting this. A court should not grant summary judgement against a party who has not had the opportunity to pursue discovery. Salahuddin v. Coughlin, 993 F.2d 306, 309-10 (2nd Cir. 1993); Robinson v. City of San Bernadino Police Department, 992 F.Supp 1198 (C.D.Cal 1998); Doe v. Gregoire, 960 F.Supp. 1577 (W.D. Wash 1992); White v. White Rose Food, Div. of DiGiorgio Corp., 128 F.3d 110 (2nd Cir. 1997).  Further, "where the facts are in the possession of the moving party, a continuance of a motion for summary judgement should be granted as a matter of course." Costlow v. United States, 552 F.2d 560, 564 (3rd Cir. 1977); accord, Baker v. McNeil Island Corrections Center, 859 F.2d 124, 127

(9th Cir. 1988); Jackson v. Procunier, 789 F.2d 307, 312 (5th Cir. 1986).

## 2. Defendant is not entitled to summary judgement because there is material fact in dispute

## V.    COUNT I - LEAST RESTRICTIVE ALTERNATIVE

As a person who has been involuntarily detained, then committed due to a mental abnormality, the plaintiff is entitled to be treated more considerately than criminals "whose conditions of confinement are designed to punish", and the plaintiff is entitled to the least restrictive conditions of confinement which will protect the staff, other inmates, and the public. Youngberg v. Romeo, 457 U.S. 307, 324 (1982); Shelton v. Tucker, 346 U.S. 479, 488 (1960); Seling v. Young, 531 U.S. 250, 265 (2001). To be "civil" commitment, the conditions of confinement should, "essentially [be] the same as conditions for other involuntarily committed persons in mental hospitals." Seling v. Young, at 261, citing Kansas v. Hendricks, 521 U.S. 346, 363 (1997).

Instead, plaintiff alleges, the conditions of confinement at the Nemansket Correctional Center$^{/1}$ are substantially more restrictive than the conditions under which the plaintiff was

---

$^{/1}$ Despite the valient efforts of the Department of Correction to hide this facility behind the dual facades of "treatment" and "rehabilitation", the Legislature has decreed, in M.G.L. c. 123A, §2, that "[s]aid facility shall be known as the 'Nemansket Correctional Center'." Only the Commissioner of Correction's total disregarde for the orders of the Legislature has allowed the Commissioner to "Decide not to formally change the name of the facility."

held while serving his prison sentence.  Complaint, ¶ 14.  For the purpose of this memorandum, this allegation is taken as true.  And, as such, by law, more restrictive than the conditions found in a secure mental health facility.  Lest the allegation be considered as "conclusory", plaintiff has alleged some 32 specific instances where the conditions of confinement at the Nemansket Correctional Center are the same as, or more restrictive than prisons housing state prison inmates (SPI) under the control of the Massachusetts Department of Correction.  Complaint, ¶¶ 15-49.  Some of these conditions pose serious dangers to the health and safety of the plaintiff, such as overcrowding the plaintiff by double bunking him in a cell, with a sexually dangerous person, which is only large enough to hold one prisoner. (Complaint, ¶ 15), despite the defendants insistance upon replacing cell furniture with beds and desks with a smaller "footprint".  See affidavit of William Stevens, attached to this memorandum as Exhibit 1.

The plaintiff provides a condition by condition comparison between the Nemansket Correctional Center, N.C.C.I. Gardner — where the plaintiff served the majority of his prison sentence, and M.C.I. Norfolk, another "Level IV" prison operated by the Massachusetts Department of Correction.  See Exhibit 2.  If the defendants applied the same conditions of confinement that the state has mandated, by statute, for other involuntarily committed mental patients, the issues raised in Count II, Telephones would be resolved because c. 123, § 23(a) provides that all other mental patients have the right to make and receive

confidential telephone calls...." Similarly, the issue of

classification raised in Count IV, is really an issue of providing

the least restrictive conditions. The level of restriction

necessary to protect the staff, other inmates, and the public

from a person with no history of violence, no crimes against

persons, other than the two crimes for which he is committed,

and no history of escape — like the plaintiff, should be much

less than the level of restriction necessary for a person with

a history of violence, both in and out of prison, a lengthy

criminal record for violent and/or lethal crimes, and a history

of escape — all of which are applicable to many of the other

residents with whom the plaintiff is being housed, under the

identical conditions of confinement. Classification requires

making a case by case assessment of what level of restriction

is necessary for each civilly committed person. Defendants

present a specious argument that "the Treatment Center provides

different levels of security." Def's Memo, p. 28.  The

plaintiff counters that:

> It is clear that the Treatment Center, which has
> existed at the intersection of the correctional and
> mental health systems, lacks one characteristic common
> to both systems; a multi-layered system of seperate
> institutions at graduated levels of security.  For
> example, in the mental health system, Bridgewater State
> Hospital provides maximum security, and facilities of
> the Department of Mental Health offer a graduated system
> from locked forensic units down to community halfway
> houses.  Within the correctional system graduated
> levels of security are provided by maximum security,
> medium security, minimum security and pre-release levels
> of confinement."  For persons committed under Mass. Gen
> Laws c. 123A, the Treatment Center is the sole
> institution and therefore it must encompass all levels
> of security...."

Plan for the Administration and Management of the Massachusetts

Treatment Center for Sexually Dangerous Persons, November 1999

p. 28. Defendants further avere that "[t]he Treatment Center also has the Community Access Program and the Community Transition House ("CTH") which is less restrictive than the main facility." They, however, fail to mention that the Community Access Program was discontinued subsequent to the enactment of M.G.L. c. 127, § 49 which prohibited the placement of sex offenders in any pre-release or work release programs. The highly acclaimed "CTH" has likewise been closed, with no known plans to reopen at any time in the foreseeable future. That leaves the Minimum Privilege Unit, "which is a temporary, seperate, and secure housing unit for those inmates and resident[sic] who require close custody and separation from the general population." Management Plan, November 1999, p. 22. The keyword, here, being "temporary", and therefore ineffective as a deterrent to mis-behavior.

The least restrictive alternative, however, is the central legal concept to resolving the issues raised by this case.

The Fourteenth Amendment provides in the Due Process Clause that no state shall "deprive any person of life, liberty, or property without due process of law." This protection was interpreted to mean that even if the government is pursuing a legitimate purpose, the government cannot use means that "broadly stifle personal liberties, when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488 (1960). Due process requires, at minimum, some rational relation between the nature and duration of commitment and its purpose. Jackson v. Indiana, 406 U.S. 715, 738 (1972). (Therefore a mentally

- 8 -

incompetent pretrial detainee could not be held indefinitely after being determined incompetent without either being committed or criminally tried.).  Similarly, for pretrial detainees not yet convicted of the crime charged, restrictions on liberty that were reasonably related to legitimate government objectives were upheld, so long as they were not tantamount to punishment. Bell v. Wolfish, 441 U.S. 520, 539 (1979).

For an involuntarily committed mentally retarded man the Court held that under the Due Process Clause the state could not "restrain residents except when and to the extent that professional judgement deems necessary to assure...reasonable safety for all residents and personel within the institution." Youngberg v. Romeo, 457 U.S. 307, 324 (1982).  The Court summarized, the "[r]espondent thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  Id.  "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than are criminals whose conditions of confinement are designed to punish." Id. at 321-322.

