**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 2005-10508-RGS**

**JOSEPH E. BLAKE,**
            **Plaintiff,**

**v.**

**ROBERT MURPHY, *et al*,**
            **Defendants.**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**DEFENDANTS ROBERT MURPHY, KATHLEEN DENNEHY TO**
**DISMISS THE SECOND AMENDED COMPLAINT, OR,**
**ALTERNATIVELY, TO GRANT SUMMARY JUDGMENT**

## INTRODUCTION

Defendants Robert Murphy and Kathleen Dennehy (collectively the "defendants"),

submit this memorandum in support of their motion to dismiss the Complaint and the Amended

Complaint, or, alternatively, for summary judgment.  For the reasons set forth below, the Court

should grant this motion.

On March 8, 2005, the plaintiff initiated this action by filing his original Complaint,

raising various claims related to his confinement as a civilly committed sexually dangerous

person ("SDP") at the Massachusetts Treatment Center ("Treatment Center") against Kathleen

Dennehy, Commissioner of Correction, Robert Murphy, Superintendent of the Treatment Center

and Department of Correction ("DOC").  On October 31, 2005, the Court issued a Memorandum

and Order in which it dismissed a number of plaintiff's complaints, sua sponte, including all

those against DOC. The Court then dismissed the action as to DOC. On November 10, 2005, the

plaintiff filed his Amended Complaint, raising additional claims.  On November 15, 2005, the

Court allowed the motion to amend, subject to its October 31, 2005 Memorandum and Order.

2

Although he initially sought monetary, injunctive and declaratory relief, the Court has dismissed

the claims for injunctive relief, claims for monetary damages against the defendants in their

official capacities, and claims for monetary damages against defendant Dennehy. Thus, the

claims for declaratory relief remained, as did the claims for monetary damages against defendant

Murphy. The defendants filed a motion to dismiss, or alternatively for summary judgment, on or

about March 20, 2006. No action was taken on that motion until March 12, 2007, at which time

the motion was denied, without prejudice, pending the filing of a second amended complaint.[1]

On that same date, counsel was appointed to represent the plaintiff. On April 17, 2007, the

second amended complaint was filed.

## FACTUAL ALLEGATIONS

On May 18, 1995, the plaintiff pled guilty a sexual offense and was sentenced to prison.

Complaint, ¶ 5.  Near the end of the plaintiff's prison sentence, the District Attorney for Franklin

County filed a petition to civilly commit the plaintiff as a sexually dangerous person.  Complaint,

¶ 6. *See* G.L. c. 123A, § 12.  On April 8, 2005, the plaintiff was adjudicated a SDP and was

civilly committed to the Treatment Center for one day to his natural life.[2]  Amended Complaint,

¶¶ 91. *See* G.L. c. 123A, § 1 (defining "sexually dangerous person"), §§ 12-14 (detailing SDP

commitment process); *Commonwealth v. Bruno*, 432 Mass. 489, 494-497 (2000) (explaining

SDP commitment process under 1999 statutory amendments to G.L. c. 123A).

---

[1]    To the extent any of the arguments raised by the defendants in their original motion remain relevant, but are not repeated here, the defendants incorporate the memorandum herein.

[2]    The Treatment Center is referred to as the Nemansket Correctional Center in G.L. c. 123A, § 2. Throughout the statute, however, the facility is also referred to as the Treatment Center. *See, e.g.*, G.L. c. 123A, §§ 1, 6A, 9, 12, 13.  The facility is commonly referred to as the Massachusetts Treatment Center as indicated by its letterhead and other official documents.

3

Robert Murphy is the Superintendent of the Treatment Center.  Complaint, ¶ 3.  At the time the original complaint was filed , Kathleen Dennehy was the Commissioner of DOC. Complaint, ¶ 4. General Laws c. 123A, § 2 vests the Commissioner of Correction with sole responsibility for the Treatment Center's operation.  The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons.  G.L. c. 123A, § 2.

**B.** **The History of the Treatment Center and the Federal Consent Decree Litigation.**

The Treatment Center has previously been under dual management.  General Laws c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by DOC.  St. 1959, c. 615, as appearing in G.L. c. 123A, § 2.  The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center that incorporated this dual management scheme.  *See King v. Greenblatt* ("*King I*"), 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).  Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment."  *Id.;  see also King v. Greenblatt ("King II"),* 127 F.3d 190, 192 (1st Cir. 1997); *King v. Greenblatt*, 149 F.3d 9 (1st Cir. 1998) *("King III"*); *King v. Greenblatt*, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999) (detailing changes in conditions at Treatment Center from 1972 to 1992). "General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the public against future antisocial behavior by the offender, and of

4

doing all that can be done to rehabilitate him.'" *Commonwealth v. Barboza*, 387 Mass. 105, 111 (1981), *cert. denied*, 459 U.S. 1020 (1982) (citations omitted).

On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L. c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC. St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2. *See King III*, 149 F.3d at 11-12; *King*, 53 F.Supp.2d at 121.

As a result of this legislative change, in 1994 the Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation. In 1994, the Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. *King*, 53 F.Supp.2d at 121.

The Court reopened another consent decree case concerning the Treatment Center, Harold G. Williams, et al. v. Michael Lesiak, et al., U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with Mitchell G. King, et al. v. Milton Greenblatt, M.D., et al., U.S.D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + 1 (together "the federal consent decree litigation"). *King*, 53 F. Supp.2d at 121.

Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. *King I*, 52 F.3d at 3. DOC submitted to the Court an extensive Management Plan for the administration of the Treatment Center. *King II*, 127 F.3d at 193. The Management Plan encompassed in detail almost every aspect of life at the Treatment Center including policies, regulations, and rules governing

5

staffing, clinical treatment, educational and vocational treatment, a community access program,

behavior management, and resident management operations. *Id.; King III*, 149 F.3d at 15. The

Court permitted DOC to implement its plan and modified the consent decrees to place

responsibility for and control of the Treatment Center in DOC. *King II*, 127 F.3d at 194.

The Court, however, did not vacate the consent decrees. *King III*, 149 F.3d at 16.

Instead, the Court elected to exercise close judicial oversight of DOC's compliance with the

consent decrees. *Id*. at 122-23; *King,* 53 F.Supp.2d at 122-23. Additionally, the Court ordered

the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan

was filed on November 29, 1996. *King*, 53 F.Supp. 2d at 122.

### C.    Termination of the Federal Consent Decrees.

From 1994 to June, 1999, the Court approved, oversaw, and monitored DOC's

assumption of sole control over the Treatment Center, including DOC's expansion of sex

offender treatment services at the Treatment Center to non-civilly committed state prison inmates

("SPI's"). *See, e.g., King*, 53 F.Supp.2d at 121-23. Throughout that period, the SDP's continued

to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility

"essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic

community." *King III*, 149 F.3d at 16. They also complained that DOC's new rules and

regulations and the additional SPI population impaired or affected treatment so as to render it

ineffective and in violation of G.L. c. 123A and the consent decrees. *King*, 53 F.Supp.2d at 123,

135.

6

This final phase of the consent decree litigation culminated in an evidentiary hearing before the Court in March, 1999. *King*, 53 F.Supp.2d at 124. At the hearing, SDP's reiterated their numerous complaints about DOC's operation of the Treatment Center. *See King*, 53 F.Supp.2d at 129-31, 134-35. After the hearing, the Court terminated the consent decrees. *King*, 53 F.Supp.2d at 136, 139. In doing so, the Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees and, by implication, did not violate any state or federal rights. *King*, 53 F.Supp.2d at 135, 137. *See King III*, 149 F.3d at 19.

## ARGUMENT

A motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6) will be granted if it appears to a certainty that the plaintiff would be unable to recover under any set of facts. *Gonzalez-Bernal v. United States*, 907 F.2d 246, 258 (1st Cir. 1990). A court ruling on a motion to dismiss must accept the factual allegations of the Complaint as true and draw all reasonable inferences in the non-moving party's favor. *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 37 (1st Cir. 1991).

Alternatively, summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir. 1995). The moving party bears the initial burden of demonstrating the absence of a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once done, the burden shifts to the

7

non-moving party to "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998).

**I.    G.L. c. 123A NEITHER VIOLATES THE PROHIBITION AGAINST**
**EX POST FACTO LAWS NOR IMPLICATES DOUBLE JEOPARDY.**

The plaintiff claims that G.L. c. 123A violates the prohibition against ex post facto laws and implicates double jeopardy. These claims are clearly erroneous and have already been rejected by this Court.

To constitute an ex post facto law, or to implicate double jeopardy, a statute must be penal or criminal in nature. "Whether a statute was intended to be criminal or civil depends on the legislature's intent, which is a matter of statutory construction." *Commonwealth v. Bruno*, 432 Mass. 489, 500 (2000), *citing Hendricks*, 521 U.S. 346, 361,117 S.Ct. 2072 (1997); *Dutil*, 437 Mass.9,19-20 (2002). The Massachusetts Supreme Judicial Court ("SJC") has "repeatedly held that the legislature intended G.L. c. 123A as a civil statute." *Dutil*, 437 Mass. at 20, and cases cited therein; *Bruno*, 432 Mass. at 500. To challenge a statutory scheme intended by the legislature to be civil, a party must show, by the "'clearest proof'" that the statute's scheme is "so punitive in purpose or effect as to negate the Legislature's remedial intention." *Bruno*, 432 Mass. at 500, 501, *quoting Hendricks*, 521 U.S. at 361; *Dutil*, 437 Mass. at 20.

In *Bruno*, the Court thoroughly examined whether G.L. c. 123A was punitive in its purpose or effect, and determined that it was not. *Bruno*, 432 Mass. at 499-503; *See Dutil*, 437 Mass. at 20. The defendants in Bruno claimed the statute was penal because the commitment and attendant treatment occurs after an offender has served a criminal sentence, there are no less restrictive alternatives to commitment under the statute, and because the Treatment Center is run

8

by the DOC rather than the Department of Mental Health ("DMH").  *Bruno*, 432 Mass. at 499.

This Court rejected each of these arguments.

The plaintiff here offers essentially the same arguments rejected in *Bruno*.  The mere fact

that the Treatment Center is operated by the DOC does not make the commitment penal in

nature. *Bruno*, 432 Mass. at 502; *Tate v. Commonwealth*, 424 Mass. 236, 238-239, *cert. denied*,

522 U.S. 832, 118 S.Ct. 100 (1997). *See Allen v. Illinois*, 478 U.S. 364, 372-74 (1986) (mere fact

that Illinois' SDP's are housed in a maximum security institution run by the Illinois Department

of Corrections does not transform that state's intent to treat into an intent to punish).  Indeed,

"[t]he Constitution itself is indifferent to whether DOC or DMH administers the Treatment

Center" and, therefore, the plaintiff  "cannot claim that DOC control, *per se* violates the

Constitution." *See King v. Greenblat* (" King I"), 52 F.3d 1, 4, 6 (1st Cir.), *cert. denied*, 516 U.S.

863 (1995).  The federal court has extensively reviewed DOC's management of the Treatment

Center and determined that it is in compliance with the consent decrees which have now been

terminated. *See King I*, 52 F.3d 1; *King v. Greenblat* ("*King II*"), 127 F.3d 190, 192 (1st Cir.

1997); *King v. Greenblat* ("*King III*"), 149 F.3d 9 (1st Cir. 1998); *King v. Greenblat*, 53 F.Supp.

2d 117, 118-20 (D.Mass. 1999).

Nor may the plaintiff assert that, as a result of his conditions of confinement, G.L. c.

123A is unconstitutional as applied to him (and all SDP's).  Both the United States Supreme

Court and the Supreme Judicial Court have already rejected "as applied" challenges to civil

commitment schemes.  In 2001, the United States Supreme Court rejected a claim that the

Washington statute for civil commitment of sexually violent predators was punitive "as applied"

to a particular individual.  *See Seling v. Young*, 531 U.S. 250, 121 U.S. 727, 735 (2001).  In

9

*Seling*, the Supreme Court held that an "'as applied' analysis would prove unworkable." *Id.*
The Court rejected the argument that a civil commitment statute can be punitive as applied to a
particular person when the highest State court has already definitively construed the statute as
civil. *Id.* at 733-735. Applying *Seling*, as discussed above, the SJC held that because G.L. c.
123A is civil in nature, the specific conditions of a SDP's confinement do not transform the
statute from civil to punitive. *Dutil*, 437 Mass. at 20; *see also Bruno*, 432 Mass. at 500-502 .

To the extent that the plaintiff claims that G.L. c. 123A violates substantive due process
because it is not narrowly tailored to further a legitimate and compelling interest, his claim is
meritless. In upholding Kansas' similar Sexually Violent Predator Act ("SVP Act"), the Supreme
Court held that, although freedom from physical restraint is a fundamental right, a state may, in
certain narrow circumstances, provide for "the forcible civil detainment of people who are
unable to control their behavior and who thereby pose a danger to the public." *Id.* at 2079. The
Court held that Kansas' SVP Act comports with substantive due process by requiring proof of
past sexually violent behavior coupled with a present mental condition that creates a likelihood
of such conduct in the future if the person is not incapacitated. *Hendricks*, 521 U.S. at 357. The
commitment provisions of G.L. c. 123A, as amended by St. 1999, c. 74, are similar to those of
the Kansas SVP Act and, for the same reasons, comport with substantive due process
requirements.

