UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-10508-RGS

**JOSEPH E. BLAKE,**
    **Plaintiff,**

v.

**ROBERT MURPHY,** *et al*,
    **Defendants.**

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THEIR MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT, OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

Pursuant to Local Rule 56.1, the defendants submit this statement of material facts in support of their motion to dismiss plaintiff's second amended complaint, or, in the alternative, for summary judgment:

1.    On May 18, 1995, the plaintiff pled guilty a sexual offense and was sentenced to prison. *Second Amended Complaint,* ¶ 5; *Complaint*, ¶ 5.

2.    Near the end of the plaintiff's prison sentence, the District Attorney for Franklin County filed a petition to civilly commit the plaintiff as a sexually dangerous person. *Second Amended Complaint,* ¶ 6; *Complaint*, ¶ 6.

3.    On April 8, 2005, the plaintiff was adjudicated a SDP and was civilly committed to the Treatment Center for one day to his natural life. *Second Amended Complaint*, ¶¶ 2, 6, 7.

4.    Robert Murphy is the Superintendent of the Treatment Center. *Second Amended Complaint*, ¶ 3.

5. At the time the original complaint was filed, Kathleen Dennehy was the Commissioner of DOC. *Second Amended Complaint*, ¶ 4.

6. General Laws c. 123A, § 2 vests the Commissioner of Correction with sole responsibility for the Treatment Center's operation. The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons. G.L. c. 123A, § 2; *Second Amended Complaint,* ¶ 9, 12.

7. The Treatment Center has previously been under dual management. General Laws c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by DOC. St. 1959, c. 615, as appearing in G.L. c. 123A, § 2.

8. The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center that incorporated this dual management scheme. *See King v. Greenblatt* ("*King I*"), 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).

9. Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment." *Id.;* see also *King v. Greenblatt ("King II"),* 127 F.3d 190, 192 (1st Cir. 1997); *King v. Greenblatt*, 149 F.3d 9 (1st Cir. 1998) *("King III")*; *King v. Greenblatt*, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999) (detailing changes in conditions at Treatment Center from 1972 to 1992); *Second Amended Complaint,* ¶ 13.

10. "General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him.'" *Commonwealth v. Barboza*, 387 Mass. 105, 111 (1981), *cert. denied*, 459 U.S. 1020 (1982) (citations omitted).

11. On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L. c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC. St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2. *See King III*, 149 F.3d at 11-12; *King*, 53 F.Supp.2d at 121.

12. As a result of this legislative change, in 1994 the Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation. In 1994, the Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. *King*, 53 F.Supp.2d at 121.

13. The Court reopened another consent decree case concerning the Treatment Center, <u>Harold G. Williams, et al. v. Michael Lesiak, et al.</u>, U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with <u>Mitchell G. King, et al. v. Milton Greenblatt, M.D., et al.</u>, U.S.D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + 1 (together "the federal consent decree litigation"). *King*, 53 F. Supp.2d at 121.

14. Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. *King I*, 52 F.3d at 3.

15. DOC submitted to the Court an extensive Management Plan for the administration of the Treatment Center. *King II,* 127 F.3d at 193.

16. The Management Plan encompassed in detail almost every aspect of life at the Treatment Center including policies, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. *Id.; King III*, 149 F.3d at 15.

17. The Court permitted DOC to implement its plan and modified the consent decrees to place responsibility for and control of the Treatment Center in DOC. *King II*, 127 F.3d at 194.

18. The Court ordered the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan was filed on November 29, 1996. *King*, 53 F.Supp. 2d at 122.

19. From 1994 to June, 1999, the Court approved, oversaw, and monitored DOC's assumption of sole control over the Treatment Center, including DOC's expansion of sex offender treatment services at the Treatment Center to non-civilly committed state prison inmates ("SPI's"). *See, e.g., King*, 53 F.Supp.2d at 121-23.

20. Throughout that period, the SDP's continued to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility "essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." *King III*, 149 F.3d at 16.

21. They also complained that DOC's new rules and regulations and the additional SPI population impaired or affected treatment so as to render it ineffective and in violation of G.L. c. 123A and the consent decrees. *King*, 53 F.Supp.2d at 123, 135.

