UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-10508 RGS

JOSEPH GENTLE MOOSE BLAKE )
    Plaintiff, )
v. )
)
ROBERT MURPHY & KATHLEEN DENNEHY, )
    Defendants. )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

The plaintiff pled guilty to a sexual offense on May 18, 1995, and was subsequently sentenced to prison. Defs.' Statement of Material Facts, ¶ 1. The plaintiff was incarcerated initially in the Massachusetts Correctional Institute in Concord, Massachusetts, where he served eight months. The plaintiff served out the remainder of his four year, four month prison term at the North Central Corrections Institute in Gardner, Massachusetts. Aff. of Pl. at ¶ 2 (Exhibit A). On October 31, 2002, approximately 31 days before the plaintiff's prison term would expire, the Franklin County District Attorney filed a petition to have the plaintiff civilly committed as a "sexually dangerous person" [hereinafter "SDP"] pursuant to chapter 123A, section 1 of the Massachusetts General Laws. Defs.' Statement of Material Facts, ¶ 2. The plaintiff was adjudicated a SDP on April 8, 2005, and is and has been "civilly" committed to the Nemansket Correctional Center in Bridgewater, Massachusetts for an indefinite period of one day to his natural life. Id., ¶ 3.

The plaintiff and other witnesses are prepared to testify and put forth evidence that, despite the "civil detainee" label assigned to them by the Commonwealth of Massachusetts, the conditions of his confinement Nemansket Correctional Center are the same as, and in some ways worse than, state prison inmates. Ex. A, ¶ 5; Pl.'s Am. Compl., ¶ 14; Aff. of William Stevens, ¶ 5 (Exhibit B). This is so despite the promise by the Commonwealth that civil detainees would be detained in the "least restrictive means" to achieve the objectives of care, custody, treatment and rehabilitation of chapter 123A of the Massachusetts General Laws. MASS. GEN. LAWS ch. 123A § 2.

As such, the plaintiff filed this Civil Rights action against the defendants in their individual and official capacities, arguing certain violations of his federal constitutional rights and variously seeking damages and equitable relief. See generally, Pl.'s Second Am. Compl. The defendants moved for summary judgment[1] as to all claims, claiming that there are no genuine issues of material fact for a jury to decide and that they are entitled to judgment as a matter of law. The plaintiffs now respectfully submit this opposition.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995) (quoting FED.R.CIV.P. 56(c)). "To succeed [in obtaining summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v.

---

[1] The defendants initially entitled their Motion a Motion to Dismiss, Or In the Alternative, A Motion For Summary Judgment. The Court recently ruled that since the defendants presented materials outside the pleadings, the Motion

Fair, 902 F.2d 140, 143 (1st Cir. 1990). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

## III.   ARGUMENT[2]

### a. The Plaintiff Has Raised a Genuine Issue For His Double Jeopardy Claim

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution has three applications: 1) it shields a defendant from a second trial on the same charges after acquittal; 2) it shields a defendant from a second trial on the same charges after a conviction; and 3) it prohibits multiple punishments for the same offense. U.S. v. Morris, 99 F.3d 476, 478 (1996).

The plaintiff has stated a valid claim that he is, at the hands of the defendants, being punished twice for the same offense. The undisputed evidence supports that the plaintiff pled guilty to an offense and subsequently paid his debt to society. Defs.' Statement of Undisputed Material Facts, ¶¶ 1-3; Ex. A, ¶¶ 1-4. The plaintiff offers affidavits supporting that after being processed under chapter 123A on account of this original offense, he finds himself detained and treated the same as, and in many ways worse than, state prison inmates at Bridgewater and other prisons throughout the Commonwealth. Ex. A, ¶ 5; Ex. B, ¶ 5.[3] A jury should decide whether the specific conditions under which he is detained constitute a de facto violation of his right not to be punished twice for the same crime.