More recently, the Courts, in denying a request to hold that the conditions of confinement under Washington State's civil commitment statute were so punitive "as applied" that the statute violated the double jeopardy clause noted that:

> "State courts, in addition to federal courts, remain
> competent to adjudicate and remedy challenges to civil
> confinement schemes arising from the Federal Constitution.
> As noted above, the Washington Act is civil in nature,
> designed to incarcerate and treat.  In Re Young, 122 Wash.
> 2d at 18-25, 857 P.2d at 996-1000.  Accordingly, Due

> Process requires that the conditions and duration of
> confinement under the Act bear some reasonable relation
> to the purpose for which persons are committed.
> Focha v. Louisiana, 504 U.S. 71, 79 (1992); Youngberg
> v. Romeo, 457 U.S. 307, 324 (1982) and Jackson v.
> Indiana, 406 U.S. 715, 738 (1972).

Seling v. Young, 531 U.S. 250 265 (2001). The Court also noted
that the State of Washington was operating its civil commitment
facility under a Federal Court injunction and cited the most
recent opinion in that action. Turay v. Seling, 108 F.Supp.
2d 1148. The Resident Handbook for The Special Commitment Center,
Washington State's sex offender treatment facility is attached as
(Exhibit 3) for comparison purposes.

In Turay v. Seling, the district court specifically held
that the standards of Youngberg apply to civilly committed sex
offenders, particularly the right to treatment and the right to
be treated more considerately than criminals. Turay, at 1151.
With regard to treatment the Court made a finding of fact that
without less restrictive alternatives "the constitutional
requirement of treatment leading, if successful, to cure and
release, cannot be fully met." Id. at 1156. Other courts that
have considered the issue of least restrictive alternatives
being required for sex offenders have reached the same conclusion.
See Atwood v. Vilsack, 338 F.Supp. 2d 985, 1003 (S.D. Iowa 2004)
(citing Seling and Youngberg); Jones v. Blanas, 393 F.3d 918,
931 (9th Cir. 2004).

The First Circuit has not yet addressed what Substantive Due
Process under the Fourteenth Amendment requires for the
Nemansket Correctional Center, because it deemed the prior Consent
Decrees went beyond the Constitutional minima required for a
correctional facility for sex offenders. The Constitutional

minima relied upon, in the past, by the First Circuit has,
however, evolved as c. 123A has evolved. Prior to the legislatures'
ending of civil commitment in c. 150, § 104 of the Acts of 1990
persons sentenced to the treatment center were of dual status
both patient and prisoner. However, since the 1999 reenactment
of civil commitment, all persons committed to the Nemansket
Correctional center have completed their prison sentence. Langton
v. Johnston, 928 F.2d 1206, 1217 (1st Cir. 1991) and Cameron v.
Tomes, 990 F.2d 14, 19 (1st Cir. 1993). The Court in both
Langton and Cameron approved "the trial court judge's skirting
of the constitutional thicket" when the issue of adequate
treatment and conditions of confinement could be decided on other
grounds, such as the Consent Decrees. Cameron at 19. The Consent
Decree which was entered in 1974 provided in the relevant portion
that:

> "5.   The Department of Mental Health shall exercise
> responsibility and authority set forth in paragraph 2 [for
> treatment], so that the patients at the Treatment Center
> should have the least restrictive conditions necessary to
> achieve the purpose of commitment. To implement this the
> Department of Mental Health shall forthwith take steps to
> jointly and in cooperation with the Department of
> Correction including, as appropriate, seeking legilative
> funding to:
> C.   Have a system of differing security for different
> catagories of patients and modifying the plant, if necessary,
> to permit less restrictive conditions for those patients
> not requiring maximum security."

Langton v. Johnston, at 1227. The First Circuit considered the
provision that "patients at the Treatment Center should have the
least restrictive conditions of confinement necessary to achieve
the purpose of commitment" to be "the essence of the original
Consent Decree." King v. Greenblatt, 149 F.3d 9, 15 (1st Cir.
1998). In the 27 years of King litigation, the vast majority of

- 11 -

plaintiff's were still serving prison sentences at the same time they were civilly committed. Therefore, the litigation did not involve the kind of true or pure civil commitment which occurs after the persons criminal sentence has expired. Ergo, the conditions of confinement standard to which the Courts, in the past, have repeatedly retreated - and rightly so - was the level required by the prisoner status of those plaintiffs, allowing correctional standards to be applied to determine their rights. When the Consent Decrees were finally terminated on June 21, 1999, prior to the reenactment of civil commitment, Judge Mazzone stated that he relied, in part, on the Management Plan - dated December 10, 1999 which the DOC had filed a mere 3 months after the reenactment of civil commitment, to conclude that "the treatment provided is effective and provided under the least restrictive conditions given all the circumstances that exist at the Treatment Center." King v. Greenblatt, 53 F.Supp. 2d 117, 135 (D. Mass. 1999). The Management Plan specified:

> "Continuation of the existing system of differing levels of security and privileges in order that the residents can be maintained in the 'least restrictive conditions necessary to achieve the purpose of commitment.'"

December 10, 1999 version of the Management Plan (attached as Exhibit 4), p. 10, § E; the internal quotation cites King at 53 F.Supp.2d 119-120 and 136-137.

It is clearly established that "when the conditions of confinement are actually harsher then the conditions the same individuals were subjected to as criminal inmates, **it is clear that Due Process can not** be satisfied." Atwood, at 1003; (emphasis added). The Court explained that "the only legitimate justification

for the curtailment of liberty involved here pending a commitment

hearing is the danger posed by the possibly mentally ill to

themselves or others." Id. Citing Lynch v. Baxley, 744 F. 2d

1452, 1458 (11th Cir. 1984). Then, "if a restriction or condition

is not reasonably related to a legitimate goal - if it is

arbitrary or purposeless - a court may infer that the purpose of

the government action is punishment that may not be inflicted upon

detainees qua detainees." Atwood at 1104, quoting Bell v. Wolfish,

at 441 U.S. 537. See also Jones v. Blanas, at 393 F.3d 932:

> "Therefore when a [Sexually Violent Predator Act]
> detainee is confined in conditions identical to, similar to,
> or more restrictive than those in which his criminal
> counterparts are held, we presume that the detainee is being
> subjected to 'punishment'."

This is because:

> "The state cannot have it both ways. If the confinement
> of a sexually violent predator is civil for purposes of
> evaluation under the Ex Post Facto Clause, that confinement
> is civil for the purpose of determining the rights to which
> the detainee is entitled while confined. Civil status
> means civil status, with all the Fourteenth Amendment rights
> that accompany it."

Jones at 932. If plaintiff could be safely held at the N.C.C.I.

Gardner Prison, identified as a level IV facility by the Department

of Correction without the extra, harsher, restrictions of the

Nemansket Correctional Center, also a facility designated by the

Department of Correction as a level IV. December 1999 Management

Plan, p. 6. These extra restrictions are excessive in relation

to the purpose of holding the plaintiff safely, both while he was

detained pending a decision of sexual dangerousness, and now that

he has been civilly committed. Prison administrators cannot

merely brandish the words "security" and "safety" and expect that

their actions will automatically be deemed constitutionally

permissible conduct.   Indeed, "inadequately formulated prison
regulations and policies grounded on mere speculation,
exaggerated fears, or post hoc rationalizations will not
suffice ...." Campos v. Caughlin, 854 F.Supp. 194, 207 (2nd Cir.
1994).