Under the version applicable to the plaintiff, G.L. c. 123A permits civil commitment of a
person who, in relevant part, has been convicted of a statutorily enumerated sexual offense and
"who suffers from a mental abnormality or personality disorder which makes the person likely to
engage in sexual offenses if not confined to a secure facility." G.L. c. 123A, § 1; *see also Dutil,*

10

437 Mass. at 13-19 (holding that pre-1990 version of G.L. c. 123A comports with substantive

due process standards articulated in *Hendricks*).  General Laws c. 123A, therefore, satisfies the

*Hendricks* requirement of past sexually violent behavior coupled with proof of a current mental

condition rendering the person likely to engage in future sexual misconduct unless confined.

The statute is thus narrowly tailored to serve a compelling state interest in protecting the public

from sexually dangerous persons.  *See Bruno,* 432 Mass. at 500; St. 1999, c. 74, emergency

preamble (statute's stated purpose is "to protect forthwith the vulnerable members of our

communities from sexual offenders").[3]

The Treatment Center is a unique institution that has specialized staff and facilities to

provide sex offender specific treatment.  *See King*, 53 F.Supp.2d at 126-27, 129-30.  The

individual needs and concerns of the SDP's have properly been left, "to the professional

judgement of those charged with operating the institution."  *Youngberg v. Romeo*, 457 U.S. 307,

323 (1982); *see King III*, 149 F.3d at 13.  These administrative decisions are presumptively valid.

*Doe v. Gaughan*, 808 F.2d 871, 884 (1st Cir. 1986).

Accordingly, the plaintiff's claim fails.

## II.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATION OF HIS RIGHT TO BE HELD IN CONDITIONS THAT ARE THE LEAST RESTRICTIVE ALTERNATIVE.

The plaintiff asserts that he is being held in conditions that exceed the "least restrictive

alternative and which are substantially more restrictive and punitive than the conditions under

which the [plaintiff] was held while in prison."   The plaintiff lists ways in which his

confinement as a SDP at the Treatment Center allegedly differs from his incarceration as an

---

[3]      Even if a SDP could prove that he was not receiving adequate treatment or the conditions of his
confinement were unlawful, his remedy would be revised conditions, not immediate release.  *See Dutil, petitioner*,

11

ordinary SPI at NCCI-Gardner and MCI-Norfolk, level four security prisons. The plaintiff claims

that the defendants have violated his right to substantive due process under the Fourteenth

Amendment and his rights under G.L. c. 123A, § 6A.

> **A.   The Alleged Differences Between Conditions at the Treatment Center**
> **and Other DOC Facilities Do Not Violate Substantive Due Process.**

Substantive due process "prevents the government from engaging in conduct that shocks

the conscience, or . . . .interferes with rights implicit in the concept of ordered liberty." *Dutil,*

*petitioner*, 437 Mass. 9, 13 (2002), *citing Aime v. Commonwealth*, 414 Mass. 667, 673 (1993)

and *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095 (1987) (internal quotations

omitted).

The alleged differences in the conditions of confinement at the Treatment Center and

MCI-Norfolk and NCCI-Gardner do not shock the conscience or interfere with rights implicit in

the concept of ordered liberty.  MCI-Norfolk and NCCI-Gardner houses SPI's serving criminal

sentences who share in common a need for classification to a particular security level. In

contrast, SDP's are committed to the Treatment Center because they have a mental condition that

renders them likely to engage in future sexual misconduct. *See* G.L. c. 123A, § 1 (defining SDP).

Notably, there are significant differences in DOC's ability to manage SPI's and SDP's.

State law requires that SDP's be housed at the Treatment Center except in limited circumstances.

*See* G.L. c. 123A, §§ 2, 2A; 103 CMR 460, Transfer Procedures for the Massachusetts Treatment

Center.[4]  The Commissioner, therefore, has a limited ability to transfer certain SDP's.  In

contrast, the Commissioner has virtually unfettered discretion to classify SPI's subject only to

_____

437 Mass. 9, 22 (2002).

12

the requirements of DOC's classification regulations.  *See* G.L. c. 127, § 97; 103 CMR 420,

Classification.  If a SPI violates institutional rules, he can be placed in segregation within the

institution, he can be transferred to higher custody or, for certain serious infractions, he may be

placed in the Departmental Disciplinary Unit for up to ten years.  *See, e.g.*, 103 CMR 430,

Disciplinary Proceedings ("disciplinary regulations"), specifically, 103 CMR 430.25(1)(f).  The

disciplinary regulations do not apply to SDP's.  Rather, 103 CMR 431, Observation of Behavior

Reports ("OBR regulations"), applies to SDP's.  The range of sanctions contained in the OBR

regulations is dramatically compressed compared to that available in the disciplinary regulations.

Different conditions of confinement for different populations that have different needs do

not, therefore, amount to government conduct that shocks the conscience. Indeed, even the

plaintiff is not in the same situation as he was when confined as a SPI at MCI-Norfolk and

NCCI-Gardner. In April, 2005, there was an adjudication, beyond a reasonable doubt, that the

plaintiff's present mental condition renders him likely to sexually reoffend if he is not confined

to a secure facility.  *See* G.L. c. 123A, §§ 1, 14(d).

Due process requires that the conditions and duration of civil confinement bear some

reasonable relation to the purpose for which persons are committed.  *Seling v. Young*, 531 U.S.

250, 121 S.Ct. 727, 736 (2001).  The plaintiff is housed at a Treatment Center where he is kept

segregated from SPI's.  He has a statutory right to treatment.  G.L. c.123A, § 2.

As discussed above, the federal courts, in the context of the consent decree litigation,

have already concluded that the conditions of confinement at the Treatment Center comport with

constitutional requirements. "This Court and the [First Circuit] have already examined . . .

---

[4]       A SDP may be transferred to another facility only if he continues to serve a prison sentence.  Because the
plaintiff is not presently serving a criminal sentence, the plaintiff may not be transferred from the Treatment Center

13

complaints about SDP's about limitations on the amount of clothing, room visits, funds,

telephone calls, etc., the First Circuit held that 'the Plan justifies some reduction in these

privileges because of past experiences with security, assault, gambling, coercion and

interruptions in treatment,' and that '[n]o reduction rises to the level of a constitutional

infraction.'" *King*, 53 F.Supp.2d at 134, *quoting King III*, 149 F.3d at 19.  Likewise, none of the

conditions complained of here rises to the level of a constitutional violation. Indeed, this Court

examined "the increased number of searches; the interruption of therapy due to drills and

scheduled movements; the atmosphere at the Treatment Center since the introduction of inmates;

and the effect that the presence of inmates has on classes, work opportunities, the maintenance of

property, and the use of the law library, gym, and recreation area." *King*, 53 F.Supp.2d at 134.

Citing the necessity for "reduction in privileges for security reasons," this Court held that the

reduction in those privileges did not "render treatment ineffective. Rather . . . the treatment

provided is effective and provided under the least restrictive conditions given all the

circumstances that exist at the Treatment Center." *King*, 53 F.Supp.2d at 135.

Further, the plaintiff is barred from relitigating this issue by the doctrines of *res judicata*

and collateral estoppel.  The doctrine of *res judicata* "bars all parties and their privies from

relitigating issues where were raised or *could have been raised* in a previous action, once a court

has entered a final judgment on the merits in the previous action."  *Aunyx Corp. v. Canon U.S.A.,*

*Inc.,* 978 F.2d 3, 6 (1st Cir. 1992) (emphasis in original), *cert. denied*, 507 U.S. 973 (1993).

To promote judicial economy, the doctrine of claim preclusion makes a valid, final

judgement conclusive on the parties and their privies and bars further litigation of all matters that

to another DOC facility.

14

were or should have been adjudicated in the action. *Heacock v. Heacock*, 402 Mass. 21, 23 (1988); *Boyd v. Jamaica Plain Co-Op. Bank*, 7 Mass. App. Ct. 153, 163 (1979). The essential elements of *res judicata* are: (1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the earlier and the later suits. *Aunyx Corp.,* 978 F.2d at 6; *see Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir. 1994). The doctrine is also "based on the idea that the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first law suit." *Heacock*, 402 Mass. at 24.

In this case, the first two elements are satisfied. Although the plaintiff was not a party to the consent decree litigation, he, and every other SDP, should be barred from relitigating these claims. There is a very close relationship between this plaintiff and the plaintiffs in the consent decree litigation. First, the consent decrees and the consent decree litigation encompassed and applied to all SDP's at the Treatment Center. Although this plaintiff was committed to the Treatment Center after the termination of the consent decree litigation, he and every other new SDP committed after the reinstatement of SDP commitments, *see* G.L. c. 123A, §§ 12-15, benefits from the consent decree litigation. The intent of the consent decree litigation was to resolve "systematic" issues concerning DOC's takeover of the Treatment Center, its management of the entire facility, and the conditions it imposed on the entire population of SDP residents. *King III*, 149 F.3d at 11-12; *see King*, 53 F.Supp. at 137. This is a unique population. Only individuals adjudicated SDP and committed to the Treatment Center pursuant to G.L. c. 123A benefited, and continue to benefit, from the consent decree litigation. The interests of the named plaintiffs in the consent decree litigation were identical to the interests of this plaintiff.

15

The Court held that its "decision does not preclude [SDP's] from challenging events on the basis of constitutional or other protected rights." *King*, 53 F.Supp. 2d at 137. Clearly, an SDP is not precluded from challenging a specific event or wrong that occurred to him. *See, e.g. Cameron v Tomes*, 990 F.2d 14 (1st Cir. 1993). Likewise, the Court did not preclude SDP's from challenging constitutional wrongs committed after the termination of the consent decrees. *King*, 53 F.Supp.2d at 137. The plaintiff, however, has broadly challenged DOC's operation of the Treatment Center. His claims do not raise discreet violations arising from a single event. The plaintiffs' allegations largely do not represent new post-termination claims.

Further, the defendants are entitled to use claim preclusion even though they were not named defendants in the federal consent decree litigation. The Court acted as if the Commonwealth were the defendant in the federal consent decree litigation. *See King*, 53 F.Supp.2d at 122. The present plaintiff has filed this action against DOC, an agency of the Commonwealth, and Commissioner Dennehy and Superintendent Murphy, in part, in their capacities as officials of an agency of the Commonwealth. Thus, there is privity between the present and prior defendants for claim preclusion purposes. *See generally, Cohen v. Shea*, 788 F.Supp. 66, 68 (D.Mass. 1992); *Trustees of Stigmatine Fathers, Inc. v. Secretary of Admin. & Fin.,* 369 Mass. 562, 566-67 (1976).

With respect to the identity of the cause of action, the First Circuit Court of Appeals has adopted a "transactional" definition of *res judicata* from the *Restatement (Second) of Judgments* § 24, which provides that "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the

16

transaction, or series of transactions out of which the action arose." *Aunyx Corp.*, 978 F.2d at

6-7. It does not matter if the two cases advance different legal theories. Indeed, "[t]he fact that

different legal theories are presented in each case does not mean that the same transaction is not

behind each. . . . '[S]o long as different theories of recovery, however prolific, derive from the

same cause of action, the requisite identity is achieved if, and to the extent that, all such theories

concern the 'same operative nucleus of fact.''" *Aunyx Corp.*, 978 F.2d at 7 (citations omitted).

In the consent decree litigation, the federal courts ruled on the constitutionality of the

Legislature's transfer of sole control of the Treatment Center to DOC. *See King I*, 52 F.3d at 4.

In addition, the SDP's alleged that DOC's new regime of rules and regulations coupled with the

introduction of over 300 SPI's was unlawful and unconstitutional. *See King*, 53 F.Supp.2d at

122. The Court ruled that these complaints, taken as whole, did not render treatment ineffective,

did not violate G.L. c. 123A, and did not violate the consent decrees. *King*, 53 F.Supp.2d at 135.

The Court concluded that the plan itself did not violate the federal consent decrees and permitted

DOC to implement all aspects of its plan. *King*, 53 Supp.2d at 121-22. The Court considered and

reviewed the identical claims the plaintiff wishes to relitigate here. The plaintiff is, therefore,

barred from relitigating these issues.

The doctrine of issue preclusion is equally applicable and bars the plaintiff's present

claims before this Court. "'When an issue of fact or law is actually litigated and determined by a

valid and final judgment, and the determination is essential to the judgment, the determination is

conclusive in a subsequent action between the parties, whether on the same or a different claim.'

. . . 'In certain circumstances, mutuality of the parties is not required. A nonparty may use

[issue preclusion] defensively against a party to the original action who had a full and fair

17

opportunity to litigate the issues in question.'" *Fay v. Federal Nat'l Mortgage Ass'n*, 419 Mass.

782, 789 (1995) (citations omitted). *See Keystone Shipping Co. v. New England Power Co.,* 109

F.3d 46, 51 (1st Cir. 1997) (noting that Massachusetts applies doctrine of issue preclusion in

same traditional manner as federal court).