22. This final phase of the consent decree litigation culminated in an evidentiary hearing before the Court in March, 1999. *King*, 53 F.Supp.2d at 124.

23. At the hearing, SDP's reiterated their numerous complaints about DOC's operation of the Treatment Center. *See King*, 53 F.Supp.2d at 129-31, 134-35.

24. After the hearing, the Court terminated the consent decrees. *King*, 53 F.Supp.2d at 136, 139.

25. The Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees and, by implication, did not violate any state or federal rights. *King*, 53 F.Supp.2d at 135, 137. *See King III*, 149 F.3d at 19.

26. The Treatment Center is a level four security facility administered by DOC. The Treatment Center currently houses three populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDP's") and

committed for an indefinite period of one day to life pursuant to G.L. c. 123A; (ii) inmates committed to DOC's custody who are participating in DOC's voluntary sex offender treatment program ("SPI's"); and (iii) persons awaiting adjudication as SDP's pursuant to G.L. c. 123A, §§ 12-14. *Affidavit of Robert Murphy,* ¶ 3.

27. As a result of the Superior Court's decision in *Durfee v. Maloney*, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, issued in July, 2001, DOC decided to change its management of the Treatment Center to keep SDP's and SPI's separate and apart at all times. *Affidavit of Robert Murphy,* ¶ 4.

28. On December 10, 2001, DOC implemented its "separate and apart" management policy at the Treatment Center. *Affidavit of Robert Murphy,* ¶ 4.

29. The implementation of the "separate and apart" management policy necessitated that the two populations be divided for purposes of access to the common areas of the facility (such as the gym, exercise yard, visiting room and library), in which they previously had the opportunity to commingle. *Affidavit of Robert Murphy,* ¶ 5.

30. Where possible, SDP's continue to receive priority in terms of access to the Treatment Center's common areas. *Affidavit of Robert Murphy,* ¶ 5.

31. Due to staffing and other administrative considerations, access to the library was divided between the two populations. As a result of the implementation of the "separate and apart" management plan, SDP's now have access to the library approximately 12 ½ hours per week (with an additional two hours of access to the book mobile). Previously, the population had access to the library approximately

22 hours per week (with each population having an additional two hours of access to the book mobile). *Affidavit of Robert Murphy,* ¶ 5.

32. Access to computers and typewriters are available during general movement hours. However, SDP's must sign up in advance for time in the computer lab. *Affidavit of Robert Murphy,* ¶ 6.

33. As a result of the implementation of the "separate and apart" management plan, SDP's now have access to either the gym or the yard 13 hours per week, the gym an additional 6 hours per week, and to the yard an additional 5 hours per week. Access to the gym and the yard is available every day of the week. *Affidavit of Robert Murphy,* ¶ 7.

34. Visitation to SDP's is available five days a week. On Mondays, Wednesdays and Fridays, visiting hours are from 1:00 p.m. to 8:30 p.m. On Saturdays, visiting hours are from 6:00 p.m. to 8:30 p.m. On Sundays, visiting hours are from 1:00 p.m. to 5:00 p.m. *Affidavit of Robert Murphy,* ¶ 8.

35. There are no free weights available in the gym. However, both "Universal" and "Nautilus" weight/exercise machines are available. Games are also available in the gym. Furthermore, games are available for the common areas of the living units. *Affidavit of Robert Murphy,* ¶ 9.

36. Native American religious services are offered at the Treatment Center. Such services are allowed weekly. On the day of the services, participating SDP's are given access to the Native American ceremonial pipe, a lighter, smudge shell, and sage and sweet grass compound. *Affidavit of Robert Murphy,* ¶ 10.

37. The Treatment Center has a written policy detailing the availability and procedure for these ceremonies. *Affidavit of Robert Murphy,* ¶ 10.

38. Additionally, a compact disc player is made available for the services. SDP's may request Native American music compact discs, which, within reason, are made available at no expense to the SDP's. *Affidavit of Robert Murphy,* ¶ 10.

39. Further, SDP's may order books, including Native American literature, in accordance with DOC's property policy, 103 CMR 403, *Inmate Property*, and the Treatment Center's attachment thereto. Pursuant to these policies, SDP's may order books directly from a publisher or approved vendors. *Affidavit of Robert Murphy,* ¶ 10.