The defendants claim that the plaintiff cannot sustain a Double Jeopardy claim because

---

would be considered one for summary judgment.
[2] The plaintiff's memorandum will follow the order and sequencing of the defendants' arguments, for the convenience of the Court, and then address any residual issues in closing.
[3] The anticipated witness list is quite larger than these two witnesses. The plaintiff has, however, used his discretion

the legislature intended chapter 123A to be civil in nature. Defs.' Memo, p. 7. This claim fails for two reasons. First, as the defendants concede, the plaintiff can overcome this declaration of legislative intent by clear proof that the statute's scheme is "so punitive **in…effect** as to negate the Legislature's remedial intentions." Id. (citing Commonwealth v. Bruno, 432 Mass. 489, 500-01 (2000)(emphasis supplied). The plaintiff provides sworn affidavits that in many critical ways the SDPs are treated no differently than state prison inmates, and in some instances, worse than state prison inmates. Ex. A, ¶¶ 6-9; Ex. B, ¶¶ 6-9. There is perhaps no greater case for showing the clear punitive **effect** of a civil statute than by proof that the persons subject to the statute's provisions are treated the same as or worse than a murderer serving out a life sentence in a state prison.

The defendants make much of the findings in the Bruno case, but that case is inapposite to the circumstances of the case at bar. The plaintiffs therein sought to argue, for the purpose of deeming it an unconstitutional ex post facto law under the Massachusetts Declaration of Rights,[4] that the *legislative purpose* of chapter 123A was punitive in nature. Commonwealth v. Bruno, 432 Mass. 489 (2000). They argued that the statute itself was intended to be punitive because it was tied to a criminal act, it did not provide for "half-way houses" or "post-release supervision," and it was to be administered by the DOC. Id., at 501-02. The Supreme Judicial Court rejected those arguments, noting the stated legislative goal that the statute was to be remedial in nature, leading to "civil" commitments, and the defendants failed to meet their burden of negating that intent. Id. at 500. The Bruno defendants were still inmates, however, subject to all the constitutionally permissible limitations that accompany a prisoner's status. They were, therefore,

---

not to provide overly duplicative testimony for the purpose of this motion.
[4] The defendants did not present any arguments under the United States Constitution. Bruno, infra, 432 Mass. at

4

unaware of and in no position to argue from the vantage point of a purely civil detainee that the **effect** of the statute was punitive in nature. Here, the plaintiff is purely a civil detainee who has already served out his criminal sentence, and unlike the Bruno litigants, he has experienced the effect of 123A firsthand. Whether chapter 123A can be viewed as criminal on account of its punitive **effect** is thus a matter is undecided in the Commonwealth.[5] Therefore, the reasoning of Seling v. Young, 531 U.S. 250, 261 (2001) does not apply.

The second reason why the defendants' arguments fail is that they misconstrue the nature of the remedies sought by the plaintiff. The plaintiff is not only challenging whether chapter 123A itself is constitutional in light of the effect on his rights. The plaintiff also claims that, irrespective of the constitutionality of chapter 123A, the defendants are, by their conduct while administering chapter 123A, punishing him a second time for a crime for which he has paid his debt to society. The reasoning of Bruno and Seling apply only to constitutional challenges of a statutory scheme. Nothing therein protects state actors from violating a detainee's civil rights when administering what may be an otherwise facially valid civil commitment program. The plaintiff claims that the defendants actively created and are implementing policy that has the effect of punishing SDPs, and he has ample proof to support that claim. As such, summary judgment is improper.

The defendants' arguments would immunize themselves from any constitutional claims as they carry out the provisions of chapter 123A. Clearly, that is not the law. The legislature very likely knew that the conditions of confinement could run afoul of, *inter alia*, the Double Jeopardy Clause if they were punitive in nature, as evidenced by the requirement that the SDPs

---

499, n. 9.
[5] To the extent the Court believes this point to be unclear, the plaintiff respectfully requests the Court's certification

5

be held in the "least restrictive means" to achieve the goals of the statute. The Massachusetts General Assembly could not at once require that the detention be in the least restrictive means, while at the same time preventing a constitutional inquiry into the actual end result. Of course the defendants *claim* that the plaintiff is not being punished. But calling their hen a rooster does not make it one, and the defendants should be made to answer when at the end of the day their fowl is found nursing an egg.