Because plaintiff's right to least restrictive conditions of
confinement is clearly established, plaintiff is entitled to
declaratory and injunctive relief enforcing his right under the
Fourteenth Amendment to be held in the least restrictive conditions
necessary to accomplish the purpose of his civil commitment,
taking into consideration the non-violent nature of his crimes,
his limited criminal history, his lack of escape history, as well
as his right to be treated more considerately than when he was a
prisoner.   In addition, plaintiff is entitled to damages under 42
U.S.C., § 1983 for violation of these clearly established rights.

## VI.   **PLAINTIFF'S CLAIMS NOT BARRED BY RES JUDICATA**

As discussed above, neither the doctrines of Res Judicata nor
Collateral Estoppel apply to any of the plaintiff's claims in the
present case.   The essential elements of Res Judicata are: (1) A
final judgement on the merits of an earlier action; (2) An
identity of parties or privies in the two suits; and (3) An
identity of the cause of action in both the earlier and later
suits.   Aunyx Corp. v. Cannon U.S.A., Inc., 978 F.2d 3, 6 (1st
Cir. 1992); See Grella v. Salem Five Cent Savings Bank, 42 F.3d
26, 30 (1st Cir. 1994).   The doctrine is also "based on the idea
that the party to be precluded has had the incentive and
opportunity to litigate the matter fully in the first law suit."
Heacock v. Heacock, 402 Mass. 21, 24 (1988).   In this case, none

of these elements are satisfied.

There is neither the identity of the plaintiff in the present case with the plaintiff's in the King cases, nor is the law under which the plaintiff has been committed the same. None of the plaintiff's in the King litigation were committed under the new (1999) version of c. 123A, which enacted a new and different form of civil commitment some two months after the King litigation concluded with the termination of the Consent Decrees. King v. Greenblatt, 53 F.Supp. 2d 117 (June 21, 1999); St 1999, c. 74, enacting the new form of civil commitment effective September 10, 1999; Commonwealth v. Bruno, 432 Mass. 489, 491 (2000).

The plaintiff in King could not have raised the claims for more considerate treatment than prisoners, because most of them were prisoners, still serving their criminal sentences. Neither the plaintiff's in King nor the courts bothered to distinguish the few plaintiffs whose criminal sentences had expired. The King litigation 1972; Langton v. Johnston, 928 F.2d 1206, 1212 (1st Cir. 1993). The Americans with Disabilities Act, enacted in 1990, was not applicable to persons with mental disabilities until after its announcement on June 22, 1999 - one day after the final King decision. Olmstead v. L.C., 527 U.S. 581 (June 22, 1999). There is one case in the 27 year history of King litigation which did distinguish between a civilly committed plaintiff, whose criminal sentence had expired, and all of the other plaintiffs, who were still serving concurrent criminal sentences with their civil commitments. In this case the Court ruled that the civil plaintiff could not be forced to be double bunked. See Langton at 1212. If that case is Res Judicata, then the defendants should be ordered immediately to stop forcing the plaintiff to

double bunk.

In the King litigation, when confronted with the plaintiffs' dual status as both prisoners under criminal sentence as well as patients under current civil commitments, the Courts repeatedly retreated to the plaintiffs' prisoner status and applied correctional standards to determine their rights.  Langton, at 1212, 1213 1217; and King v. Greenblatt, 149 F.3d 9, 20 (1st Cir. 1998).  A synopsis of the history of the "Treatment Center" and the 27 years of litigation it engendered has been attached as Exhibit 5.  The First Circuit has also weighed in on this issue:

> "comparing a program for civilly committed persons only with the Nemansket Correctional Center's Program for concurrently sentenced and committed prisoners was 'essentially comparing oranges to... apples.'"

King at 149 F.3d 20 (1998).

> "What we have said in upholding modifications of the Decrees concerning the DOC's Plan should not be construed as rulings foreclosing issues arising out of Plan administration in the future.  What we have done is to survey the new regime, its general approach, and given a green light.  That does not mean that reckless driving will be immune from review."

King at 22.

> "I recognize that residents will continue to voice their complaints about circumstances of their existance at the Treatment Center.  This decision does not preclude them from challenging events on the basis of constitutional or other protected rights.... [P]laintiffs remain free to initiate a new round of preceedings designed to show that post-termination conditions actually do violate their federally protected rights."

Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 662 (1st Cir. 1997) citing King.

The new version of civil commitment which Massachusetts enacted in 1999 was modeled, in many respects, on the Kansas statute approved in Kansas v. Hendricks, 521 U.S. 346 (1997)

with the exception of protections for those committed under the statute.  See Commonwealth v. Bruno, 432 Mass. 489 (2000). Unlike the old version where civil commitment was either concurrent with or in lieu of a criminal sentence, the new version of civil commitment is a seperate proceeding initiated at the conclusion of all criminal sentences.  In Re: Dutil, 437 Mass. 9, 19 - 20 (2002); and Bruno at 495.  In upholding the Kansas statute the Supreme Court found it not punitive in violation of double jeopardy, because "the conditions surrounding that confinement do not suggest a punitive purpose on the State's part." The State has represented that an individual confined under the Act is not subject to the more restrictive conditions placed on the State's prisoners, but instead experience essentially the same conditions as any involuntarilly committed patient in the state mental institution.  Because none of the parties argues that people institutionalized under the Kansas civil commitment statute are subjected to punitive conditions, even though they may be involutarilly confined, it is difficult to conclude that persons confined under this act are being punished."  Hendricks, at 363.

In addition to the changes to the civil commitment statute and the recent federal cases interpreting how this form of civil commitment must be implemented to be constitutional, the facts regarding the implementation of civil commitment, at the Nemansket Correctional Center, have drasticly changed as compared to the facts stated in various King decisions.  The single biggest change is the overcrowding of the facility.  As designed the facility was to house 216 prisoners in single cells, currently

the facility houses some 300 prisoners within its walls and 300
additional state prison inmates in an adjoining modular unit
who share common areas of the facility such as the chow hall,
library, health services unit, gym, yard and educational area.
By tripling the number of individuals utilizing the common areas
of the facility, the defendats have effectively reduced the amount
of individual access to one third of what it was previously.
Compare the description of the facility in Langton, at 1212-1217,
to plaintiff's allegations, Complaint, ¶¶ 14-49. Vocational and
avocational programs have shriveled to almost nothing, as compared
to when "a large majority of participating patients were usefully
involved in the construction of green houses at Bridgewater State
Hospital." Langton at 1214. Now there is no workrelease program
of any kind, and not a single flower or shrub is planted on the
grounds of the Nemansket Correctional Center. Compalint ¶ 24.
The yard described in Langton, at 1214, was bulldozed to construct
the modular unit which houses the additional 300 state prison
inmates, and the new yard is approximately one third the size.
In 1989 there was a "tier system under which patients were
theoretically treated in the least restrictive environment."
Langton, at 1217. The least restrictive tier was the community
transition house. Id. Now there is no tier system and all
inmates are subjected to the same level of restrictions,
Complaint ¶¶ 66-70. Moreover, plaintiff's reference to his
Native American Religious Practice, complaint ¶ 48,
does not allege a denial of his right to practice his religion,
as he has alleged in another pending court action, Blake v.
Howland, et al., Worcester Superior Court, Docket No. 05-0497,
but merely expresses just one more instance of which he is not

being held in the least restrictive environment.