As discussed above, the plaintiff's constitutional challenges were actually litigated or

could have been litigated in the federal consent decree litigation.  Moreover, the determination of

these issues was essential to the Court's decision to terminate the consent decrees.  The Court

could not lawfully terminate the consent decrees that were created to remedy past violations of

statutory and constitutional rights if there were ongoing violations.  *See King*, 53 F.Supp.2d at

124.  Indeed, the plaintiffs alleged that past statutory and constitutional wrongs had not been

remedied and DOC's management of the Treatment Center had unlawfully and

unconstitutionally transformed it into a penal environment no different from any other prison.

*See King*, 53 F.Supp.2d at 123, 135. Ultimately, the Court properly concluded that DOC's

management of the Treatment Center did not violate any statutory or constitutional rights and,

therefore, terminated the consent decrees.  *King,* 53 F.Supp.2d at 135, 137, 139.  *See Bruno*, 432

Mass. at 514 (noting that the Court determined that DOC's management plan comports with

constitutional requirements).  Because there was a full and fair opportunity to litigate these issues

in the consent decree litigation, this Court should dismiss the plaintiff's second amended

complaint.

To the extent that the plaintiff relies on post-termination events, his claim also fails.  The

plaintiff has not alleged that there have been systematic changes since the time of the consent

decree litigation that were not covered by the Management Plan or Amended Plan.  For example,

18

the plaintiff challenges the practice of double bunking and alleges overcrowding.[5] The

Management Plan, which contains the provisions and procedures for double bunking SDP's, was

found by the Federal District Court to comply with the federal consent decrees. The Court

permitted DOC to implement all aspects of its plan. *King*, 53 Supp.2d at 121-22. The plaintiff

makes no allegation that the defendants are not following the double bunking procedures

established in the Management Plan and incorporated by reference into the Amended Plan.[6]  Nor

has he alleged any cognizable injury as a result of being double bunked. Regardless, double

bunking, in and of itself, is not a *per se* constitutional violation.  *See Doe v. Gaughan*, 808 F.2d

871, 885 (1st Cir. 1996) (overcrowding, without more, does not amount to a constitutional

violation); *Bell v. Wolfish*, 441 U.S. 520, 541 (1979) (there is no "one man, one cell" principle

lurking in the Due Process Claus; rather, the Due Process Clause is only implicated if detainees

are confined in such a manner as to cause them to endure genuine privations and hardship over

an extended period of time).

The plaintiff also challenges his access to the law library and computers. Again, any

reduction in access to the law library computers at the Treatment Center does not mean, as this

Court found, that the plaintiff is not being held in the least restrictive alternative. *King*, 53

F.Supp.2d at 135.   Moreover, to the extent that the plaintiff claims his access to the law library

and computers denies him access to the courts, his claim fails. The standards governing inmate's

claims regarding access to the courts are well established.  In 1977, the United States Supreme

---

[5]       The First Circuit Court of Appeals recently dismissed a complaint challenging to double-bunking at the
Treatment Center in an unpublished decision. *Cote, et al v. Murphy, et al,*  152 Fed. Appx. 6 (2005)
[6]       Judge Mazzone, of course, did not have occasion to consider the impact that adoption of new commitment
procedures and the addition of new SDP's would have on the Treatment Center.  The consent decrees were
terminated in June, 1999.  The new commitment provisions of G.L. c. 123A were added to the statute in September,
1999.  *See* St. 1999, c. 74, §§ 3-8.

19

Court held that inmates are entitled to have "access to the courts [that] is adequate, effective and meaningful." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). This standard is satisfied when an inmate has the "ability to prepare a petition or complaint," *Carter v. Fair*, 786 F.2d 433, 435 (1st Cir. 1986) (internal citations omitted), and "to participate meaningfully in the legal process." *Sowell v. Vose*, 941 F.2d 32, 41 (1st Cir. 1991).

To establish a denial of access to the courts, a plaintiff must allege actual injury in the presentation of a nonfrivolous claim relating to *his* sentence or *his* conditions of confinement. *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 2181-2182 (1996). The injury suffered by the inmate must be substantial, such as the dismissal of an action or the inability to file a complaint. *Id*. at 2180-81. *See also Sowell*, 941 F.2d at 34 (imposing requirement of actual injury); *Harris v. Commissioner of Correction*, 409 Mass. 472, 480 (1991) (prisoner claiming denial of access to courts "must make at least a prima facie showing of lack of access"). A plaintiff must show that he has been personally injured, not merely that another prisoner has been harmed. *Lewis*, 116 S.Ct. at 2183. When confronted with a motion for summary judgment, the plaintiff cannot rest on mere allegations but must set forth specific facts, by affidavit or other evidence, to support his allegations. *Id*.

Here, the plaintiff cannot show a lack of access to the courts. The plaintiff has not identified any actual, specific injury *he* suffered as a result of the defendants' actions. Indeed, the fact that he has brought this very action demonstrates that his access to the courts has not been violated. Moreover, in addition to this action, the plaintiff has filed at least one other lawsuit against DOC defendants: *Blake v. Howland, et al.,* Worcester Superior Court No. 05-0497( a copy of the Complaint and Amended Complaint are attached hereto as Exhibits 1A & 1B). After

20

filing these lawsuits, it is impossible to conclude that the plaintiff's First Amendment right to

access the courts was in any way impaired. *Lewis*, 116 S. Ct. at 2177.   In order to establish a

First Amendment "access to court" violation, the plaintiff must allege that he has suffered some

"actual injury." *Id.*, at 2179-80.  Not only has the plaintiff utterly failed to allege in these

complaints that he sustained an actual injury as a result of the defendants' conduct, it is

inconceivable that he suffered any injury given the fact that he has filed the prior complaints and

has now successfully sought the appointment of counsel.  No where does the plaintiff allege that

the defendants' actions in any way impaired his ability to access this Court.

The plaintiff also challenges his access to certain religious articles related to his practice

of Native American religious practices. It is well established that prisoners do not give up all

constitutional protections upon their incarceration, *Bell v. Wolfish*, 441 U.S. 520, 545 (1979),

including the free exercise of religion guaranteed under the First Amendment. *Cruz v. Beto*, 405

U.S. 319 (1972).  The "free exercise right is necessarily limited by the fact of incarceration, and

may be curtailed in order to achieve legitimate correctional goals or to maintain prison security."

*O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987).  In upholding a prison practice which prevented

some Muslim prisoners from attending religious services, the Supreme Court stated that

prisoners' constitutional rights are subject to restrictions based on "valid penological objectives-

including deterrence of crime, rehabilitation of prisoners and institutional security."  *O'Lone,*

482 U.S. at 348. The Supreme Court adopted the standard of review set out in *Turner v. Safley*,

482 U.S. 78, 89 (1987):

> To ensure that courts afford appropriate deference to prison officials, we have
> determined that prison regulations alleged to infringe constitutional rights are
> judged under a 'reasonableness' test less restrictive than that ordinarily applied to
> alleged infringements of fundamental constitutional rights.

21

*O'Lone*, 482 U.S. at 349.  In *Turner v. Safley*, 482 U.S. at 89, the Supreme Court held that "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

Here, the plaintiff does not allege that he has been denied access to these materials, just that there are more restrictions placed on their access at the Treatment Center than there were at other DOC facilities. Indeed, the Treatment Center has a policy in place which allows Native Americans to perform religious services weekly, and allows access to Native American music and literature. *See* Affidavit of Robert Murphy, ¶ 10. Moreover, SDP's request for a sweat lodge is under consideration by the DOC. Affidavit of Robert Murphy, ¶ 10. The fact that the access to religious items may be less than it was at another DOC facility does not constitute a denial of his right to practice his religion[7], nor does it mean that the plaintiff is not being held in the least restrictive alternative.

Likewise, the plaintiff's other allegations relating to the amenities in the gym and yard, access to various foods, access to property, and the like do not amount to constitutional violations. Indeed, the restrictions on property and the procedures regarding collecting urine samples and strip searches are governed by DOC policies or regulations, *See* Affidavit of Robert

---

[7]  Moreover, the plaintiff has raised the same issues regarding his religious practices in a pending state court action, *Blake v. Howland*, et al., Worcester Superior Court, Docket No. 05-0497. A copy of the Complaint is attached as Exhibit 1. A federal court may decline to exercise jurisdiction based on the pendency of a state action arising out of the same transaction.  In *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), the Supreme Court established a doctrine governing the stay or dismissal of federal of federal cases when the three traditional forms of abstention are not available.  *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 12 (1st Cir. 1990)  In *Colorado River*, the Supreme Court noted that, while the pendency of a state court action is not a bar to concurrent federal proceedings, principles resting on "'[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation'" may warrant a federal court declining to exercise jurisdiction in a case properly before it.  *Colorado River*, 424 U.S. at 817, *quoting Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952). This Court should decline jurisdiction over the

22

Murphy, ¶¶ 10, 11, 12 and 14, which was anticipated in the Amended Management Plan. *King*, 53 F.Supp.2d at 134. Again, the plaintiff has not alleged that these practices have materially changed since the approval of the Amended Management Plan. Finally, this Court has examined the reduction in access to the law library, gym and recreation areas as a result of the introduction of SPI's to the Treatment Center and found that the SDP's were still held in conditions amounting to the least restrictive alternative. *King*, 53 F.Supp.2d at 135.

This Court, therefore, should dismiss the second amended complaint.

**B.    The Conditions of the Plaintiff's Confinement Do Not Violate His Rights Under G.L. c. 123A, § 6A.**

To state a civil rights claim under 42 U.S.C. § 1983, the plaintiff must allege that the defendants, acting under color of state law, committed some conduct which deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Johnson v. Summers*, 411 Mass. 82, 86 (1991). This statute, 42 U.S.C. § 1983, in and of itself does not offer the plaintiff any substantive ground for relief. It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating <u>federal</u> rights conferred under the United States Constitution or federal law. *Chapman v. Houston Welfare Rights, Org.*, 441 U.S. 600, 615-618 (1978).

In addition, rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional or statutory right, the mere failure to properly follow state law or regulations cannot provide the basis for a § 1983 claim. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Quintero de Quintero v. Aponte-Roque*,

---

religious issues and allow them to be resolved in the state court action. The defendants will brief this issue further at the Court's request.

23

974 F.2d 226, 230 (1st Cir. 1992); *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992)

("It is bedrock law in this circuit, . . . that violations of state law -- even where arbitrary,

capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive

due process under the U.S. Constitution").

General Laws, c. 123A, § 6A provides that the "[a]ny person committed as a sexually

dangerous person to the treatment center or branch thereof under the provisions of this chapter

shall be held in the most appropriate level of security required to ensure the protection of the

public, correctional staff, himself and others."  Even if a violation of this provision of state law

occurred, this violation would not give rise to a claim under § 1983.

Further, to the extent that the plaintiff's claim rests in state law, his claim is barred by the

provisions of G.L. c. 127, §§ 38E, 38F, because he has not alleged that he has exhausted the

administrative remedies available to him as required under state law. General Laws c. 127, § 38F

provides that:

> An inmate shall not file any claim that may be the subject of a grievance under
> section 38E unless the inmate has exhausted the administrative remedy
> established pursuant to said section 38E; but the court may consider such claim if
> a final administrative resolution of a grievance filed pursuant to said section 38E
> has not been decided within 180 days from the date of filing such a grievance, or
> if the inmate can demonstrate to the court that exigent circumstances exist which,
> if delayed pursuant to the requirements of this section, would jeopardize the life
> or seriously impair the health of the inmate, or, for actions seeking equitable
> relief.

General Laws c. 127, § 38E(a) provides, in relevant part, that the Commissioner "shall

promulgate regulations to establish a fair, impartial, speedy and effective system for the

resolution of grievances filed against the department, its officers or employees, by inmates who

are committed to, held by or in the custody of the department in a state, county, or federal

24

correctional facility, or the <u>Massachusetts treatment center</u>." (Emphasis added). DOC has

adopted grievance procedures, 103 CMR 491, <u>Inmate Grievances</u>. This statute further provides

that:

> (c) Grievances that may be brought by inmates subject to the provisions of
> subsections (a) and (b) shall include all grievances arising out of or resulting from
> a condition of or occurrence during confinement, whether or not said grievance is
> presented in the form of petition for a writ of habeas corpus. A petition for a writ
> of habeas corpus seeking only release from unlawful imprisonment or restraint
> and no other relief shall not be subject to the provisions of this section. All
> applicable statute of limitations and presentment periods shall be tolled from the
> date of the filing of a grievance pursuant to this section until the final
> administrative resolution of the grievance

The statute, by its, terms includes the Treatment Center. Further, the term "inmate" is not

specifically defined in G.L. c. 127. Thus, the definition contained in G.L. , c. 125, § 1 provides

that:

> As used in this chapter and *elsewhere in the general laws*, unless the context
> otherwise requires, the following words shall have the following meanings: . . .

> (i) "inmate", a committed offender or such other person as is placed in custody in
> a correctional facility in accordance with law . . . .

(Emphasis added). The plaintiff makes no claim that he has exhausted the grievance procedures

available to him for his state law claims. Accordingly, the Court should dismiss this claim as

well as any other state law claim for which he has failed to allege exhaustion of the grievance

procedures.