40. SDP's have requested that a sweat lodge be provided at the Treatment Center. The request is being studied by theDOC's Religious Review Committee. *Affidavit of Robert Murphy,* ¶ 10

41. Urine samples are collected from SDP's in accordance with 103 DOC 525, *Inmate Substance Abuse Testing and Sanctions.* 103 DOC 525 is applicable to all DOC facilities. *Affidavit of Robert Murphy,* ¶ 11.

42. In accordance with that procedure, the subject of the collection must be strip searched prior to the collection of the sample, in accordance with DOC's strip search procedure. 103 DOC 525.02 (I)(A)(8). The procedure also requires that the collecting officer "be in a position to verify that the specimen passes directly from the inmate's body into the collection cup." 103 DOC 525.02 (II)(A)(1). *Affidavit of Robert Murphy,* ¶ 11.

43. It is the Treatment Center's policy to collect the specimen immediately after the strip search, while the SDP is still unclothed, to further ensure the verification of the validity of the sample. *Affidavit of Robert Murphy,* ¶ 11

44. Strip searches are conducted at the Treatment Center in accordance with 103 DOC 506.04, *Search Policy-Strip Searches.* 103 DOC 506 is applicable to all DOC facilities. *Affidavit of Robert Murphy,* ¶ 12.

45. The strip search includes a visual inspection of the entire body, including mouth, pubic region and rectum. 103 DOC 506.04 (2)(C). *Affidavit of Robert Murphy,* ¶ 12.

46. SDP's are served a standard meal at each mealtime. SDP's requiring a special diet for medical or religious purposes will be provided with special meals. Additionally, SDP's have access to approximately 200 food items for purchase through the canteen. Each housing unit has a microwave oven, a refrigerator and instant hot water dispenser for preparing and storing foods purchased through the canteen. An SDP may also purchase a hot pot for use within their rooms. *Affidavit of Robert Murphy,* ¶ 13.

47. SDP's may purchase and possess a number of types of property. The receipt, storage, maintenance, and transfer of property is governed by 103 CMR 403, *Inmate Property Policy,* and the Treatment Center attachment thereto. *Affidavit of Robert Murphy,* ¶ 14.

48. Lamps are not approved property for any inmate, including SDP's. *See* 103 CMR 403.10 (listing approved items). However, when DOC began administering the Treatment Center, SDP's who already possessed certain items were allowed to

maintain, but not replace those items. Therefore, some SDP's were allowed to retain lamps, typewriters with memory and computers. *Affidavit of Robert Murphy,* ¶ 14.

49. SDP's are allowed to possess or purchase from an approved vendor, subject to certain conditions, televisions, radios, fans, hot pots, "Walkman" radios, headphones, musical instruments, non-memory typewriters, and extension cords. Clothing may also be possessed and purchased by SDP's, subject to color and amount restrictions, through the approved vendor. 103 CMR 403.10. *Affidavit of Robert Murphy,* ¶ 14.

50. Showers are controlled by a push button. SDP's have no control over the temperature of the water. However, the Massachusetts Department of Public Health ("DPH") inspects the water temperature for the showers annually to ensure that they fall within the required range. The shower water temperature at the Treatment Center has consistently fallen within the required temperature range. *Affidavit of Robert Murphy,* ¶ 15.

51. Currently, after pressing the shower control button, the showers run for one minute. The button can then be pressed again to resume the shower. This system is currently being upgraded to allow for a continuous six-minute shower. *Affidavit of Robert Murphy,* ¶ 15.

Respectfully Submitted

by the Commonwealth

NANCY ANKERS WHITE
Special Assistant Attorney General

|  |  |
|---|---|
|  | by:    /s/ Brian P. Mansfield |
|  | Brian P. Mansfield, Counsel |
|  | Department of Correction |
|  | Massachusetts Treatment Center |
|  | 30 Administration Road |
|  | Bridgewater, Massachusetts 02324 |
|  | (508) 279-8180 |
| Dated: August 31, 2007 | BBO Number 564671 |

**CERTIFICATE OF SERVICE**

    I hereby certify that I did this day serve a photocopy of the above document upon the plaintiff's counsel of record by filing electronically.

|  |  |
|---|---|
|  | /s/ Brain P. Mansfield___ |
| Dated: August 31, 2007 | Brian P. Mansfield |