Moreover, courts reviewing the constitutionality of chapter 123A have painstakingly focused upon the conditions of confinement. Seling, supra, 531 at 261; King v. Greenblatt, 53 F.Supp.2d 117, 119-124 (1999)(D.Mass., Mazzone, J.). Surely, the courts would not have wasted their resources examining constitutionally inconsequential details. More on point, the King Court was well aware of the concern that after the termination of the consent decrees, there was a risk that the conditions of confinement at Bridgewater would gradually revert back to constitutionally unacceptable levels. King, supra, at 125. As such, the Court was careful to point out that, "as the First Circuit stated in affirming the district court's decision to terminate another consent decree, plaintiff remains free to initiate a new round of proceedings designed to show that post-termination conditions actually do violate their federally protected rights." Id. at 137 (citing Inmates of Suffolk County Jail v. Rouse, 129 F.2d 649, 662 (1st Cir. 1997). This is such an action, and a valid one indeed.

The Massachusetts Supreme Judicial Court held quite clearly that despite the "remedial" intentions of chapter 123A, it must be narrowly construed and subject to strict judicial scrutiny since it has the direct effect of depriving a citizen of his liberty. Commonwealth v. McLeod, 437

---

of the question to the Massachusetts Supreme Judicial Court.

Mass. 286, 292-93 (2002)(also holding that due process applies). To the extent that judicial oversight of the resultant conditions of confinement is as "unworkable" as the defendants suggest, then the plaintiff would counter that this is purely the result of the constitutionally precarious way in which state legislatures such as Massachusetts have chosen to deal with sexual offenders.

Lastly, the plaintiff does indeed claim that the statutory scheme is unconstitutional as applied to him, and would question the validity of Seling. "As applied" or "disparate impact" challenges have historically provided a critical constitutional check on otherwise facially valid statutes, so as to ensure that the statute is not in truth a pretextual end-around core constitutional protections. The Court must not turn its back on those whose constitutional rights are trampled upon in the aftermath of these carefully crafted statutes, simply because it would be too difficult or impractical to adjudicate on a case-by-case basis. History has informed us that the United States Constitution must be at its most courageous when the rights of insular minorities or unpopular classes of citizens are at stake, or thus begins the erosion of protections for all. Surely, the Commonwealth is not without constitutionally valid options during the criminal sentencing phase of the trials if it holds the position that certain criminals pose an indefinite and serious danger to society that extends beyond the current sentencing guidelines. But the bottom line is that if the Commonwealth and other states have created statutory schemes to deal with SDPs, the results of which are constitutionally and judicially unworkable in the face of otherwise valid "as applied" challenges, then the Commonwealth and similarly situated states should be forced to fix them.

### b. The Plaintiff Has Raised a Genuine Issue For His Due Process Claim

Substantive due process protects citizens from conduct that "shocks the conscience," or interferes with rights that are "implicit in the concept of ordered liberty." U.S. v. Salerno, 481 U.S. 739, 746 (1987). Freedom from restraint is a fundamental right that implicates due process. Foucha v. Louisiana, 504 U.S. 71, 80 (1992).