There is no identity between the plaintiff and plaintiffs in the King cases. The facts and civil commitment statutes have both changed significantly since the King cases were decided, and a series of federal decisions, including Hendricks, Seling, and Olmstead have been decided directly affecting how the new version of civil commitment must be implemented. All these factors mean that the King cases have no Collateral Estoppel effect on the present case.

## VII. COUNT II VIOLATION OF THE MINIMUM STANDARDS OF FITNESS FOR HUMAN HABITATION

The defendants have overcrowded the plaintiff by forcing him to double bunk in a cell with only 80 square feet of floor space in violation of the State Sanitary Code. Complaint ¶¶ 50-53. This violation has also been cited by the Department of Public Health on numerous occassions. A DPH inspection report has been attached as (Exhibit 6). There is no access to toilets from the yard, a condition which Judge Mazzone noted in 1999, and which has yet to be addressed 7 years later. King, at 53 F.Supp. 2d at 134 and Complaint ¶¶ 54-56.

M.G.L. c. 111, § 127A provides that the Department of Public Health Sanitary Code, which shall have the "force of law" and include the Minimum Standards of Fitness for Human Habitation. For purposes of this action the State Sanitary Code is divided into two parts: 105 CMR 451.000 which applies exclusively to "correctional institutions", and 105 CMR 410.000 which applies to all other places of human habitation. See 105 CMR 410.010 (B) (2) and 105 CMR 451.010; M.G.L. c. 111, § § 3, 5, 21 and 127A. Which part of the Code applies to the Nemansket Correctional Center is,

in one sense, the heart of the matter at hand.

The defendants have contended that for the purposes of the State Sanitary Code the Nemansket Correctional Center is (a) immune from the code, or (b) a "correctional facility". The disingenuousness of option "a" hardly makes it worth a rebutal so plaintiff will address option "b". The defendants have refered to M.G.L. c. 125, § 1(d) which defines a correctional facility as "any building, enclosure, space, or structure used for the custody, control, and rehabilitation of committed offenders and such other persons as may be placed in custody therein in accordance with law." and c. 125, § 1(n) which defines a "state correctional facility" as "any correctional facility owned, or operated, administered or subject to the control of the department of correction, including but not limited to....", as well as c. 125, § § (c) and (i) variously defining inmates as committed offenders. Counsel then, miraculously, ties this package together and concludes that the plaintiff is an "inmate" in a "correctional facility" for purposes of DPH regulations.

On the other hand, the Massachusetts Supreme Judicial Court, in light of the Kansas v. Hendricks decision, which it cited repeatedly, ruled that a person committed under c. 123A is "committed to a Treatment Center" and does "not remain incarcerated." Commonwealth v. Bruno, 432 Mass. 489, 504 (2000) (ruling that 123A is not punitive, and therefore does not violate the Double Jeopardy or Ex Post Facto Clause of the Constitution). Four years later the courts reaffirmed that "those confined [under 123A] are held at the Treatment Center (a secure mental health facility), not a correctional facility." Commonwealth v. Knapp, 441 Mass. 157, 166-167 (2004).

If the Supreme Judicial Court is correct and the
Nemansket Correctional Center is not a correctional facility but
instead a secure mental health facility, then 105 CMR 410.000
applies.   There is no question that the conditions alleged by
the plaintiff violate the Minimum Standards of Fitness for
Human Habitation.   To put two prisoners in one cell, 105 CMR
410.400 (B) requires 120 square feet of floor space, not the 80
square feet that exists in the Nemansket Correctional Center.

Authority to enforce the State Sanitary Code comes from
M.G.L. c. 111, § 127I, as amended in 1992, which provides that:

> "Upon the filing of a petition to enforce the
> provisions of the state sanitary code, or any civil action
> concerning violations of the sanitary code by any affected
> occupants or public agency, whether begun in the district,
> housing or superior court and whether brought under section
> 127C or otherwise, the court may issue a temporary
> restraining order, preliminary and perminant injunctions...."

This is consistant with the State Sanitary Code itself which
states at 105 CMR 410.010 (C) that, "Nothing contained herein
shall be construed to limit or otherwise restrict any person from
seeking judicial relief in a court of competent jurisdiction
notwithstanding any hearing, proceeding or other administrative
remedy set forth in 105 CMR 410.000."  It is also consistant with
the holdings of Boston Housing Authority v. Hemingway, 363 Mass.
184 (1973) and Commonwealth v. Haddad, 364 Mass. 795 (1974); both
of which came down strongly in support of broad enforcement of
the State Sanitary Code as a matter of public policy.

Even if this Court finds that the Nemansket Correctional
Center is a correctional facility, as the defendants have argued,
the 1992 amendment which rewrote § 127I, broadened the language
describing who can bring an action to enforce the State Sanitary

Code to include "any affected person", which the plaintiff is. This amendment effectively overrules the holding in Attorney General v. Sheriff of Worcester County, 382 Mass. 57, a 1980 case.

Eleventh Amendment Immunity of a state to suits brought against it by one of its citizens does not apply, because the state waived its Eleventh Amendment Immunity.  Section 127I, when read in conjunction with the State Sanitary Code, indicates a very broad intent to encourage enforcement of the Code in any "court of competent jurisdiction" against anyone in control of property occupied for human habitation, including governmental units and the agents of governmental units.  105 CMR 410.010 (C) and 410.020, the definitions of "owner" and "persons".

If the plaintiff's claims for correcting substandard conditions cannot be resolved through the Court's supplemental jurisdiction to enforce the plaintiff's state law claims, then it is necessary to enter the "constitutional thicket", (Langton, 928 F.2d at 1217), but the same minimum standards should be applicable. Returning to the basic holding in Youngberg, "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish".  The Minimum Standards for Correctional Facilities, 105  CMR 451.000, provides an excellent base line for what the conditions of confinement for criminals should be.  These are minimum standards issued by the Commonwealth, itself, by its own Department of Public Health. Using these as a base line, it is clear that the physical conditions at the Nemasket Correctional Center do not even

comply with what the conditions of confinement for criminals should be. With only 80 square feet of floor space in each cell - a number only reached by hiding storage lockers under bunks and shrinking the footprint of the bed and desk in each cell - there should be no more than one person per cell. 105 CMR 451.320 and 105 CMR 451.321. All prisoners must also have access to a toilet at all times. 105 CMR 451.112.

The question, then, becomes: if civilly committed persons are entitled to more considerate treatment, then how much more considerate? For non-convicted pre-trial detainees the Fourteenth Amendment requires that the government do more than provide the "minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); and Jones v. Blanas, 393 F.3d 918, 931-932 (9th Cir. 2004). The State Sanitary Code is an explicit itemization of the "minimal civilized measure of life's necessities" with regard to dwelling places. The standards set by the State Sanitary Code for prisons and all other dwellings are materially the same for the specific conditions raised by this action. More than 80 square feet of floor space are required in order to have two people sharing a room, under both parts of the Code, as is access to toilet facilities. The housing part of the Code is mandatory while the prison part of the Code is mainly hortatory. Although plaintiff has clearly established a constitutional right to be treated more considerately than prisoners and to more than the minimal civilized measure of life's necessities, the plaintiff, in this particular instance, is only requesting that he be treated as considerately as prisoners should be treated, according to the State's own Sanitary Code, or that he be provided with dwelling

space which meets the "Minimum Standards for Human Habitation".