Regardless, the Treatment Center has already been found to provide differing levels of

security in the course of the consent decree litigation. In the consent decree litigation, the Court

stated that "[e]ffective treatment is offered; physical conditions have improved greatly; there are

<u>differing levels of security</u>; meaningful work, education and avocational programs; and

discipline, including sequestration, conforms to acceptable standards of due process;  all under
the least restrictive conditions necessary to achieve the purposes of commitment, namely, the
care, treatment, rehabilitation, and custody of sexually dangerous persons."  *King*, 53 F.Supp.2d
at 137 (emphasis added).  Further, the Treatment Center has several levels of security.  The
Treatment Center has a main facility.  *King*, 53 F.Supp.2d at 125.  The Treatment Center has a
Minimum Privilege Unit ("MPU") where SDP's who have been found guilty of violating certain
institutional rules may be placed pursuant to 103 CMR 431, Observation of Behavior Reports.
*See King III*, 149 F.3d at 21.  The Treatment Center also has the Community Access Program
and the Community Transition House ("CTH") which is also less restrictive than the main
facility.  *See King III*, 149 F.3d at 17.[8]

This Court should, therefore, dismiss the second amended complaint.

## III.  THE PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE EIGHTH AMENDMENT FOR CRUEL ND UNUSUAL PUNISHMENT

It is well settled that the Eighth Amendment's prohibition against cruel and unusual
treatment applies to both the treatment of a prisoner and the conditions of his confinement.
*Giroux v. Somerset County*, 178 F.3d 28, 31 (1st Cir. 1999), citing *Farmer v. Brennan*, 511 U.S.
825, 832 (1994). In the context of a prison conditions complaint, two factors must be shown to
prove an Eighth Amendment violation.  There must be a "substantial risk of harm" and the
official involved must have had a "sufficiently culpable state of mind" amounting to "deliberate
indifference" to the safety of the inmate. Giroux, 178 F.3d at 32, citing Farmer, 511 U.S. at 834.

---

[8]    The CTH has been temporarily closed following the escape of a SDP.  That temporary closure, however,
has had no impact on the plaintiff who has not alleged that he has applied for the CTH or that he meets the eligibility
requirements for placement in the CTH.

26

To prove deliberate indifference, the prisoner must "prove that the defendant . . . intended wantonly to inflict pain." The level of conduct necessary to establish deliberate indifference can be equated to criminal recklessness, and must include "knowledge of impending harm, easily preventable." *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991).

Here, there are absolutely no allegations that there had been prior acts or threats of acts against the plaintiff, nor any pattern of abuse against plaintiff, which would give rise to "actual knowledge of impending harm." *DesRosiers*, 949 F.2d at 19. Without such actual knowledge, the defendants could not be "deliberately indifferent" to a need to protect the plaintiff. *See Cortes-Quinones v. Jiminez-Nettleship*, 842 F. 2d 556, 561 (1st Cir. 1987) ("[W]hen a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference."). There are no allegations set forth in the plaintiff's claim that either of these defendants acted with deliberate indifference towards the plaintiff.

To sustain an Eighth Amendment claim involving prison medical treatment, an inmate must prove that the prison officials' actions amounted to "deliberate indifference to a serious medical need." *DesRosiers v. Moran*, 949 F.2d 15, 18 (1st Cir. 1991), *citing Estelle v. Gamble,* 429 U.S. 97, 104-106 (1976); *see also Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir. 1981). "Deliberate indifference is conduct that offends evolving standards of decency in a civilized society." *DesRosiers*, 949 F.2d at 18, *citing Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Put another way, deliberate indifference to serious medical needs amounts to the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104, *quoting Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

27

Deliberate indifference in the context of medical treatment involves a two-prong analysis:

> The deliberate indifference standard embodies both an objective and a subjective prong.  First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'  Second, the charged official must act with a sufficiently culpable state of mind. . . . a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'

*Hathaway v. Coughlin*, 37 F.3d 63, 66 (2nd Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995) (internal citations omitted), *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994); <u>see</u> *DesRosiers*, 949 F.2d at 18.  This mental state is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable."  *DesRosiers*, 949 F.2d at 19.

Assuming without conceding that civil commitment as a sexually dangerous person constitutes a serious psychological need that properly falls under Eighth Amendment analysis, the plaintiff has access to sex offender specific treatment at the Treatment Center. *See King*, 53 F.Supp.2d at 126-27, 129-30. The defendants are entitled to rely on the judgments of the qualified professionals they retain.  *Cf. Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir. 1981). (prison officials entitled to rely on professional judgment of medical providers).  Thus, the plaintiff's claim fails as a matter of law.

The plaintiff makes no specific allegation from which one could infer that he has any other serious medical or psychological need for which he has not received attention. The plaintiff has therefore failed to satisfy the first part of the deliberate indifference inquiry.  It has repeatedly been held, in actions for alleged constitutional violations, "conclusory allegations will not suffice."  *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981); *Kearson v. Southern Bell Telephone & Telegraph Co.*, 763 F.2d 405, 407 (11th Cir. 1985), *cert. denied*, 474 U.S. 1065

28

(1986). The complaint must at least set forth minimal facts, not subjective characterizations, as to who did what to whom and why. *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982), *cert. denied*, 461 U.S. 944 (1983). Even a *pro se* complaint must "... be backed up with enough supportive facts to outline the elements of the pleader's claim. .." and courts "need not conjure up unpleaded facts to support conclusory [allegations]." *Hurney v. Carver*, 602 F.2d 993, 995 (1st Cir. 1979). A complaint may be dismissed on motion if it is clearly without merit, and this want of merit may consist of an absence of facts sufficient to make a good claim. 2A Moore, Federal Practice, § 12.08 at pp. 2267-70 (and cases cited therein).

In his Complaint, the plaintiff has failed to demonstrate how his rights under the Eighth Amendment to the United States Constitution have been violated. Where a plaintiff has utterly failed to assert any facts in support of his claim, a civil rights action is properly dismissed for failure to allege facts upon which relief can be granted. *Carwile v. Ray*, 481 F.Supp. 33, 35 (E.D.Wash. 1979). "To state a constitutional claim, plaintiff must do more than simply state a conclusion or engage in artful pleading. . . . A plaintiff must state a compensable claim for relief that details the facts forming the basis for the claim." *Blinder, Robinson & Co. v. U.S.S.E.C.*, 748 F.2d 1415, 1419 (10th Cir. 1984). The plaintiff has failed to sustain this burden here and his second amended complaint should be dismissed.

**IV.    EACH INDIVIDUAL DOC DEFENDANT IS ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY.**

As public officers in their roles as DOC employees, Commissioner Dennehy and Superintendent Murphy are entitled to qualified immunity from a suit for damages in their individual capacities on the plaintiff's claims against them.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that

29

"government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Subsequently, the Supreme Court refined the qualified immunity inquiry, writing:

> The contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted); *see Souza v. Pina*, 53 F.3d 423, 425 (1st Cir. 1995); *Horta v. Sullivan*, 4 F.3d 2, 13 (1st Cir. 1993).

The central purpose of affording government officials qualified immunity from suit is to protect them "'from undue interference with their duties and from potentially disabling threats of liability.'"  *Elder v. Holloway*,  510 U.S. 510, 514 (1994), *citing Harlow*, 457 U.S. at 806. Qualified immunity plays a critical role in striking the "balance...between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties."  *Davis v. Scherer*, 468 U.S. 183, 195 (1984). The Supreme Judicial Court has recognized that "[i]f State officials were held personally liable for <u>damages</u> every time regulations that they issued or enforced pursuant to statute were found to violate the Federal Constitution, only the most fearless among them would dare to fulfill their duties."  *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 144 (1993) (emphasis added).

Once a defendant raises a qualified immunity defense, the burden is on the plaintiff to show that the law was clearly established at the time of the alleged violation.  *Dixon v. Richter*, 922 F.2d 1456, 1460 (10th Cir. 1991).  If the plaintiff does not meet this initial burden, "the government official is properly spared the burden and expense of proceeding any further."

30

*Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989).  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability;...it is effectively lost if a case is erroneously permitted to go to trial."); *see Harlow*, 457 U.S. at 818 (until the "threshold immunity question is resolved, discovery should not be allowed").  Thus, qualified immunity questions should be resolved at the earliest possible stage of the litigation. *Anderson*, 483 U.S. at 646 n. 6; *Harlow*, 457 U.S. at 817; *see Singer v. Maine*, 49 F.3d 837, 844 (1st Cir. 1995) (where a qualified immunity defense is asserted by pre-trial motion, usual summary judgment standard applies regarding existence of genuine issue of material fact and moving party's entitlement to judgment as a matter of law).

Qualified immunity is a powerful defense.  "[Q]ualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil rights suits for money damages."  *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.), *cert. denied*, 516 U.S. 1029 (1995) (citation omitted*); see Hunter v. Bryant*, 502 U.S. 224, 229 (1991); *Malley v. Briggs*, 475 U.S. 335, 343 (1986).  Qualified immunity protects law enforcement officers from "bad guesses and gray areas" and ensures that they are liable only "for transgressing the bright lines."  *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *quoting Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).  Courts have noted that qualified immunity gives police and correctional officers a wide zone of latitude in determining the proper action to take in circumstances (such as in the present case) that are sudden, tense, uncertain and rapidly evolving. *See, e.g., Roy v. City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) ("the Supreme Court's standard of reasonableness is comparatively generous to the police where potential danger, emergency conditions or other exigent circumstances are present."); *Foster v. McGrail*, 844 F.Supp. 16, 24 (D. Mass. 1994) (qualified

immunity protects a correction officer from §1983 liability when making quick decisions about how much force to use).

The First Circuit has established a two-part inquiry for qualified immunity analysis:

> First, the court must establish whether the constitutional right asserted by the plaintiff was 'clearly established' at the time of the alleged violation. . . .Second, the court must ask whether a 'reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.'

*St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir. 1995), *cert. denied*, 518 U.S. 1017 (1996), *citing Hegarty*, 53 F.3d at 1371 & *Burns v. Loranger*, 907 F.2d 233, 235-36 (1990). Qualified immunity, therefore, does not turn on the government official's state of mind. Rather, it turns on the "objective legal reasonableness " of the official's action, in light of legal rules that were "clearly established" at the time the action was taken. *Anderson*, 483 U.S. at 639; *see Wood v. Clemons*, 89 F.3d 922, 927 (1st Cir. 1996) ("The 'touchstone' of the qualified immunity question is the concept of 'objective legal reasonableness.'") (citation omitted). The inquiry becomes whether the official acted as a reasonable official might in light of the information that the official possessed at the time of the challenged conduct. *Wood*, 89 F.3d at 929-30.

As the Supreme Court has stated, a "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). As a predicate to the "objective reasonableness" inquiry, therefore, "a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights." *Singer*, 49 F.3d at 844 (citation and internal quotation omitted); *see Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 531 (1st Cir. 1995), *cert. denied*, 516 U.S. 1159 (1996).

32

Whether an asserted federal right was clearly established at a particular time so that a public official who allegedly violated the right has qualified immunity is a question of law, not one of legal facts. *Elder*, 510 U.S. at 516; *see Hegarty*, 53 F.3d at 1373. Accordingly, appellate review of qualified immunity must be conducted in light of all relevant precedents, not simply those cited to or discovered by the parties or the trial court. *Id.*

> For purposes of determining qualified immunity, the officer's actions are measured by a standard of "objective legal reasonableness...in light of the legal rules that were clearly established at the time [they] were taken," [footnote omitted]. Anderson v. Creighton, 483 U.S.. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed. 2d 523 (1987) (internal quotation omitted).

*St. Hilaire*, 71 F.3d at 24. "It is not enough for the constitutional right to be 'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law." *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998), *citing Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998). "This qualified immunity standard leaves 'ample room for mistaken judgments.'" *Ringuette*, 146 F.3d at 5, *quoting Malley*, 475 U.S. at 343; *see Berthiaume*, 142 F.3d at15 (the question is whether in the circumstances that confronted the official, a reasonable official would have understood that what he is doing violated that right). Qualified immunity permits some leeway for mistakes, even negligent ones, without the consequence of legal liability. *Foster*, 844 F.Supp. at 24.

While "the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson*, 141 F.3d at 114; *see Souza*, 53 F.3d at 425 (right must have been clearly established at time of the challenged conduct). Qualified immunity may exist even though, in hindsight, a court might determine that the action of the official violated the Constitution. *Berthiaume*, 142 F.3d at 15; *see Wood*, 53 F.3d at 1375-76

33

(inquiry must be made based on information available to the official at the time the challenged conduct occurred without indulging hindsight).

As the First Circuit has noted,

> [t]he Supreme Court, recognizing that the use of summary judgment in qualified immunity cases could be undermined, has held that a very broad articulation of the 'clearly' established law at the time of the alleged violation is inappropriate:

> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence, more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  Anderson, 483 U.S. at 640, 107 S.Ct. 3039.

St. Hilaire, 71 F.3d at 24; see Singer, 49 F.3d at 845 (inquiry is "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged") (citations and internal quotations omitted).  If there is a "legitimate question" as to whether an official's conduct rises to a constitutional violation, the official is entitled to qualified immunity.  Singer, 49 F.3d at 845.   For the reasons discussed above, none of the plaintiff's allegations establishes the violation of a clearly established right.  Accordingly, Commissioner Dennehy and Superintendent Murphy are entitled to the protection of qualified immunity.

## **CONCLUSION**

For the foregoing reasons, the defendants respectfully request that this Court dismiss the Complaint and the Amended Complaint. Alternatively, the defendants request that this Court grant them summary judgment.