The plaintiff has a case that the defendants' conduct shocks the conscience. The defendants routinely require that the plaintiff provide a urine sample in a manner that is at best humiliating, without any reason to believe that the plaintiff has used illicit drugs. Ex. A, ¶ 7(h); Ex. B, ¶ 7(h); Defs.' Statement of Material Facts, ¶¶ 41-45. The defendants require routine inspections of his genitals and anus for illegal contraband, without any reason to believe that the plaintiff possesses any such items. Ex. A, ¶ 7(h); Ex. B, ¶ 7(h); Defs.' Statement of Material Facts, ¶¶ 41-45. Moreover, without repeating all of the allegations of his Second Amended Complaint, paragraph 14(a)-(t), the plaintiff contends that this conduct, taken together as a whole, shocks the conscience. The plaintiff is not a prisoner. He is detained, *inter alia*, for the safety of society. There is no just reason to subject him to these heightened security measures without probable cause that he is a threat to security at NCC, and there is no just reason to limit his privileges as a matter of policy. The plaintiff earns $1 or $2 dollars per day, and must earn the simplest of everyday privileges by complying with certain behavioral protocols. On this evidence, it is for a jury to decide whether the defendants' treatment of him shocks the conscience.

The defendants make much of the obscure "security" justifications of their policies. But the plaintiff plans to prove that this is nothing more than pretext for animus and punitive intent,

in part by showing that the Commonwealth inexplicably does not treat mental health patients (without criminal histories) who are involuntarily detained under chapter 123 the same as it does SDPs under chapter 123A. For example, mental health patients involuntarily committed for the safety reasons are entitled to their own kitchen and eating facilities from state hospitals, and they are entitled to living space that is safe, comfortable, well-lit, well-ventilated, adequate in size and of sufficient quality. MASS. REGS. CODE tit. 04 §§ 27.04(4) & (6). In contrast, the plaintiff shares a cell that is not even big enough under prisoner regulations for one prisoner, and is not allowed a light to read by. The plaintiff must often yield his common area rights and privileges, including eating facilities, to convicted murderers. The plaintiff found no provision in title 104 of the Code of Massachusetts Regulations allowing for routine urine samples or humiliating body cavity searches of chapter 123 mental patients' for contraband absent probable cause that such contraband will be found. Surely, if mental hospitals subjected their involuntary detainees to such humiliating processes it would be national news. There is no just reason why such conduct should be any less shocking when the civil detainee happens to be a SDP. Indeed, it is more shocking when one considers the logical likelihood that the plaintiff is being treated worse than chapter 123 detainees on account of animus towards him for his past crimes.

    The plaintiff accepts that his freedom may be forcibly restrained under "certain narrow circumstances" without running afoul of his due process rights. Kansas v. Hendricks, 521 U.S. 346, 357 (1997). The plaintiff contends, however, that the circumstances under which he is held are not narrow enough to avoid a constitutional collision. The legislature's aim is certainly compelling – to protect its citizens unless and until SDPs are rehabilitated. But the means employed the defendants are hardly narrow. None of the tactics alleged by the plaintiff in

paragraph 14 of his Second Amended Complaint are *even rationally related* to the stated purpose of chapter 123A, and indeed, due process requires more, i.e., that the conditions be <u>reasonably related</u> to the purpose of confinement. <u>Jackson v. Indiana</u>, 406 U.S. 715, 738 (1972). The plaintiff can show that the conditions are not even in keeping with the very statute under which he is being held, which requires that he be detained in the least restrictive means.[6] Again, the General Assembly included this language for a reason, and it seems rather obvious that this reason was to respect the rights of SDPs while carrying out the legislative intent of chapter 123A. It necessarily follows that if the regulations, policies and practices of the defendants are not respecting that provision, then due process concerns are implicated. It then becomes a question of degree for a jury to decide. The defendants boldly seize the role of the trier of fact in section II.A of their brief, concluding that the conditions under which the plaintiff is held do not shock the conscience, or violate due process. <u>Def.'s Memo</u>, pp. 10-22. The plaintiff respectfully disagrees, as argued above, and this is perhaps the epitome of a genuine issue of material fact for the jury to decide.