Finally, as a matter of equal protection of the laws, there is no rational basis for distinguishing between the plaintiff and other mental patients involuntarily committed under c. 123 to whom the 105 CMR 410.000 applies.

Because the plaintiff's right to be treated in a manner more considerate than that of a prisoner and to more than the minimal measure of life's necessities is clearly established, the plaintiff is entitled to declaratory and injunctive relief enjoining the defendants from failing to correct the overcrowding, and the lack of access to a toilet from the yard, immediately, together with damages under 42 U.S.C., § 1983 for violation of these clearly established rights.

## VIII.    **COUNT III TELEPHONES**

The plaintiff has alleged that he is subject to exactly the same telephone restrictions, at the Nemansket Correctional Center, as he was subject to while in prison. Complaint ¶ 57. All of his calls must be placed collect, and include recorded announcements, before and interrupting during, saying, "This phone call is from a correctional facility and is subject to monitoring and recording." Id. The plaintiff is limited to calling 5 attorneys and 10 other persons on a pre-authorized list. Id. All of the phone calls made by the plaintiff are at collect call rates which substantially exceed direct dial rates and pre-paid calling card rates.  (See Exhibit 7).  Complaint ¶¶ 59-60.  The DOC has contracted with one carrier to provide all telephone services to prisoners.  The telephone service provider at the outset of this action was Verizon, who had been providing inmate calling services to the DOC since

- 24 -

1994.  Recently, however, the DOC awarded a contract to Global
Tel Link for the provision of inmate calling services which
continue at the previously usurious rates.  Exhibit 7.  In
return for this contract the carrier pays a commission on the
telephone calls directly into the General Fund of the Commonwealth.
Complaint ¶ 61, and 103 CMR 482.07(6).  There is no authorization
in the General Laws of Massachusetts for this commission or tax
to be assessed on prisoners.  Complaint ¶ 62.

For the purpose of this memorandum these allegations are
taken as true.  This being so, the defendants are violating the
plaintiff's clearly established First Amendment right to
communicate with family and friends, as well as with the courts,
government agencies and attorneys. See Morgan v. Vallee, 526 F.2d
211, 225 (2nd Cir. 1975).  A statute or regulations that effectively
suppresses a large amount of speech that adults have a constitutional
right to receive and address to one another is unacceptable, if
less restrictive alternatives would be at least as effective in
achieving the legitimate purpose that the statute was enacted to
serve.  Reno v. American Civil Liberties Union, 521 U.S. 844, 874
(1997).

In the context of civilly committed inmates, the Court in
Turay v. Seling, ordered that the Special Commitment Center for
Washington State: eliminate the monitoring of residents telephone
calls, eliminate the bar on outgoing calls (other than collect),
and allow prompt telephone access to residents in case of family
emergency.  Id. at 108 F.Supp. 2d 1148, 1156-1157.  The Ninth
Circuit upheld this order reasoning that residents have a First
Amendment right to telephone access, subject to reasonable
security limitations, Young v. Seling, 72 Fed.Appx. 657, 659

(9th Cir. 2003) quoting Keenan v. Hall, 83 F. 3d 1083, 1092 (9th Cir. 1996); denying qualified immunity on this point. And, therefore, since civil detainees under clearly established law are entitled to "more considerate treatment" than prisoners, they should be subjected to fewer restrictions on their constitutional right to telephone access. Id. 72 Fed. Appx. 659-660, citing Youngberg at 457 U.S. 321-322.

The defendants, in their memorandum of law in support of their motion to dismiss (pp. 26-28) cite prison regulations, 103 CMR §§ 482.00 et seq., and court decisions involving the use of phones by prisoners. While these cases may all be good law, they are not applicable to the plaintiff, who is not a prisoner but an involuntarily civilly committed person who is entitled to more considerate treatment than prisoners.

The plaintiff has, at the very least stated a claim for the same type of relief that the court in Turay granted and should be granted injunctive relief enjoining the defendants from, immediately, discontinuing the practice of monitoring and recording the plaintiff's phone calls, remove limitations on outgoing calls, and unless the defendants can demonstrate a legitimate purpose and statutory authorization for collecting a commission on the plaintiff's calls – cease immediately and refund all commissions paid on plaintiff's calls to date.

## IX.  COUNT IV CLASSIFICATION

The Nemansket Correctional Center has no system of classification, Complaint ¶¶ 67-70, despite the defendants specious argument to the contrary. As discussed above, the Community Access Program (CAP) and the Community Transition House

(CTH) are no longer in operation at the Nemansket Correctional
Center.  The CAP was phased out subsequent to the enactment of
M.G.L. c. 127, § 49 and had ceased to exist by 1999. (See Exhibit
4 at p. 10).  And, the CTH was closed in mid 2003 after the walk
away of a resident, no known plans to reopen.  The plaintiff,
who is civilly committed because of a mental abnormality, has no
history of violence or escape, and the Department of Corrections'
level classification system - for prisoners - would have placed
plaintiff in a minimum security prison, work release or pre-
release program were the plaintiff not a sex offender.  ¶ 66.
The palintiff is currently subjected to the very same high level
of security as applies to the worst of inmates who have long
histories of escape, sexual sadism, murder, and forceable rape,
both inside and outside of prison as well as within the Nemansket
Correctional Center.  Complaint ¶ 67.  For the purpose of this
memorandum these allegations are taken as true.

## A. CLASSIFICATION NECESSARY TO ACHIEVE THE LEAST
## RESTRICTIVE CONDITIONS OF CONFINEMENT

As a practical matter the plaintiff cannot be provided with
the least restrictive conditions of confinement unless and until
the defendants implement an effective classification system, which
requires the making of a case by case assessment of what level of
restriction is necessary for each civilly committed person.  A
classification system is a "system of differing security for
different catagories of patients modifying the plant, if necessary,
to permit less restrictive conditions for those patients not
requiring maximum security."  Consent Decree, ¶ 5 (c), quoted in

- 30 -

which the defendants accuse the plaintiff of failing to fillout and submit, this form requests no information that is not already in possession of the DOC and amounts to nothing more than a delaying tactic. Also the forms are routinely unavailable.

Under the provisions of the ADA and the holding of the Court in Olmstead, the plaintiff is entitled to an order requiring the defendants to provide him with community based treatment and to provide all other services, programs and activities in the most integrated setting appropriate to the needs of the plaintiff.

## X.  GRIEVENCES

Again counsel has shown his appreciation for the current political climate and demonstrated his ability to flip flop on the status of the plaintiff.  While the arguments of the defendants may be sound and the cases all good law, they are not applicable to the plaintiff, who is not a prisoner but an involuntarily civilly committed person who is entitled to more considerate treatment than prisoners.  Despite arguments to the contrary the defendants are not providing the plaintiff with a grievance process that comports with the language of M.G.L. c. 127, § 38(e) and have further failed to follow the language or intent of 103 CMR 491, the DOC's inmate grievance policy.  As an involuntarily civilly detained person the grievance procedure provided to the plaintiff does give rise to a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.  Therefore this Court should exercise supplemental jurisdiction over this claim.