Defendants Robert Murphy and Kathleen Dennehy,

NANCY ANKERS WHITE
Special Assistant Attorney General

34

<u>/s/ Brian P. Mansfield</u>

By:    Brian P. Mansfield, Counsel  (BBO # 564671)
          Department of Correction
          Massachusetts Treatment Center
          30 Administration Road
          Bridgewater, Massachusetts 02324
          (508) 279-8183
          (508) 279-8181 (fax)
          BPMansfield@DOC.state.ma.us

Dated:  July 6, 2007

<u>Certificate of Service</u>

I hereby certify that I did this day served the above by filing electronically with the Court.

<u>/s/ Brain P. Mansfield___</u>
Brian P. Mansfield

Dated:  July 6, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-10508-RGS

JOSEPH E. BLAKE,
      Plaintiff,

v.

ROBERT MURPHY, *et al,*
      Defendants.

### AFFIDAVIT OF MARYANNE PERCUOCO

1.      I am a registered nurse and am licensed as a nurse in the Commonwealth of Massachusetts. Since approximately 2001, I have been employed at the Massachusetts Treatment Center ("Treatment Center"), in the position of Health Services Administrator. I have worked in managerial capacities in Department of Correction ("DOC") facilities since August, 1996. Prior to January, 2003, I was employed by prior vendors that contracted with DOC to provide medical and mental health services to DOC inmates/residents. On January 1, 2003, I began employment with UMASS Correctional Health Care Program ("UMASS"), the company that presently contracts with DOC for the provision of medical and mental health services to DOC inmates/residents.

2.      As part of my responsibilities as the Health Services Administrator, I supervise the maintenance of medical and mental health records for all inmates/residents housed at the Treatment Center.

3.      I also review any Request for Reasonable Accommodation of Special Need(s) submitted by an inmate or resident pursuant to 103 DOC 207, Special Accommodations for Inmates. Joseph Blake has not submitted a request for any accommodation relating to any mental condition or impairment.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 20TH DAY OF MARCH, 2006.

                                               Maryanne Percuoco

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 2005-10508-RGS

JOSEPH E. BLAKE,
         **Plaintiff,**

v.

ROBERT MURPHY, *et al*,
         **Defendants.**

### AFFIDAVIT OF JOSEPH MURPHY

I, Joseph Murphy, being duly sworn, do hereby depose and state as follows:

1. Since 1986, I have been employed by the Massachusetts Department of Correction ("DOC"). I currently hold the position of Deputy Superintendent of Treatment at the Massachusetts Treatment Center ("Treatment Center"). I have held this position since January, 2005.

2. In my capacity as Deputy Superintendent of Treatment, I serve as the Treatment Center's Institution ADA Coordinator for the purpose of coordinating and monitoring activities and procedures related to special accommodations and access to programs for inmates with disabilities at the Treatment Center. DOC has developed a written policy for such accommodations, 103 DOC 207, Special Accommodations for Inmates, a true and accurate copy of which is attached hereto.

3. Pursuant to 103 DOC 207.04, Requests for Reasonable Accommodations, an inmate or resident may submit a request for reasonable accommodation by either (1) submitting a request to medical staff for a medically prescribed accommodation, or (2) by completing a Request for Reasonable Accommodation of Special Need(s) form, Attachment A to 103 DOC 207, Special Accommodations for Inmates. The inmate or resident then submits the request to either medical staff or to me. See 103 DOC 207.04(1), (3).

4. Joseph Blake has not submitted a Request for Reasonable Accommodation of Special Need(s) form relating to his mental illness or other mental impairment to me. Further, I have reviewed records to determine if he has submitted such a form from November, 2002, to the present. I could not locate any such form from Mr. Blake.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14TH DAY OF MARCH, 2006.

Joseph Murphy     3/14/06

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-10508-RGS

JOSEPH E. BLAKE,
      Plaintiff,

v.

ROBERT MURPHY, *et al*,
      Defendants.

---

## AFFIDAVIT OF ROBERT MURPHY

---

I, Robert Murphy, being duly sworn, depose and state as follows:

1.     Since November, 1997, I have been the Superintendent of the Massachusetts Treatment Center ("Treatment Center").

2.     I have been an employee of the Department of Correction ("DOC"), since 1976. I received my Bachelor of Science in Criminal Justice from Northeastern University in 1977. At that time, I was a Correctional Social Worker at MCI Cedar Junction. In 1979, I became a Correction Counselor at MCI Norfolk. In 1980, I became a Correction Counselor at MCI Concord and, in 1982, I became a Supervising Correction Counselor at MCI Concord. I held that position until 1985, when I became Director of Treatment at MCI Plymouth and then Director of Classification at MCI Shirley. In 1987, I was promoted to the position of Deputy Director of Classification Services for the entire Department. In 1988, I was appointed to be Deputy Superintendent of Patient Services at Bridgewater State Hospital ("BSH"). In 1992, I became the Deputy Superintendent of Treatment at MCI Framingham. While in that position at MCI Framingham, I received my Masters of Arts in Business Administration from Framingham State College in 1994. Subsequently, in 1996, I became the Deputy Superintendent of Treatment at MCI Concord, a position I held until I was promoted to my present position as Treatment Center Superintendent.

3.     As Superintendent, I am responsible for the overall operation of the Treatment Center, including the care, custody and control of residents, the physical plant of the institution, and the safety of staff, visitors and the public. The Treatment Center is a level four security facility administered by DOC. The Treatment Center currently houses three populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDP's") and committed for an indefinite period of one day to life pursuant to G.L. c. 123A; (ii) inmates committed to DOC's custody who are participating in DOC's voluntary sex offender treatment

- 2 -

program ("SPI's"); and (iii) persons awaiting adjudication as SDP's pursuant to G.L. c. 123A, §§ 12-14.

4.      As a result of the Superior Court's decision in Durfee v. Maloney, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, issued in July, 2001, DOC decided to change its management of the Treatment Center to keep SDP's and SPI's separate and apart at all times. On December 10, 2001, DOC implemented its "separate and apart" management policy at the Treatment Center.

5.      The implementation of the "separate and apart" management policy necessitated that the two populations be divided for purposes of access to the common areas of the facility (such as the gym, exercise yard, visiting room and library), in which they previously had the opportunity to commingle. Where possible, SDP's continue to receive priority in terms of access to the Treatment Center's common areas.   Due to staffing and other administrative considerations, access to the library was divided between the two populations.  As a result of the implementation of the "separate and apart" management plan, SDP's now have access to the library approximately 12 ½ hours per week (with an additional two hours of access to the book mobile).  Previously, the population had access to the library approximately 22 hours per week (with each population having an additional two hours of access to the book mobile).

6.      Access to computers and typewriters are available during general movement hours. However, SDP's must sign up in advance for time in the computer lab.

7.      As a result of the implementation of the "separate and apart" management plan, SDP's now have access to either the gym or the yard 13 hours per week, the gym an additional 6 hours per week, and to the yard an additional 5 hours per week. Access to the gym and the yard is available every day of the week.

8.      Visitation to SDP's is available five days a week. On Mondays, Wednesdays and Fridays, visiting hours are from 1:00 p.m. to 8:30 p.m. On Saturdays, visiting hours are from 6:00 p.m. to 8:30 p.m.  On Sundays, visiting hours are from 1:00 p.m. to 5:00 p.m.

9.      There are no free weights available in the gym. However, both "Universal" and "Nautilus" weight/exercise machines are available. Games are also available in the gym. Furthermore, games are available for the common areas of the living units.

10.      Native American religious services are offered at the Treatment Center. Such services are allowed weekly. On the day of the services, participating SDP's are given access to the Native American ceremonial pipe, a lighter, smudge shell, and sage and sweet grass compound. The Treatment Center has a written policy detailing the availability and procedure for these ceremonies, a copy of which is attached. Additionally, a compact disc player is made available for the services. SDP's may request Native American music compact discs, which, within reason, are made available at no expense to the SDP's. Further, SDP's may order books, including Native American literature, in accordance with DOC's property policy, 103 CMR 403,

- 3 -

*Inmate Property*, and the Treatment Center's attachment thereto. Pursuant to these policies, SDP's may order books directly from a publisher or approved vendors. SDP's have requested that a sweat lodge be provided at the Treatment Center. I have passed this request on to the DOC's Religious Review Committee. The request is being studied and a decision from the committee is still pending.

11.    Urine samples are collected from SDP's in accordance with 103 DOC 525, *Inmate Substance Abuse Testing and Sanctions*. 103 DOC 525 is applicable to all DOC facilities. In accordance with that procedure, the subject of the collection must be strip searched prior to the collection of the sample, in accordance with DOC's strip search procedure. 103 DOC 525.02 (I)(A)(8). The procedure also requires that the collecting officer "be in a position to verify that the specimen passes directly from the inmate's body into the collection cup." 103 DOC 525.02 (II)(A)(1). It is the Treatment Center's policy to collect the specimen immediately after the strip search, while the SDP is still unclothed, to further ensure the verification of the validity of the sample.

12.    Strip searches are conducted at the Treatment Center in accordance with 103 DOC 506.04, *Search Policy-Strip Searches*. 103 DOC 506 is applicable to all DOC facilities. The strip search includes a visual inspection of the entire body, including mouth, pubic region and rectum. 103 DOC 506.04 (2)(C).

13.    SDP's are served a standard meal at each mealtime. SDP's requiring a special diet for medical or religious purposes will be provided with special meals. Additionally, SDP's have access to approximately 200 food items for purchase through the canteen. Each housing unit has a microwave oven, a refrigerator and instant hot water dispenser for preparing and storing foods purchased through the canteen. An SDP may also purchase a hot pot for use within their rooms.

14.    SDP's may purchase and possess a number of types of property. The receipt, storage, maintenance, and transfer of property is governed by 103 CMR 403, *Inmate Property Policy*, and the Treatment Center attachment thereto. Lamps are not approved property for any inmate, including SDP's. *See* 103 CMR 403.10 (listing approved items). However, when DOC began administering the Treatment Center, SDP's who already possessed certain items were allowed to maintain, but not replace those items. Therefore, some SDP's were allowed to retain lamps, typewriters with memory and computers. SDP's are allowed to possess or purchase from an approved vendor, subject to certain conditions, televisions, radios, fans, hot pots, "Walkman" radios, headphones, musical instruments, non-memory typewriters, and extension cords. Clothing may also be possessed and purchased by SDP's, subject to color and amount restrictions, through the approved vendor. 103 CMR 403.10.

15.    Showers are controlled by a push button. SDP's have no control over the temperature of the water. However, the Massachusetts Department of Public Health ("DPH") inspects the water temperature for the showers annually to ensure that they fall within the required range. The shower water temperature at the Treatment Center has consistently fallen within the required temperature range while I have been superintendent. Currently, after

- 4 -

pressing the shower control button, the showers run for one minute. The button can then be pressed again to resume the shower. This system is currently being upgraded to allow for a continuous six minute shower.  Additionally, I have never received a grievance from Joseph Blake complaining about the shower water temperature.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 14th DAY OF MARCH, 2006.

Robert Murphy, Superintendent
Massachusetts Treatment Center

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                                    SUPERIOR COURT
                                                 CIVIL ACTION NO.

Joseph "Gentle Moose" Blake,
              Plaintiff,

v.

Robert Howland,
Joseph Murphy,
Robert Murphy,
Kathleen Dennehy,
Massachusetts Department of Corrections,
              Defendants.

05-0497

**FILED**

ATTEST:

MAR 18 2005

CLERK

### COMPLAINT

1.  This action is brought by Joseph "Gentle Moose" Blake
of the Massachusetts Treatment Center at Bridgewater, Plymouth
County, Massachusetts (MTC) who is a member of the Native American
Spiritual Awareness Council (NASAC), alleging violations of his
rights under the Constitution and Laws of the Commonwealth of
Massachusetts and the Constitution and Laws of the United States
by the defendants and personnel of the MTC.  Declaratory relief,
injunctive relief and monetary damages are sought.

### JURISDICTION

2.  This action arises under 42 U.S.C., sec 1983 and under
Amendments 1 and 14 of the United States Constitution, and M.G.L.
c. 93, §102, M.G.L. c. 12, §11H and 11I and article 16 of the
Massachusetts Declaration of Rights.  The matter is within the
general equity jurisdiction of the Superior Court, M.G.L. c.
214, §1.  Review of the grievance decisions is authorized under
M.G.L. c. 127, §38H, in accordance with the standards set out
in M.G.L. c. 30A, §14.  An action to protect the plaintiff's
Freedom of Religious exercise is authorized by 42 U.S.C., 2000cc,

(2)

et seq., and by Massachusetts Constitution Amendment Article
18, §1 and 4, M.G.L. c. 127, §88, M.G.L. c. 124, §1 (e) and
(1), M.G.L. c. 266, §127B.  The plaintiff has a right to declaratory
judgement under M.G.L. c. 231A, and M.G.L. c. 30A, §7.

<u>PARTIES</u>

3.  The plaintiff, Joseph "Gentle Moose" Blake (Blake), a
member of NASAC, is a natural person who is commorant at the
Massachusetts Treatment Center at 30 Administration Road,
Bridgewater, Plymouth County, Massachusetts 02324.