    Contrary to the defendants' assertion, the plaintiff also does not contend that being treated worse than he was when he was a prisoner gives rise to a *per se* violation of his due process rights. The plaintiff simply contends that this is evidence that he is not being treated in the least restrictive means, and that this is a small part of a plethora of evidence that he is serving a de facto second criminal sentence for his original crimes. It is up to the jury to decide whether the

---

[6] This is an important point, because the defendants cite <u>Doe v. Gaughan</u>, 808 F.2d 871, 884 (1st Cir. 1986) for their position that their decisions are presumptively valid. Not only does this misconstrue the Court's findings therein, since the Court was referring to the decisions of medical/psychiatric care providers, but the position also ignores the Court's basis for its deferential treatment of such providers - that the details are left up to the state legislatures, and not the courts. <u>Id.</u> at 877. In the plaintiff's context, the state has spoken, and has required that the defendants detain the plaintiff in the least restrictive means. Surely, the defendants do not claim that if they choose not to detain the

circumstances infringe upon the given constitutional rights. Similarly, the plaintiff is also not claiming that any substantive rights flow from chapter 123A, or that the defendants are violating any such state-based rights. The plaintiff is claiming, in part, that the General Assembly installed a constitutionally significant requirement into chapter 123A that requires the defendants to detain the plaintiff in the least restrictive means, and that the defendants are ignoring that provision. As such, the federally rights that are protected by this provision are being violated. The defendants' claim that the plaintiff is trying to justify state-born rights through the Civil Rights Act is therefore without merit.

### c. The Doctrine of Res Judicata Is Inapplicable

The defendants' contention that the doctrine of *res judicata* precludes the plaintiff's claims is incorrect. Under a federal-law standard, the essential elements of claim preclusion are (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suits; and (3) an identity of parties or privies in the two suits. Kale v. Combined Ins. Co. of America, 924 F.2d 1161, 1165-66 (1st Cir. 1991), *cert. den'd*, 502 U.S. 816 (1991). Despite these clear requirements, the defendants would elevate the King litigation to a super-precedent of sorts, barring all claims by any SDP relative to the conditions of detention. The position is untenable, and would read the third element right out of the doctrine. As the defendants concede, the plaintiff was not a party to the King litigation, and had absolutely no opportunity or motivation to litigate the issues before that Court. The plaintiff was not even a SDP until April of 2005. The defendants also concede that they were not parties to the King litigation. Defs.' Memo, p. 15. Since there is obviously no identity of identity of parties, the

---

plaintiff in the least restrictive means, then their decision is presumptively valid.

doctrine of *res judicata* does not preclude the plaintiff's claim.[7]

### d. The Plaintiff Has Raised a Genuine Issue For His Freedom Of Religion Claim

The defendants contend that the plaintiff's claims relative to undue restrictions on his freedom to practice his religion should fall to the defendants' discretion since they are "reasonably related to legitimate penological interests." Defs.' Memo, pp. 21-22 (and the cases cited therein). The problem with this argument is that **the plaintiff is not detained at Nemansket Correctional Center to be penalized**. All of the cases upon which the defendants rely deal with *prisoner* rights to practice their religion, and the necessary balance that must be struck consistent with *penological* objectives. The plaintiff is not a prisoner, and he is not at NCC to be penalized in any way. This slip of the tongue is perhaps a telling admission by the defendants' that they view the plaintiff as nothing more than another prisoner, and that they justify their treatment of him accordingly. It is at least indicative of the defendants' utter lack of understanding of chapter 123A and the plaintiff's status as a civil detainee, and explains much about the administrative failures of the statutory scheme in the Commonwealth. This "DOC mentality" is what the plaintiff and other SDPs have been up against since the DOC took over the implementation of chapter 123A, and is the root of all the litigation that has followed.

Absent penological considerations, the plaintiff would argue for a strict scrutiny standard of review relative to the limitations placed upon his ability to practice his religion like any other citizen. There is simply no justification for a relaxed, intermediate standard of review.