## XI.  c. 123A IS UNCONSTITUTIONAL AS APPLIED TO THE PLAINTIFF AND ALL OTHER CIVILLY COMMITTED PERSONS

The plaintiff has alleged that he and all other civilly

- 32 -

civil, and that the allegations of the plaintiff would not be sufficient to refute the prior decision of the Washington State Court that the Act is civil.  Id. at 264-265.  The Court was careful to deliniate that:

1.  It was not deciding that the statute cannot be challenged on the basis that it is punitive as applied to everyone confined under its provisions; Id. at 264-265 and 267, n.2;

2.  It was not making a first instance determination of whether the statute is punitive; Id.;

3.  It did not "express any view as to how (the plaintiff's) allegations would bear on a court determining in the first instance whether Washington's confinement scheme is civil."; Id. at 262; and

4.  It did not consider the extent to which a court may look at actual conditions of confinement and implementation to determine in the first instance whether a confinement scheme is civil in nature."  Id. at 266 and 267, Scalia, J., concurring, and 270, Thomas, J., concurring in judgement.

The present case, as alleged by the plaintiff, is distinguishable from the Seling case.  The plaintiff is alleging that c. 123A is punitive as it applies to all persons confined pursuant to it.  The plaintiff is asking the Court to make a "first instance" determination of whether c. 123A is punitive.  The plaintiff is asking the Court to determine whether the conditions of confinement, as they exist now, and as they have existed for over the 50 year history of c. 123A, are sufficient to refute the determination of the Supreme Judicial Court that c. 123A is civil.

Factually, the Nemansket Correctional Center is very different from Washington State's Special Commitment Center.  The Nemansket

- 33 -

Correctional Center has a 45 year history of being a correctional facility, primarily for prisoners still serving their prison sentences, with the added component of treatment. For the past twelve (12) years the Nemansket Correctional Center has been under the exclusive control of the Department of Correction. When "civil" commitment was reenacted in 1999, the legislature adopted the criteria for commitment, which the Supreme Court approved in Hendricks, but unlike Kansas and Washington State, the legislature chose to put the new "civil" commits into an existing correctional facility that housed some 300 state prisoners still serving their prison sentences, plus, as of 1999, some 190, so called, "old civils", many of whom to this day are still serving prison sentences concurrently with their commitment. When the legislature did this, it is presumed to be aware that there were numerous federal court decisions upholding the DOC's imposition of correctional regulations on what these courts considered a correctional facility. See for instance, King, 149 F.3d 9, 20-22 (1989).

By contrast both Kansas and Washington State put their commitment centers under the control of their department of mental health with the departments of correction only providing security services, and they treated their civil commits in "essentially the same conditions as for other involuntarily committed persons in mental hospitals." Seling at 262.

Also unlike Kansas and Washington State, in Massachusetts, the Supreme Judicial Court has authoritatively interpreted c. 123A as permitting the punitive conditions that are alleged in this complaint. In Re: Dutil, 437 Mass. 9, 19-20 (2002); See also

- 34 -

Commonwealth v. Bradway, 816 N.E. 2d 152; and Seling, at 269-270,
Scalia, J., concurring and explaining that in his opinion if "the
state  courts authoritatively interprete the state statute as
permitting the impositions that are indeed punitive, then and
only then, can federal courts pronounce the statute that on its
face is civil to be criminal." citing Railroad Commission of Texas
v. Pullman Co., 312 U.S. 496, 500-501 (1941).

Chapter 123A, its interpretation by the Supreme Judicial
Court, and the actual conditions of confinement are all distinctly
different from the statutes, interpretations and conditions on
which the Hendricks and Seling decisions were based.  The legal
issues raised by the plaintiff in this case are also different.
Many of the legal issues, are issues which the Court in Seling
specifically declined to decide, because of the particular posture
of that case when it reached the Court.  The fact that the
plaintiff raises legal issues which are still unsettled, "does not
constitute an 'insuperable bar to relief', and therefore does not
justify dismissal for failure to state a claim upon which relief
may be granted."  Ybara v. City of San Jose, 503 F.2d 1041 (9th
Cir. 1974).

## XII.   COUNT VII - CONFIDENTIALITY IN TREATMENT AND THE FIFTH AMENDMENT

The Fifth Amendment provides that no person "shall be
compelled in any criminal case to be a witness against himself."
This language has been held to mean that the "Amendment not only
protects the individual against being involuntarily called as a
witness against himself in a criminal prosecution but also
privileges him not to answer official questions put to him in any

McKune, at 48. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of Five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgements on the narrowest grounds." Marks v. U.S., 430 U.S. 188, 193 (1977); Ainsworth v. Stanley, 317 F.3d 1, 4 (1st Cir. 2002). The difficulty with the McKune decision is that Justice O'Connor did not lay out any guidposts for determining when there has been compulsion of a prisoner to waive his Fifth Amendment right. Aisnworth, at 4. With no controling standard to be derived from the McKune decision, the First Circuit returned to Turner v. Safely, 428 U.S. 78 (1987) to determine if the waiver of confidentiality associated with the New Hampshire prisons' sex offender treatment impinged on the prisoners' Fifth Amendment right. Id. See also the earlier decision Ainsworth v. Risley, 244 F.3d 209 (1st Cir. 2001). As the First Circuit noted for non-prisoners, compulsion means the imposition of any sanction which makes assertion of the Fifith Amendment privilege costly. Ainsworth v. Risley, at 213, quoting Spevack v. Klien, 385 U.S. 511, 515 (1967).

In the present case, the sanction for not waiving the plaintiff's Fifth Amendment Privilege, is automatic exclusion from treatment. The plaintiff has a constitutional right to this treatment, as a matter of substantive due process under the Fourteenth Amendment. Youngberg v. Romeo, 457 U.S. at 322; Turay v. Seling, 108 F.Supp. 2d at 1156. For the civilly committed person, the only practical hope of release is to show progress in treatment. And assuming that treatment is actually effective, treatment then provides a way of escaping a syndrome which is every

bit as insidious as drug addiction or alcoholism. The sanction in this case is not just the loss of privileges or minimal incentives, as the plurality found in McKune, at 29, but the continued loss of the plaintiff's freedom. The right to treatment is not a matter of legislative grace, like granting future parole or good time credits, it is a constitutional right.

Even if one applies the test set out in Turner v. Safely, keeping in mind that civilly committed persons are entitled to more considerate treatment than prisoners, the impingment on the plaintiff's Fifth Amendment privilege is not justified. The first Turner factor is whether there is a "valid, rational connection" between requiring the Fifth Amendment waiver contained in the consent form and the admittedly valid rehabilitation goal of the treatment program. Turner, at 89-91; and Ainsworth, at 5. Because the issue here is the treatment of civilly committed persons, the DOC does not have the same degree of discretion that it would have in administering a prison program. The question is not whether the rational connection exists in the minds of the DOC administrators, but rather whether the waiver of confidentiality is reasonable in the "judgement exercised by a qualified professional." Youngberg, at 322. The plaintiff has alleged that to the contrary the defndants have substantially departed from accepted professional judgement practice or standards. (Amended Complaint, ¶ ¶ 93-102). For purposes of this memorandum these allegations must be taken as true. Plaintiff's confidentiality allegations are also consistant with the Ethical Standards for Psychologists, set out in 251 CMR 1.11, G.L. c. 112, § 129A, and c. 233, § 20B. As the American Psychiatric Association noted in its 2001 edition of the

Principles of Medical Ethics, p. 7 "Confidentiality is essential to psychiatric treatment." If waiving confidentiality is counter theraputic, then there is no valid rational connection between the waiver and the goal of rehabilitation.