4.  The defendant, Robert Howland (Howland), is the Staff
Program Director of the MTC at 30 Administration Road, Bridgewater,
Plymouth County, Massachusetts 02324.

5.  The defendant, Joseph Murphy (DOT), is the Director of
Treatment of the MTC at 30 Administration Road, Bridgewater,
Plymouth County, Massachusetts 02324.

6.  The defendant Robert Murphy (Superintendent), is the
Superintendent of the MTC at 30 Administration Road, Bridgewater,
Plymouth County, Massachusetts 02324.

7.  The defendant, Kathleen Dennehy (Dennehy), is the
Commissioner of the Massachusetts Department of Corrections, 50
Maple Street, Suite 3, Milford, Worcester County, Massachusetts 01757.

8.  The defendant, the Massachusetts Department of Corrections
is a "government" within the meaning of 42 U.S.C., 2000cc.  Its
principle place of business is 50 Maple Street, Suite 3, Milford,
Worcester County, Massachusetts 01757.  The Massachusetts Department
of Corrections is sued in its official capacity.

9.  Each of the individual defendants are sued both in their
official and their individual capacity.

(3)

10. At all times relevant to this action each of the defendants was acting under the color of state law.

## STATEMENT OF FACTS

11. On November 25, 2002 Blake was ordered temporarily held at the MTC.

12. Blake is a member of NASAC.

13. NASAC is a religious group equivalent to a Christian church, Jewish temple or a Muslim mosque. NASAC was established in 1989 and is recognized by the Massachusetts Department of Corrections. Many members of NASAC are Native American. However, membership is not so limited by the group and is open to all prisoners desiring to join. NASAC maintains ongoing relationships with Native American leaders and Medicine teachers from New England who hold positions of responsibility and respect similar to Christian Ministers, Jewish Rabbis and/or Muslim Imams.

14. Blake and other members of NASAC are, as a part of Native American religious worship are authorized the use of a Ceremonial Pipe and Kinnik-kinnik as well as flat cedar, sweet-grass and various sages for smudging by the DOC.

15. All of these items have religious significance to Blake and all other members of NASAC and are utilized for prayerful purposes. The Massachusetts Department of Corrections has previously allowed these items to be kept in individual members' cells for daily use without jeopardizing the mission of the Massachusetts Department of Corrections.

16. On various occasions one, or more, of the defendants have withheld the use of or confiscated these items causing Blake and other members of NASAC repeated emotional distress

(4)

and suffering as well as perventing them from engaging in Native American religious worship.

17.  On May 7, 2004 the Director of Treatment was sent a purchase request for a Ceremonial Pipe.

18.  On September 16, 2004 Blake questioned the DOT regarding the status of the Pipe and was told there was some question as to whether the Pipe would be ordered.

19.  On September 30, 2004 the DOT told Blake the request for the Ceremonial Pipe was denied.

20.  On October 15, 2004 the DOT told Blake the order for the Pipe would be approved.

21.  On October 19, 2004 the DOT told blake that he (DOT) would have to consult with the Superintendent about whether the Ceremonial Pipe could be ordered.

22.  On May 7, 2004 NASAC provided the DOT with an order request to replace consumed ceremonial items; Kinnik-kinnik, Cedar, Sweetgrass and Sage.

23.  On October 18, 2004 Blake and other members of NASAC were denied access to Sacred Items for Pipe Ceremony and Smudge by Howland.  Blake was told to discuss the issue with the DOT.

24.  Between October 19, 2004 and present Blake has repeatedly spoke with the DOT at staff access hour to request that the plaintiff and other members of NASAC be allowed to perform a Smudge and Pipe Ceremony.

25.  The DOT has given Blake inconsistant and varying answers regarding the eventual disposition of Blakes' and other members of NASACs' ability to engage in Native American religious worship while detained at the MTC.

26.  On October 21, 2004 Blake was again allowed to access

(5)

NASAC's Sacred Items, on November 1, 2004, access was again denied, December 21, 2004 allowed, December 24, 2004 denied.

27.   Between November 9, 2004 and November 18, 2004 Blake at the suggestion of the DOT, spoke to the Superintendent with the hope of resuming the Smudge and Pipe Ceremonies. Blake was told to, "wait and see, we'll try to get it back on track."

28.   On January 13, 2005 the DOT informed Blake that he and other members of NASAC would be allowed access to the Sacred Items for the Smudge and Pipe Ceremonies only if they would use them outdoors.

29.   On January 17, 2005 Blake and other members of NASAC were forced to endure 45-50 minutes in freezing temperatures to perform their Pipe and Smudge Ceremonies.

30.   On January 28, 2005 a Recreation Officer "Coach John" was asked by Blake for access to the herbs to perform the Pipe and Smudge Ceremonies.  The coach indicated that though he was aware of that the items were approved for the use outdoors he felt "uncomfortable" doing so but that Howland would be back on January 31, 2005 and we could "get [our] stuff then."

31.   On information and belief the defendants have repeatedly, intentionally, with forethough and malice obstructed Blake's ability to practice Native American religious worship by refusing to procure and permit the use of approved Sacred Items.

32.   On May 7, 2004 NASAC provided the DOT with an order for Cedar, Sweetgrass, Sage and Kinnik-kinnik.

33.   On June 1, 2004 Blake was told by Howland that "[the] order was in the warehouse."

34.   On July 25, 2004 Blake questioned the Superintendent regarding the status of the order in the warehouse and was informed

(6)

that the order was not in the warehouse but in fact, had just been placed.

35. On July 29, 2004 Blake attempted to confirm that the order had been sent and was told by the DOT that the budget was pending and would not be sent until after August 1, 2004.

36. On September 9, 2004 Blake was informed by the DOT that the budget was approved and the order had been sent.

37. On September 30, 2004 Blake checked with Howland on the status of the order and was told that "It [has] just been approved. We'll get it right out."

38. On October 20, 2004 it was confirmed by telephone call to the vendor that "No order had been received."

39. At the next Staff access hour Blake confronted DOT with this information. The DOT denied responsibility and placed the blame for the order not being sent on "Finance".

40. On December 17, 2004 Blake was contacted by Howland and informed that, after seven (7) months the order was in.

41. Music is a major part of Native American religious worship. The DOC has previously approved the Drum, Rattles and Flute for NASAC use. The defendants have denied Blake access to these items as well as adequate audio recordings without cause. Other religious groups have access to musical instuments and a variety of recorded media.

42. On January 8, 2004 Blake provided the DOT with a list of requested Ceremonial Musical items with no results.

43. On February 6, 2004 a request for the above ceremonial music was submitted with the Religious Services Committee, to date there has been no response.

44. On February 23, 2004 Blake was told by Howland that

(7)

the requested ceremonial music items were not approved although
the DOC Religious Service Handbook clearly showed that they
were.

45.  On May 7, 2004 Blake, at the request of the DOT,
submitted an order for the ceremonial items, to date there has
been no response.

46.  On November 9, 2004 Blake questioned the DOT about
Native American Instruments for Ceremonial use and was told
that the matter was being looked into.

47.  On January 16, 2005 Blake wrote a letter to the DOT
requesting that, among other things, NASAC be given access
to Ceremonial instruments, to date there has been no response.

48.  There has been a continuing history to the present
time of harassment of Blake and other members of NASAC by the
defendants and/or their agents.

49.  Blake and other NASAC members have been instructed
to immediately cease wearing the Native American headband and
choker in a manner that is normally accepted Native American
Tradition ie: limiting color, size and style of the above items,
a restriction not enforced at other Massachusetts Department
of Corrections facilities without jeopardizing the mission of
the DOC or the security of its personnel.

50.  The defendants have prohibited Blake and other NASAC
members from engaging in special celebrations such as Summer/Winter
Solstice observations in a manner consistant with Native American
beliefs and DOC policy in other facilities.  Special celebrations
in other faiths have been permitted at the MTC without restriction.

51.  On November 4, 2004 Blake spoke to the DOT in an attempt
to have the menu for the NASAC Winter Solstice celebration,

(8)

and all future Solstice/Equinox celebrations, modified to include
Lima beans.  Historically the main staple of Native American
diets was corn, squash and lima beans, known as the "Three Sisters"
in Native Lore.  The DOC currentl allows corn and squash for
Solstice/Equinox meals.  The DOT's response was that he "[would]
look into it and see what [could] be done." The eventual outcome
was that nothing was done.

52.  On December 20, 2004 a grievance was filed to that
effect and was denied.

53.  On January 3, 2005 Blake submitted a Religious Service
Request Form to the DOT formally requesting the addition of
lima beans to the approved items list.  To date no response
has been received.

54.  On March 16, 2004 Blake was informed by the Superintendent
that the Solstice meal could not be consumed in the approved
meeting area where, at that time, food items could be smudged
in accordance with Native American religious beliefs.  The
Superintendent alleged that food could not be consumed outside
the chow hall and the Ceremonial Pipe and Smudge could not be
performed inside the chow hall.  Other religious groups are
allowed to consume food for religious purposes outside of the
chow hall.  To date several grievances have been filed on this
matter and there has been a continuing dialog with the defendants
in an effort to have this important religious tradition approved
at the MTC as it is at various other DOC facilities.

55.  The defendants are still denying Blake the ability
to perform this aspect of his religious beliefs.

56.  The defendants have limited the ability of Blake and
other prisoners to purchase items of religious significance,

(9)

which are approved by the DOC, unless their names are listed on a "roster" of Native Americans. A roster generated and maintained by the defendants.

57. On February 3, 2004 Howland refused to place an inmates name on the "approved roster" because in his opinion this inmate was not Native American. Howland knew or should have known that his imposition of racial or ethnic requirements for religious group membership constitutes a violation of that inmates freedom of religion. Defendants have not placed ethnic or racial requirements on membership in any other religious group.

58. The defendants and/or their agents have repeatedly subjected Blake and other NASAC members to verbal abuse because of their religious beliefs. Several grievances have been filed but, as yet, no actions have been taken to curb this behavior.

59. None of the religious practices of Blake or other NASAC members have impaired the mission of the MTC or the security of its personnel.

60. Many state and federal prisons throughout the United States and in Massachusetts allow Native American Purification Lodge ceremonies with no impairment of institutional function- - including MCI Shirley Medium, NCCI Gardner Medium, MCI Norfolk and the federal prison at Devens.

61. A Purification Lodge is generally twelve feet in diameter; its frame is composed of bent willow poles; its outer skin is composed of material that is non-porous as befits a structure intended to avoid outleaks of heat and smoke.

62. The usual ceremony in a Lodge requires that stones be heated in a wood-fed fire pit a short distance from the entrance ant transported, by scooping with two deer antlers, into the

(10)

Lodge.  The rocks heat the interior of the Lodge to about 150°F,
thus accounting for its less elecant sobriquet "sweat lodge".
The ceremonial activities within the Lodge may last up to four
to five hours.

63.  On February 6, 2004 NASAC filed a Religious Services
Request Form asking that a Purification Lodge be provided.  To
date there has been no answer.

64.  On March 18, 2004 the Superintendent and DOT indicated
that the Purification Lodge was being "considered" by them.

65.  On July 6, 2004 a letter was written to Deputy
Commissioner James Bender requesting that the Purification Lodge
be authorized.  To date no answer has been received.

66.  On November 9, 2004 Blake talked to the DOT about the
status of the Purification Lodge but received no satisfactory
answer.

67.  On January 18, 2005 at Staff Access hour the DOT informed
Blake that the "States (state inmates) got an answer to their
request for a Purification Lodge."  The DOT was not forthcomming
with what the answer was and Blake has no access to the State
inmates to ascertain what the answer was.

68.  The defendants have substantially burdened Blake's
religious exercise as well as that of other NASAC members.

69.  The defendants actions against Blake and other NASAC
members, has at all times been deliberate, willful, malicious,
and taken with calous disregard for Blake's religious faith and right
to practice that faith.

69.  The defendants interference with Blake's and other NASAC
members, religious faith and rightful attempts to practice that
faith have been coercive, threatening and intimadating and done

(11)

while acting under color of law.

70.  Blake and other NASAC members, have been afforded unequal treatment to that given inmates of other religious/spiritual persuasions with regard to access to "adequate" time and space for religious worship and study.  Which should include daily access to time, space and materials necessary to perform the Pipe and Smudge ceremonies as well as weekly Purification Lodge ceremonies.

71.  The defendants have at all times known, or reasonably should have known, that their actions violated Blake's clearly established right to religious freedom, as well as the religious freedom of other NASAC members.

CLASS ACTION

72.  The plaintiff class consists of all persons who are members of NASAC and are incarcerated at the MTC.

73.  The class is so numerous that joinder of all members is impractical, because the defendants' continual transfer of inmates among DOC facilities results in a continually changing membership in NASAC.

74.  There are questions of law and fact common to the class. These questions predominate over questions affecting only individual class members.

75.  The claim of the plaintiff is typical of the claim of the class.

76.  The plaintiff will adequately protect the interest of all members of the class.

77.  A class action is superior to other available methods for a fair and effective ajudication of this action.  Separate actions could result in inconsistent and varying decisions, and

(12)

conflicting and incompatable standards of conduct for the defendant.

RELIEF SOUGHT

Wherefore, the plaintiff requests that the court grant the following relief;

1.  Issue an Order of Notice to the defendants to show cause within ten (10) days why a preliminary injunction should not be granted.