---

[7] The doctrine of "non-mutual claim preclusion" also does not apply. That doctrine allows a litigant to raise claim preclusion despite not being a party to the previous action, if the litigant can prove that he should have been so added and his adversary had a full and fair opportunity to litigate his current claims in the prior action. In re El San Juan Hotel Corp., 841 F.2d 6, 10-11 (1st Cir. 1988). Here, it is the *defendant* that was, at best, a party to the King litigation, and he is attempting to raise claim preclusion against the *plaintiff*, a non-party to the King litigation. That

Notwithstanding the applicable standard of review, the plaintiff contends that the limitations upon his right to practice his religion are not reasonably related to any DOC interests. The plaintiff is not asking for entitlements that would place him at risk of escape. He is asking for access to the basic amenities of his religion. That the defendants have been "considering" his requests for several years does not excuse them from depriving the plaintiff of these things in the first instance.

### e. The Plaintiff Has Raised a Genuine Issue For His Cruel & Unusual Punishment Claim

The defendants similarly claim that the plaintiff has failed to state a claim for cruel and unusual punishment, and cite standards applicable to prisoners. Defs.' Memo., pp. 25-28 (and the cases cited therein). Again, the defendants' analysis and the cases relied upon are wrought with discussions of a balance between prisoners' rights and valid penological objectives. Giroux v. Somerset County, 178 F.3d 28, 31-32 (1st Cir. 1999). The defendants again sorely miss the mark. There is no penological objective to chapter 123A, and to the extent that the defendants contend as much, their skewed interpretation of that statute in and of itself creates a question of fact for the jury to decide as to whether they are violating the plaintiff's constitutional rights. If the jury agrees with the plaintiff that the defendants, through their policies or through their conduct, are punishing him at all, without cause, then this may constitute cruel and unusual punishment.

Where penological considerations are not part of the equation, any punishment without cause is cruel and unusual. Indeed, cases applying Eight Amendment principles to a civil detainee held under chapter 123A have held that proof of a punitive intent or effect when

---

is the complete reverse of what the doctrine allows.

13

carrying out the provisions of chapter 123A could carry the day for a claim for cruel and unusual punishment. Specifically, Judge Garrity held,

> It is well established that proceedings under c. 123A are nonpenal. "There may be no punitive aspects to such confinement." <u>Commonwealth v. Gomes</u>, supra, at 484, 245 N.E.2d at 432. It follows that resort to c. 123A as a punitive instrument, as alleged here, would be punishment both cruel ad unusual in violation of the Eighth and Fourteenth Amendments.

<u>Meloa v. Fitzpatrick</u>, 322 F.Supp 878, 887 (D.Mass., 1971). See also, <u>Commonwealth v. Purdy</u>, 408 Mass. 681, 686-87 (1990)(requiring the Commonwealth to show good faith basis for their actions when a punitive intent is proven). In the case at bar, the plaintiff has ample evidence of policies and conduct by the defendants that could only be the product of punitive intent. Basic, everyday rights and privileges are withheld until earned. They work for, at best. $2 per day, making what little property they are allowed to possess beyond their financial reach. If these are not penological concepts, one might wonder what is. In any event, intent is inherently a fact-based inquiry, and under the circumstances of the case at bar there is no reason to take this evidence from the jury.

### f. **The Defendants Are Not Entitled To Qualified Immunity**

The plaintiff does not take issue with the defendants' six-page summation of the law of qualified immunity. <u>Defs.' Memo</u>, pp. 28-33. The plaintiff does take issue with the defendants' one-sentence, conclusory claim in closing that summation that "for the aforementioned reasons" the plaintiff has failed to allege or establish the violation of a clearly defined right. <u>Defs.' Memo</u>, p. 33. The defendants' contention that the plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments were not "clearly established" at the time of the conduct alleged is without merit. Placing those rights in the context of a civil detainee does nothing to muddy the

waters.

The defendants have long been on actual notice that the purpose of chapter 123A is not to punish, and that under the clear text of that statute, the detainees are to be held under the least restrictive measures to accomplish the General Assembly's remedial goals. See generally, King, supra. It defies reason for the defendants to now claim that they were unaware of the clear provisions of chapter 123A, and the resultant impact the defendants' conduct would have upon the clearly established constitutional protections they took away from the plaintiff.