The defendants advance one other goal as justification for the waiver, and that is assessment of the mental state of the civilly committed person. The defndants suggest that "it is nonsensical to conduct an inquiry into the effectiveness of treatment without allowing access to the treatment history of the person being evaluated." (Defendant's Memo., p. 40.) For decades courts have evaluated the progress of alcoholics and drug addicts by whether they are participating in programs such as Alcoholics Anonymous, not by the content of any particular disclosures that are made in any of these treatment groups. For purposes of predicting the likelihood of re-offending, the only factor that bears any correlation to re-offending is dropping out or being thrown out of treatment. Hanson, K.R. & Bussiere, M.T. (1998) Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism, Journal of Counsulting Psychology, 66, 348-362. Without confidentiality, the likelihood that anyone in therapy will honestly and candidly reveal anything of substance about their pathological behavior is very substantially deminished, and the effectiveness of therapy is compromised. Conducting therapy under the threat of constant disclosure is a lot like using torture as a component of interrogation; it is very effective at getting the subject to tell you what you want to hear, but otherwise worthless. The quality of decisions made, based on this kind of information, are equally compromised.

The second Turner factor is whether there is an alternative means by which the plaintiff could assert his Fifth Amendment privilege and still participate in the treatment program as the DOC has structured it. The answer is no.

The third Turner factor is what the impact of accomodating the plaintiff's Fifth Amendment privilege will have on guards, other inmates, and institutional resources. This particular constitutional right should have no impact.

The fourth Turner factor is whether there exists an easy obvious alternative that will fully accomodate the prisoner's right at a De Minimis cost to the state's interest in effective sex offender treatment and evaluation of sex offenders for release. If the question is confined to effective treatment, the obvious easy alternative is for the state to provide "use immunity" and "derivative use immunity" for anything said in therapy. Ainsworth, at 220-221. In Ainsworth; although the director of the treatment program testified in favor of use immunity, the Court concluded that the decision to grant use immunity was a policy choice that lies in the state's hands in a prison context. Given the more considerate treatment that civilly committed persons are entitled to and the presumption that decisions made by professionals, here treating clinicians, are valid, the balance in this case should be tipped in favor of granting use immunity.

If the question is whether there is an obvious easy alternative that will accomodate the plaintiff's Fifth Amendment right to therapy at a De Minimis cost to the State's interest in evaluating the plaintiff for release, the answer is that it is not ethically or practically possible to do evaluation and therapy at

the same time.  The kind of information gleaned from the clinical
setting of therapy is useless for the purposes of predicting
recidivism.  See Hanson, Supra.  Ethically it is not possible to
to do both therapy and evaluation at the same time.  The Ethics
Committee of the American Psychiatric Association has called this
a "classic example of 'Double Agentry'", which is ethically
prohibited.  Opinions of the Ethics Committee on the Principles
of Medical Ethics with Annotations Especially Applicable to
Psychiatry, 2001 Edition, p. 41, § 4-H.

Weighing all of these factors, the plaintiff should not have
to choose - as a civilly committed person - between his right not
to incriminate himself and his right to treatment.  The defendants
can accomodate both of these rights, by not requiring the plaintiff
to waive his statutory and common law rights to confidentiality
under state law, or Fifth Amendment right under the U.S.
Constitution, and by granting the plaintiff use immunity and
derivative use immunity for anything said in therapy.  The plaintiff
is entitled to injunctive relief under 42 U.S.C. § 1983 to enforce
both his right to treatment and his privilege against self
incrimination.

## 1.  FAILURE TO PROVIDE EFFECTIVE TREATMENT

As discussed above the plaintiff is entitled to treatment for
his alleged "mental abnormality".  The defendants are correct that
the plaintiff also has a statutory right to treatment under G.L. c.
123A, § 2, and ordinarily the failure to fulfill a state law does
not create a § 1983 claim for violation of civil rights.  But when
a state deprives a person of liberty by civilly committing him
for "care, custody, treatment and rehabilitation," due process

requires "that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Youngberg, at 325, Blackmun, J. with O'Connor and Brennan, JJ. joining and concurring, quoting Jackson v. Indiana, at 406 U.S. 738; the same language was reiterated in Seling v. Young, at 531 U.S. 265. Justice Blackmun points out that the state could have committed the plaintiff solely for care and custody, but having done so for the purpose of treatment and rehabilitation, due process binds the state to ensure that the conditions of confinement bear some reasonable relation to those purposes, including treatment. Id.

Alternatively, if as the defendants point out, this Court "should refrain from addressing the constitutional issues raised by the plaintiff," if the Court can resolve the issues on other grounds; (Defendants Memo, pp. 41-42, citing Langton at 1217.) then the Court should use its supplemental jurisdiction under 28 U.S.C. § 1367 to resolve the plaintiff's state law claims.

Under Youngberg, the defendants are obligated to provide treatment which does not substantially depart "from accepted professional judgement, practice, or standards." Id. at 323. The plaintiff has alleged that the defendants have substantially departed from accepted professional judgement, practice or standards by requiring that the plaintiff waive all rights to confidentiality in violation of the ethical standards of the professionals providing treatment and over the protests of the professionals at the time the waiver policy was instituted.

Current standards and practice for psychological treatment of mental disorders requires that the treatment be "evidence based."

Both the current contract with Forensic Health Services - the present treatment provider for the DOC, and the contract with the University of Massachusetts Medical School - the present provider for medical and other psychological services for the DOC, specify that treatment be evidence based.  The reason for this is that the history of medical and psychological practice is littered with discarded treatments which when carefully studied turned out to be useless or even harmful.  A classic example of this is the blood letting treatment that killed George Washington.  Even treatments which seem, in theory, and initial research to be very promising, all too often turn out, when rigourously tested in randomized comparison studies, to be no more effective than a placebo or no treatment at all.  "The most well designed and executed study [of sex offender treatment], the California Atascadero Study that used random assignment, that included volunteers and non-volunteers, that implemented a state of the art intervention program, that had a follow-up treatment component, and that calculated recidivism in the most comprehensive way found no significant effects from treatment."  Lucy Berliner, Commentary, Sexual Abuse: A Journal of Research and Treatment, Vol. 14, No. 2, April 2002, pp. 196-197.  (This is the Journal of the Association for the Treatment of Sexual Abusers, ATSA.)

The plaintiff has alleged that the defendants have deviated substantially from accepted professional judgement, standards and practice, by requiring waivers of confidentiality, not having a community access program, and not having differing levels of security to provide less dangerous inmates with less restrictive conditions of confinement, as well as by overcrowding and imposing needlessly

punitive conditions of confinement. Since under the best, state of the art treatment programs, no significant effect on recidivism can be demonstrated by participating in treatment, it is especially egregious that the defendants are departing from accepted professional standards of treatment, with no evidence that these departures will improve treatment outcomes, nor with any systematic attempt to evaluate the effect of these departures. The plaintiff also alleged that the defendants are using treatment providers who are not professionally qualified. The defendants are using the same company, FHS, to provide treatment and to evaluate inmates for release. This creates both an ethical conflict of interest Supra, and a financial conflict of interest since FHS is paid on a per capita basis. (Amended Complaint, ¶ 102.) For the purpose of this memorandum these allegations are taken as true. The failure to provide adequate treatment in accordance with accepted professional judgement, practice, or standards entitles the plaintiff to relief under § 1983. See Turay v. Seling, 108 F.Supp. 2d 1148.