2.  Issue a preliminary injunction pending trial on the merits enjoining the defendants from interfering with the plaintiff's possession and use of ceremonial items.

3.  Enter a declaratory judgement and a permanent injunction that the defendants must make available to the plaintiff an area for construction of a Purification Lodge and the means to construct said structure.

4.  Issue judgement against the defendants in their official capacity as agents of the Massachusetts Department of Corrections and personally for compensatory damages and costs.

5.  Issue judgement for punitive damages against the defendants individually.

6.  Enjoin the defendants from interfering with the plaintiff's possession and use of ceremonial items and return to the plaintiff ceremonial items previously siezed.

7.  Enter a declaration of Blake's rights to daily time for Native American Religious worship and study and weekly Purification ceremony.

8.  Award Blake damages, costs and reasonable attorneys fees pursuant to M.G.L. c. 1983 §102, M.G.L. c. 12, §11I and 42 U.S.C. 1988.

9.  Certify this action as class action.

(13)

10.  Grant further relief as justice and equity require.

Joseph "Gentle Moose" Blake
Plaintiff, Pro Se

_____
Joseph "Gentle Moose" Blake
Mass Treatment Center
30 Administration Road
Bridgewater, MA. 02324

## VERIFICATION

I, the under signed, Joseph "Gentle Moose" Blake state under the pains and penalties of purjury that all tha factual allegations made in the foregoing complaint are true and correct with personal knowledge and observation.

DATED: 3/7/05

_____
Joseph "Gentle Moose" Blake

04/27/2005  12:42    5082798181                MTCLEGAL                        PAGE  04

COMMONWEALTH OF MASSACHUSETTS

WORCESTER,  SS,

SUPERIOR COURT
CIVIL ACTION NO.
WOCV2005-00497

Joseph "Gentle Moose" Blake,
                Plaintiff,

v.

Robert Howland,
Joseph Murphy,
Robert Murphy,
Kathleen Dennehy,
Massachusetts Department of Corrections,
Captain Rull,
             Defendants.

## AMENDED COMPLAINT

78. The plaintiff re-alleges and incorporates all of the Allegations contained in the 77 paragraphs of the original complaint filed in this action.

## ADDITIONAL PARTIES

79. The defendant Captain Rull (hereafter Rull) is a natural person, who is the Massachusetts Department of Corrections employee most responsible for resident housing assignments at the M.T.C., 30 Administration Road, Bridgewater, Plymouth County, Massachusetts 02324.

## STATEMENT OF ADDITIONAL FACTS

### REPRISAL AND RETALIATION

80. On 2/28/05 Blake brought the original of the complaint, in the above entitled matter, to the M.T.C. library to have a copy made so that he could send the original to the court for filing. After several hours had elapsed Blake was provided with his original and requested copy.

81. On 3/2/05 Blake was moved to a new cell in a cell block known to be noisier, more crowded and furnished more like a prison

(2)

cell than a treatment room.  See <u>Langton v. Johnston</u>, 928 F.2d at 1212

for Judge Mazzone's description of a "treatment center room."

82.  On 3/24/05 Blake submitted the envelopes containing the
complaints and summonses in the above entitled action to the M.T.C.
institutional mail officer to be sent by certified mail to each
defendant.  The mail officer caused a 9 day delay in the mailing of
the summonses before causing them to be sent to the defendants.

83.  On 3/14/05 Blake was called to the "New Man" section of the
M.T.C. at which time he was placed in handcuffs, belly chains and
leg irons after being made to strip in front of M.T.C. employees.

84.  Blake was then chained to a state prisoner and loaded into
a windowless van with only wooden benches, no seat belts and no other
means to stabilize himself.  Blake was subsequently driven to another
prison where he consulted with a doctor of orthopedics about upcomming
surgery.

85.  On knowledge and belief this vehicle was used when other
safer and more adequate means of transportation were readily available.

86.  On or about 4/4/05 the M.T.C. based defendants in the instant
case received the copies of the complaint and their summonses.

87.  On 4/6/05 Blake was dismissed from his inmate kitchen job
at the M.T.C. for no reason.

88.  Blake has received limited assistance from outside sources
and relied upon his inmate job as the only means to obtain anything
beyond the "minimal civilized measure of life's necessities" provided
by the D.O.C.

(3)

### ADDITIONAL RELIEF SOUGHT

11.  Grant a preliminary and permanent injunction restraining the defendants from acting, further, in any manner towards the plaintiff, that the court deems to be retaliatory in nature.

12.  Enter a declaration of the plaintiff's right to equal access to the courts without retaliation, retribution or harassment.

13.  Enter a declaratory judgement ordering the defendants to return the circumstances of the plaintiff's daily life to the conditions enjoyed prior to the commencement of the defendants retaliatory actions, including in the judgement the plaintiff's lost wages.

Joseph "Gentle Moose" Blake
Plaintiff, Pro Se

Joseph "Gentle Moose" Blake
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA  02324

### VERIFICATION

I, Joseph "Gentle Moose" Blake, state under the pains and penalties of purjury that all the factual allegations made in the foregoing Amended Complaint are true and correct, with personal knowledge and observation.

DATED: 4/23/05

Joseph "Gentle Moose" Blake

04/27/2005  12:42     5082798181                    MTCLEGAL                        PAGE  02

CC: legal

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER,  SS

                                                          SUPERIOR COURT
                                                       CIVIL ACTION NUMBER
                                                         WOCV2005-00497
Joseph "Gentle Moose" Blake,
              Plaintiff,

v.

Robert Howland,
Robert Murphy,
Joseph Murphy,
Kathleen Dennehy,
Massachusetts Department of Corrections,
Captain Rull,
              Defendants.


### Plaintiff's Motion to Amend the Complaint

   The Plaintiff, Joseph "Gentle Moose" Blake, moves to amend the
complaint.  In support of this motion the plaintiff states that Rule
15(a) of the Massachusetts Rules of Civil Procedure provides that
the complaint may be amended once as a matter of course, if the
defendants have not already answered or otherwise responded to the
complaint.  The defendants in this case have not answered or otherwise
responded to the complaint in this case, filed with this motion is
the proposed complaint.


                              Joseph "Gentle Moose" Blake, Plaintiff



                              Joseph "Gentle Moose" Blake, Pro Se
                              Mass. Treatment Center
                              30 Administration Rd.
                              Bridgewater, MA 02324


RECEIVED
APR 2 7 2005

04/27/2005 12:42   5082798181              MTCLEGAL                PAGE 03

(2)

## CERTIFICATE OF SERVICE

I, Joseph "Gentle Moose" Blake, state under pains and penalties of purjury that I have served a copy of the foregoing motion to Amend the Complaint and the proposed Amended Complaint on the following by Intra-Institutional Mail:

Robert Howland, Staff Program Director
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

Joseph Murphy, Director of Treatment
Mass Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

Robert Murphy, Superintendent
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

Kathleen Dennehy, Commissioner
50 Maple St., Suite 3,
Milford, MA 01757

Massachusetts Department of Corrections
50 Maple St., Suite 3,
Milford, MA 01757

Captain Rull, Housing Assignment Officer
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

Joseph "Gentle Moose" Blake, Pro Se
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 94-2170-C

GORDON O'BRIEN

vs.

L.E. DUBOIS, et al

MEMORANDUM OF DECISION AND ORDER

The defendants, L.E. Dubois, Commissioner of the Department of Corrections, and John Marshall, Superintendent of the North Central Correctional Institution at Gardner, have moved to dismiss and alternatively for summary judgment. For the following reasons, the defendants' motions are allowed.

BACKGROUND

The plaintiff is an inmate at the North Central Correctional Institution in Gardner. He brings this action pursuant to M.G.L. c. 12, §11 and M.G.L. c. 231A and c. 30A. The plaintiff also brings an action pursuant to 42 USC §1983. The plaintiff seeks injunctive relief and declaratory judgment to redress what he alleges are constitutional violations of his rights pursuant to the terms of his incarceration.

In his complaint, the plaintiff makes numerous allegations with respect to the conditions that exist at the North Central Correctional Institution. Specifically, the plaintiff complains of the failure of the Department of Corrections to launder pillows properly, to provide

*EXHIBIT*        2

washcloths, and to provide clean mattresses as well as numerous complaints involving the bathroom facilities. The plaintiff further alleges that the drinking water at the facility is not of acceptable quality and that the premises subject him to the possibility of contracting communicable diseases. The plaintiff further alleges that the living area space is insufficient to comply with the code of Massachusetts regulations. As redress for these conditions, the plaintiff seeks a declaration that the conditions at the facility constitute cruel and unusual punishment, or that they are a violation of his civil rights guaranteed by the United States Constitution and the Constitution of the Commonwealth of Massachusetts. The plaintiff further alleges a failure of the Department of Corrections to follow its own regulations as found in the code of Massachusetts regulations.

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, "and [further] that the moving party is entitled to judgment as a matter of law," Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent's case or "by demonstrating that proof of that element is unlikely to be forthcoming at trial." Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. General Motors Corp., 410

Mass. 706, 716 (1991). "If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion." Pederson, supra, 404 Mass. at 17. "[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." LaLonde v. Eissner, 405 Mass. 207, 209 (1989).

Massachusetts General Law, c. 111, §21 is the enabling statute providing for the rules that govern "houses of correction, prisons and reformatories, regarding...general health and safety of a detainee." The Department of Public Health is charged with the responsibility of maintaining compliance with rules and regulations promulgated to insure safe conditions at prisons. These Department of Public Health regulations, however, do not provide a private cause of action. Rather, the Department of Public Health Commissioner is vested with discretion in establishing the rules for the running of prisons. A reading of 105 CMR 451.00 et seq. makes it clear that broad discretion is left to the Commissioner of the Department of Public Health in regulating the health standards at correctional facilities. If the Commissioner believes that there are conditions which are dangerous to the public health constituting an emergency, the Commissioner shall notify the Commissioner of Corrections, the Secretary of Human Services and the Governor, and request that the Governor declare that an emergency exists which is detrimental to the public health. This authority vested in the Department of Public Health Commissioner carries with it, by inference, the right to seek judicial relief through declaratory judgment. Such a right is shared by

the Attorney General of the Commonwealth as the chief law officer of the Commonwealth. Nowhere in c. 111, §21 is there a private cause of action. Nor does 105 CMR 451.00 et seq. provide for a private cause of action. Rather, the provisions provide for the minimum health and sanitation standards at correctional facilities. The proper party to address public health issues therefore is the Attorney General or the Commissioner of the Department of Public Health.

## The Civil Rights Claim

The plaintiff has further claimed that his civil rights have been violated by the conditions which he alleges are present at the North Central Correctional Institution. The Massachusetts civil rights act does provide a private cause of action if a person alleges that their civil rights have been interfered with by "threats, intimidation or coercion". The prerequisites to maintaining such an action, however, are the elements of threats, intimidation or coercion. Absent one of these three elements, the claim will not stand. The plaintiff has failed to allege facts sufficient to meet the threshold of "threats, intimidation or coercion." Even assuming that the threat of contracting communicable diseases through contact with other inmates or through ingestion of impure drinking water were to be proven by the defendant, such facts alone would be insufficient to show a civil rights violation. Similarly, the plaintiff's cause of action pursuant to 42 USC §1983 must fail. The allegations as made by the plaintiff, even if taken as true, fail to set out a federal civil rights violation.

## The Due Process Issue

The plaintiff argues that the very language of 105 CMR 451.00 et
seq. provides for mandatory action by the correctional facility and,
therefore, failure to comply with these mandates constitutes a violation
of the plaintiff's due process rights.  105 CMR 451.100 provides that
"Each correctional facility shall comply with the minimum health and
sanitation standards set forth in 105 CMR 451.101 through 105 CMR
451.214."  This language, although appearing to explicitly mandate
compliance by all correctional facilities, must be read in context of the
entire section of 105 CMR 451 et seq.  The remedies provided for non-
compliance are to be found in 105 CMR sections 401 through 410.  These
sections clearly vest the Department of Public Health with the
responsibility to inspect correctional facilities and to seek compliance
so as not to allow conditions to exist which would pose a serious threat
to the health or safety of inmates or employees of correctional
facilities.  These responsibilities carry with them a great deal of
discretionary power.  The provisions of 105 CMR 451.100, therefore, do
not explicitly mandate conditions that must exist at correctional
facilities.  Rather, in the context of the entire section, they provide
guidelines which the Department of Public Health, in its discretion should
seek to obtain.  Absent a clearly mandated requirement to provide minimal
conditions, the due process claim must fail.  Kentucky Department of
Corrections v. Thompson, 109 S. Ct. 1904 (1989).

The plaintiff's complaints, in sum, refer to the manner in which the
North Central Correctional Institution is run.  These complaints have
centered on the alleged public health deficiencies.  The administration
of penal institutions is best left to those professionals who are trained

Worcester Civil Action                      -6-                           No. 94-2170-C

and most knowledgeable of the proper manner in which the correctional facility should be run. It has been noted that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security". Bell v. Wolfish, 441 U.S. 520, 540-547 (1979) quoted in Nelson v. Commissioner of Correction, 390 Mass. 379, 392 (1983). The defendants' motion for summary judgment is, therefore, ALLOWED.