The plaintiff has alleged sufficient facts to show that the defendants have and continue to violate the claimed constitutional rights, and these constitutional rights are as clearly established as they are centuries old. It is not objectively reasonable for the defendants to now claim that they were ignorant of these rights. The defendants have misstated, obscured and complicated the rather straightforward claims advanced by the plaintiff, and now wish to bootstrap a qualified immunity defense with this artificially-created ambiguity. The interests of justice require that they not succeed.

### g. Equal Protection

The defendants make no effort to challenge the plaintiff's equal protection claims, and summary judgment must therefore be denied as to the plaintiff's Counts VII and VIII.

Nevertheless, the plaintiff has stated a claim that he is not enjoying the same rights as other groups of civil detainees in the Commonwealth. Specifically, both chapter 123 and 123A provide for involuntary, civil detention of dangerous persons for safety reasons by reason of mental defect. The security concerns should, therefore, be the same and there is no "rational government interest" for the differential treatment between the two groups. In re Dutil, 437

Mass. 9, 21 (2002). As noted above, the regulations relative to chapter 123 detainees guarantee such detainees ample living space, separate eating quarters and well-lit rooms, among other things. Infra, p. 8. There are no regulations requiring that chapter 123 detainees earn basic rights and privileges. Surely, discovery will mete out that chapter 123 mental health detainees do not sleep in a cell, are not routinely strip searched and that they are not shackled at the waist and hands every time circumstances require their presence outside the facility. As a chapter 123A detainee, the plaintiff, in contrast, enjoys none of these privileges, in law or in fact.

Moreover, even SDPs within the NCC are treated differently, with the older detainees allowed certain privileges above and beyond those of the newer detainees like the plaintiff, on account of the fact that they were there before the DOC took the given privileges away. The plaintiff should have the right to further explore this differential treatment via discovery.

### h. The Defendants Have Not Met Their Burden Of Showing That There Is No Genuine Dispute of Material Facts

As noted above, the burden is first upon the defendants to demonstrate that there is no genuine dispute of material facts and that they are entitled to judgment as a matter of law. The plaintiff does not agree that much the recited "facts" in the Defendants' Statement of Material Facts are material. Much of it consists of irrelevant facts and/or a historical legal summary of the King litigation. Nevertheless, the plaintiff has quite clearly shown that many of the facts recited are disputed. Moreover, the defendants have not met their burden of showing why they are entitled to judgment as a matter of law, even if their claimed material facts were undisputed. They did not even address the Equal Protection claims, and the remaining arguments are either obscure, misstate the plaintiff's claims, flawed or amount to nothing more than a disagreement as

to the weight or probative value of the evidence. Since the defendants failed to meet this threshold burden, their Motion fails.

## IV.   **CONCLUSION**

If the plaintiff served his criminal sentence, was once again charged and convicted of the same crimes and sentenced to prison, he would be in a better position than he is today. That is, quite simply, what the evidence in this case will show. The defendants' justify this intolerable end result with smoke and mirrors. The plaintiff has pled sufficient facts to sustain a prima facie case against the defendants for violation of his civil rights, and there are numerous issues of material fact to be decided by a jury relative to each of his claims. As such, summary judgment is improper.

                                    The Plaintiff,

                                    JOSEPH GENTLE MOOSE BLAKE,
                                    By his attorney,
                                    **PIERCE, DAVIS & PERRITANO, LLP**

                                    _____
                                    Michael D. Leedberg, BBO #660832
                                    Ten Winthrop Square
                                    Boston, MA 02110
                                    (617) 350-0950

Dated: October 5, 2007

## **CERTIFICATE OF SERVICE**

I, Michael D. Leedberg, attorney for the plaintiff in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing with the U.S. District Court, on this 5th day of October, 2007.

                                    _____
                                    Michael D. Leedberg