## XIII.   MAIL

103 CMR 481.00 Inmate Mail, § 481.25 Responsible Staff, reads in its entirety "The Superintendent of each institution shall be responsible for implementing and monitoring 103 CMR 481.00. This combined with plaintiff's documentation of mishandling of mail issues through the inmate grievance system with appeals to the superintendent proves knowledge and responsibility. A reasonable superintendent would have known that it was not required that receipts for certified mail be provided. Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990). However, so providing said return receipts the superintendent gave his implied guarantee that the

service would be provided in exchange for payment for that service.
103 CMR 481.07 allows for the Superintendent to implement
institutional policies with regard to inmate mail. And, further, a
policy need not be formal or written to serve as a basis for liability,
Smith v. Jordan, 527 F.Supp. 167, 170-71 (S.D.Ohio 1981). As a
involuntarily civilly committed person the plaintiff is entitled
unfettered acess to receive and send mail. Plaintiff alleges that
the defendants are not providing the "unfettered access" to which he
is entitled. Plaintiff is providing the documentation describing the
defendants mishandling of mail issues as Exhibit 14 of this memorandum.
The failure of the defendants to provide plaintiff with access to the
United States Postal Service's mail services rises to a § 1983
complaint.

### XIV.  QUALIFIED IMMUNITY

The defendants are not entitled to qualified immunity in this
case because:

A.  The constitutional rights asserted were all clearly
established at the time of the alleged violations; and

B.  A reasonable official situated in the same circumstances
would have understood that the challenged conduct violated the
established right. St Hillier v. City of Lacona, 71 F.3d 20, 24 (1st
Cir. 1995) cert denied, 518 U.S. 1017 (1996). "Qualified Immunity
does not turn on the government official's state of mind. Rather it
turns on the 'objective reasonableness" of the officials action, in
light of the rules that were 'clearly established' at the time the
action was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987).
For the purpose of this determination, the actions of the defendants,
as alleged by the plaintiff, are taken as true to determine whether

those actions violated clearly established law.   Accord, Michael
v. Forsyth, 472 U.S. 511, 526 (1985).

To determine whether the right to least restrictive conditions
of confinement was clearly established during the relevent period,
November 22, 2002 through the present, the Court has to examine
whether the court decisions, statutes and regulations cited by the
plaintiff predate the alleged violation.   The cases cited: Youngberg
(1982), Hendricks (1997), Seling v. Young (2001) and King v.
Greenblatt, 53 F.Supp. 2d (1999); as well as the Consent Decrees
(1974) and the Management Plan (1999) all predate the plaintiff's
incarceration at the Nemansket Correctional Center, beginning
November 22, 2002, under more restrictive conditions than the prison
he had just came from.   The plaintiff has provided the Court with
specific cases, statutes and regulations for each count of the
complaint to show that the action of the defendants violated clearly
established law at the time of the violations.   See the argument for
each count above.

Neither Commissioner Dennehy nor Superintendent Murphy acted
as a reasonable Commissioner of Corrections or Superintendent
should act, in light of clearly established law.   This case does
not involve a guard working alone in a cell block at three o'clock
in the morning faced with a spur of the moment decision.   The
Commissioner has a full time legal division of lawyers at her
disposal.   Superintendent Murphy has four full time lawyers with
their offices at the Nemansket Correctional Center.   The decisions
made by the Commissioner and Superintendent involve the
implementation of long term policies and proceedures.   These
violations have occured because the defendants have violated their
own Management Plan, and ignored the citations issued by the

Department of Public Health for violations of its regulations. Similarly the defendants have ignored the accepted judgement, practice or standards of treatment professionals. The defendants have persisted in these violations, even when the clearly established law has been called to their attention in correspondence, grievance and appeals. Under all these circumstances a reasonable Commissioner or Superintendent would not have violated the plaintiff's clearly established rights. The defendants are not entitled to qualified immunity.

## 1. **LIABILITY FOR DAMAGES**

The individual defendants are liable for damages in their individual capacities. The plaintiff brings this action against each of the individual defendants in their individual capacities. Under 42 U.S.C. § 1983 the defendants are liable for damages in their individual capacities for violations of the plaintiff's constitutional rights. In Hafer v. Melo, 502 U.S. 21, 31 (1991) the Court said, "state officials sued in their individual capacities are 'persons' within the meaning of sec. 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under sec. 1983 solely by virtue of the 'official' nature of their acts." With regard to injunctive relief, the Court noted that, "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under sec. 1983 because 'official-capacity' actions for prospective relief are not treated as actions against the state." See also Kentucky v. Graham, 473 U.S. 159, 167, n.14; Ex Parte Young, 209 U.S. 123, 159-160 (1908) and Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).

- 48 -

## CONCLUSION

With no history of escape or violence, having served his complete prison sentence, the plaintiff has been "civilly" committed for a day to life to the Nemansket Correctional Center, under exclusive control of the Department of Correction, confined in conditions more restrictive and punitive than prison.  These conditions are not the "vagaries" of the implementation of c. 123A, they are the intended result of its implementation.  The legislature called this facility the "Nemansket Correctional Center" intentionally, M.G.L. c. 123A, Sec. 2.  It gave the Department of Correction exclusive control of the facility intentionally.  It chose the Nemansket Correctional Center as the place of confinement, when it reenacted "civil" commitment even though the Nemansket Correctional Center was already occupied by 500 prisoners serving state prison sentences.  It did so in light of 27 years of federal court litigation, which ended when the federal courts concluded that the Nemansket Correctional Center, holding primarily prisoners is a correctional facility and therefore subject to correctional restrictions.

"The state cannot have it both ways... civil status means civil status, with all the Fourteenth Amendment rights that normally accompany it."  Jones v. Blanas, at 393 F.3d 933.  In this case the state clearly intended to have it both ways: choosing the criteria of "civil" commitment to determine who is committed, and choosing the facilities of a prison as the place of commitment.  This is punitive.  This is intentional.  This is unconstitutional.  The plaintiff is entitled to relief.

- 49 -

For the forgoing reasons, the plaintiff respectfully requests that this Court **DENY** the Defendants Motion to Dismiss, or, in the Alternative for Summary Judgement.

Respectfully Submitted,
Joseph Gentle Moose Blake, Plaintiff

Dated: 5/17/06

Joseph Gentle Moose Blake, Pro Se
Nemansket Correctional Center
30 Administration Road
Bridgewater, MA  02324


## VERIFICATION

I, Joseph Gentle Moose Blake, state under the pains and penalties of purjury that all of the factual allegations in the foregoing memorandum are true.

Dated: 5/17/06

Joseph Gentle Moose Blake, Pro Se
Nemansket Correctional Center
30 Administration Road
Bridgewater, MA  02324


## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the within document to be served upon the defendant's attorney of record by Intra-facility mail, Massachusetts Treatment Center, 30 Administration Road, Bridgewater, MA 02324.

Dated: 5/17/06

Joseph Gentle Moose Blake, Pro Se
Nemansket Correctional Center
30 Administration Road
Bridgewater, MA  02324