Judd J. Carhart
Justice of the Superior Court

DATED: March 3ᴿᴰ, 1995
[s.d.]

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

*8 1*

SUPERIOR COURT
CIVIL ACTION
NO. 94-4686

WAYNE ALEXANDER, and others[1]

vs.

LARRY E. DUBOIS, and others[2]

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS'
MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

Plaintiffs, present and past inmates of the

Department of Correction, formerly housed at the New Line facility[3]

at MCI-Concord ("New Line"), brought this action alleging civil

rights and health violations. Plaintiffs claim that the failure of

prison officials to replace window screens in their former cells at

New Line resulted in an infestation of mosquitos, flies, insects,

and bugs which made living at New Line intolerable. Plaintiffs

---

[1]   Lawrence Auch, Bruce Bennett, James Bourget, Kevin Brown,
Lloyd Cayman, Jose Garcia, Luke Janusz, Eric Knowles, Juan Muniz,
Stanley Matus, Jr., Dennis Paiva, Nelson Rodrigues, Philip Rogers,
Robert J. Simmington, Jr., Jose Solivan, Terrell Walker, Rudolph
West, Paul Woodley, Ronald Chambers, Randolph Clough, Antone Costa,
John DeDominicis, David Edwards, Lance Ekstrom, Roger Galio, Jose
Garcia, Thomas Gerraughty, William Lewis, Gary Melanson, Michael
Nelson, Gerald Pini, Andrew Puopolo, Jose Tavares, Larry Taylor,
Charles Thompson, Lawrence Trant, Gregory Washington, Richard
Whelan. All of the plaintiffs are or were in the custody of the
Department of Corrections.

[2]   Larry E. DuBois, Commissioner of Correction,
Massachusetts Department of Correction; Paul DiPaolo,
Superintendent, Massachusetts Correctional Institution at Concord;
Edward McDonald, Director of Engineering Services, Massachusetts
Correctional Institution at Concord; Kathleen O'Toole, Secretary of
Public Safety, Department of Public Safety.

[3]   None of the plaintiffs currently reside at New Line.

1

seek   declaratory   and   compensatory   relief.    Defendants,
administrators for the Department of Corrections ("DOC") and other
state officials, move to dismiss and for summary judgment. For the
following reasons, defendants' motion to dismiss pursuant to Mass.
R. Civ. P. 12(b)(6) is **ALLOWED**.

### BACKGROUND

For purposes of this motion, the court accepts as true the
facts, taken from plaintiffs' complaint.  On June 30, 1994,
plaintiff Wayne B. Alexander complained to defendant Paul DiPaolo,
Superintendent, Massachusetts Correctional Institution at Concord
("DiPaolo") that he and other prisoners were being attacked in
their New Line cells by mosquitos, insects, other bugs, and
vermin.[4]  The reason, according to plaintiffs, was a lack of
screens on their cell windows.  On July 15, 1994, Alexander also
notified defendant Larry E. DuBois, Commissioner of Correction,
Massachusetts DOC ("DuBois"), of the insect infestation and
resultant "health risk."  On July 13, 1994, Howard S. Wensley,
director of Community Sanitation for the Department of Health wrote
Alexander stating that he was in receipt of his complaint. Wensley
notified DiPaolo regarding Alexander's complaint, however, nothing
was done to replace the screens while plaintiffs were incarcerated
at New Line.

### DISCUSSION

For purposes of Mass. R. Civ. P. 12(b)(6), the court must take

---

[4]     For purposes of this decision, these terms are used
interchangeably.

2

the factual allegations of the complaint, as well as inferences which can be drawn from those allegations in plaintiff's favor, as true. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991), and cases cited. The complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitled [them] to relief." Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Plaintiffs[5] appear as pro se litigants, therefore their complaint is liberally construed, Haines v. Kerner, 404 U.S. 519, 520-521 (1972). Pro se plaintiffs, however, are still required to plead specific facts to support their claims of civil rights violations. Glaros v. Perse, 628 F.2d 679 (1st Cir. 1980).

Plaintiffs argue that living conditions in New Line were intolerable due to an infestation of mosquitos, flies, bugs, and other "vermin" that entered their cells through screen-less windows. In addition, plaintiffs contend that the close proximity of a garbage dumpster to New Line attracted pests to their cells. They claim these conditions violated their civil rights under the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution and the Massachusetts Declaration of Rights. They also allege that

_____

[5]    The plaintiffs in this case include both convicted prisoners and pre-trial detainees. Although pre-trial detainees may not be subjected to punishment at all, Ingraham v. Wright, 430 U.S. 651, 671-672 n. 40 (1977), convicted prisoners may be punished so long as the punishment is not cruel and unusual. See Abdullah v. Secretary of Pub. Safety, 42 Mass. App. Ct. 387, 393 (1997). For purposes of this action, however, the distinction between pre-trial detainees and prisoners is not relevant because the claims are moot.

defendants' failure to install screens was a violation of various health regulations and subjected plaintiffs to a higher risk of infection, disease, and sickness.

Defendants argue plaintiffs have failed to establish a claim under either the U.S. Constitution, the Massachusetts Declaration of Rights, or Massachusetts Department of Health Regulations; that plaintiffs claim is moot; and that defendants are entitled to qualified immunity.

A.    Mootness

The court recognizes that none of the defendants are currently housed in New Line and, for that reason, any claim for declaratory or injunctive relief is moot. <u>Blake</u> v. <u>Massachusetts Parole Bd.</u>, 369 Mass. 701, 703 (1976) (ordinarily, litigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome). Further, plaintiffs are without standing to assert the claims listed in their complaint on behalf of other prisoners currently residing at New Line. Third-party standing will be allowed in limited circumstances if (1) the third-party's rights are 'inextricably bound up with the activity the litigant wishes to pursue,' and (2) a genuine obstacle bars the third-party from asserting a right himself. See <u>Singleton</u> v. <u>Wulff</u>, 428 U.S. 106, 114 (1976); <u>Eisenstadt</u> v. <u>Baird</u>, 405 U.S. 438, 444 (1971). Plaintiffs have not shown that these factors exist, therefore they may not assert their claims on behalf of those inmates currently incarcerated at New Line. See <u>Gilmore</u> v. <u>Utah</u>, 429 U.S. 1012, 1017 (1976).

4

Any claim for monetary relief is also moot because plaintiffs have demonstrated no legally redressible injury. <u>Blake</u>, 369 Mass. at 703. Bug bites that occurred three summers ago, in and of itself, do not constitute a legally cognizable injury entitling plaintiffs to monetary relief. Plaintiffs have not demonstrated that they suffered actual infection, disease, or other injury from mosquitos and bug bites, therefore plaintiffs' claims for compensatory relief must be dismissed on mootness grounds. <u>Id</u>.

When an issue is "capable of repetition, yet evading review," however, the court will take an opportunity to address the substance of the complaint. <u>Stokes</u> v. <u>Superintendent, Massachusetts Correctional Institute, Walpole</u>, 389 Mass. 883, 887 (1983). Assuming that plaintiffs' claims were not moot and could be redressed, plaintiffs still fail to state a claim under the U.S. Constitution, the Massachusetts Declaration of Rights, or the Massachusetts Department of Public Health regulations.

B.    Prison Health and Sanitation Regulations

Plaintiffs allege violations of the prison health and sanitation regulations. See, e.g., 105 CMR 451.141.[6] Prison health and sanitation regulations do not enable a private cause of action. <u>Attorney General</u> v. <u>Sheriff of Worcester County</u>, 382 Mass. 57, 59 (1980) (the Attorney General is the appropriate party to maintain a civil action to enforce the departmental rules and

---

[6]    "Each window . . . shall have tight-fitting screens . . . to effectively block insects and rodents . . . ." 105 CMR 451.141.

5

regulations);[7] see also 105 CMR 451.409 and 410.    Therefore, plaintiffs lack standing to assert claims under 105 CMR 451.000, et. seq.

C.    Article 26 and Eighth Amendment Claims

Plaintiffs also assert an Eighth Amendment claim as well as a claim under Article 26 of the Massachusetts Declaration of Rights for "cruel and unusual punishment" in violation of their civil rights.  The bug infestation, they allege, created conditions that made the risk of disease, infection, and injury pervasive, constituting a "cruel and unusual punishment."

Under the Eighth Amendment, convicted criminals may be subject to punishment which is not cruel and unusual.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  Similarly, Article 26 of the Massachusetts Declaration of Rights prohibits "cruel and unusual punishment." Massachusetts courts have concluded that Article 26 rights are co-extensive with rights guaranteed by the U.S. Constitution's Eighth Amendment.    See, e.g., Abdullah, 42 Mass. App. Ct. at 394. Therefore, the same legal analysis applies.

The Eighth Amendment applies to the states through the Fourteenth Amendment due process clause and prohibits "cruel and unusual punishment."  Robinson v. California, 370 U.S. 660, 666 (1962).

---

[7]    Violation of prison health and sanitation regulations also does not rise to a per se constitutional violation. Richardson v. Sheriff of Middlesex County, 407 Mass. 455, 460 (1990), but may be objective evidence of conduct violative of civil rights.    Id.; see also Michaud v. Sheriff of Essex County, 390 Mass. 523, 531 (1983).

6

> A prison official violates the Eighth Amendment when two
> requirements are met.  First, the deprivation alleged
> must be, objectively, 'sufficiently serious' . . . [it]
> must result in the denial of the 'minimal civilized
> measure of life's necessities.' Farmer v. Brennan, 511
> U.S. 825, 834 (1994).  Second, the prison official must
> have a sufficiently culpable state of mind, that is, the
> official must have "deliberate indifference" to the
> inmate's health or safety. Id.  Thus, to be held liable
> under the Eighth Amendment for denying an inmate humane
> conditions of confinement, a prison official must know
> and disregard an excessive risk to inmate health or
> safety.

Abdullah, 42 Mass. App. Ct. at 394 (citations and quotations

omitted) (emphasis added).

Plaintiffs fail to establish the objective component of the

Eighth Amendment test for cruel and unusual punishment.  The court

does not doubt that if the plaintiffs' current prison cells were

continually infested with mosquitos, flies, and bugs, then they

might state viable Eighth Amendment claim.  See, e.g., Hutto v.

Finney, 437 U.S. 678, 686-687 (1979) (prison conditions which might

be tolerable for a few days may be intolerably cruel for weeks or

months).  But here, none of the plaintiffs currently live at New

Line, therefore they cannot bring an Eighth Amendment action for

past exposure to a summer bug infestation or mosquito bites.

Plaintiffs also allege no resulting current injury, disease, or

infection from these bites that rise to the level of an Eighth

Amendment violation.  See Bell, 441 U.S. at 542.

Plaintiffs also fail to establish the subjective component of

a cognizable Eighth Amendment claim.  Plaintiffs allege no facts

that would support a reasonable inference that defendants

intentionally desired to subject plaintiffs to a substantial risk.

7

Farmer, 511 U.S. at 834. Without a demonstration of "deliberate indifference" on the part of prison and health officials, plaintiffs cannot establish the subjective component of their Eighth Amendment claim.  Id.

D.  Due Process Claims

Plaintiffs also claim that defendants violated the Fifth Amendment's due process clause.  The Fifth Amendment's due process clause, however, limits only federal action. See, e.g., Bartkus v. Illinois, 359 U.S. 121 (1959).  The plaintiffs raise no claim against federal officials, therefore their Fifth Amendment due process claim against the defendants must be rejected.

Plaintiffs also raise a Fourteenth Amendment due process claim.  Pretrial detainees,[8] while not protected by the prohibition against "cruel and unusual punishment" pursuant to the Eighth Amendment, are guaranteed substantive due process under the Fourteenth Amendment. Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983).  Massachusetts courts, like federal courts, have analogized the due process rights of pre-trial detainees to the Eighth Amendment rights of convicted prisoners.  See Miga v. City of Holyoke, 398 Mass. 343 (1986).  Pretrial detainees "retain at least those constitutional rights that . . . are enjoyed by convicted prisoners." Bell, 441 U.S. at 535 n. 16.

Applying this analogy to the plaintiffs in this case who are pre-trial detainees, Miga, 398 Mass. at 351, the court holds that

---

[8]  Pre-trial detainees are in custody pursuant to G.L. c. 276, § 52A.  The statute has been held to be constitutional. Mendonza v. Commonwealth, 423 Mass. 771 (1996).

8

they have not demonstrated that the conditions of mosquito and bug infestation violate the objective "standards of decency which mark the progress of society." Good v. Commissioner of Correction, 417 Mass. 329, 335 (1994). The infestation occurred over three summers ago and no plaintiff claims to be currently suffering actual injury, disease, or infection as a result of that infestation. It is also not a reasonable inference that defendants purposely caused plaintiffs injury, disease, or infection by allowing mosquitos and other bugs to "feast" on plaintiffs.     For those reasons, the plaintiffs' Fourteenth Amendment due process claim is rejected. Compare Michaud, 390 Mass. at 533-534 (unsanitary human waste disposal systems violated pre-trial detainees Fourteenth Amendment due process rights).

## ORDER

For the foregoing reasons, it is ORDERED that defendants' motion to dismiss plaintiffs' complaint be ALLOWED.

Wendie I. Gershengorn
Justice of the Superior Court

DATED:     November 17, 1997

9

Entered~Dcd 18 Nov 1997