# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO 2005-10508-RGS**

| | |
|---|---|
| **JOSEPH E. BLAKE,** **Plaintiff,** | ) ) ) ) |
| **v.** | ) ) |
| **ROBERT MURPHY, et al.,** **Defendants.** | ) ) ) ) |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the defendants submit this statement of material facts in support of their motion to dismiss plaintiff's second amended complaint, or, in the alternative for summary judgment:

1.      On May 18, 1995, the plaintiff pled guilty to a sexual offense and was sentenced to prison. *Second Amended Complaint* ¶ 5; *Complaint,* ¶ 5

**RESPONSE:**

**Uncontested.**

2.      Near the end of the plaintiff's prison sentence, the District Attorney for Franklin County filed a petition to civilly commit the plaintiff as a sexually dangerous person. *Second Amended Complaint,* ¶ 6; *Complaint,* ¶ 6.

**RESPONSE:**

**Uncontested.**

3.      On April 8, 2005, the plaintiff was adjudicated a SDP and was civilly committed to the Treatment Center for one day to his natural life. *Second Amended Complaint,* ¶¶ 2, 6, 7.

**RESPONSE:**

**Contested.  The plaintiff was committed to the Nemansket Correctional Center ["NCC"].**

4.      Robert Murphy is the Superintendent of the Treatment Center. *Second Amended*

*Complaint*, ¶ 3.

**RESPONSE:**

**Uncontested.**

5.     At the time the original complaint was filed, Kathleen Dennehy was the Commissioner of DOC. *Second Amended Complaint*, ¶ 4.

**RESPONSE:**

**Uncontested.**

6.     General Laws c. 123A, § 2 vests the Commissioner of Correction with sole responsibility for the Treatment Center's operation. The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons.  G.L. c. 123A, § 2; *Second Amended Complaint*, ¶ 9, 12.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.  To the extent that a response is required, it is uncontested that the Department of Corrections and the defendants operate the NCC at which the plaintiff is held.**

7.     The Treatment Center has previously been under dual management. General Laws c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by DOC.  St. 1959, c. 615, as appearing in G.L. c. 123A, § 2.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.  To the extent that a response is required, it is uncontested that the DMH and the DOC originally operated the NCC at which the plaintiff is held, and that the DOC and the defendants now solely operate the NCC.**

8.     The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center that incorporated this dual management scheme. *See King v. Greenblatt* ("*King I*"), 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is**

unsupported here and on the record, and inappropriate to include in a Local Rule 56.1
Statement of Undisputed Material Facts.

9.    Among other things, the consent decrees mandated that Treatment Center residents "have
the least restrictive conditions necessary to achieve the purpose of commitment." *id.*, see also
*King v. Greenblatt* ("*King II*"), 127 F.3d 190, 192 (1st Cir. 1997); *King v. Greenblatt*, 149 F.3d
9(1st Cir. 1998) ("*King III*"); *King v. Greenblatt*, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999)
(detailing changes in conditions at Treatment Center from 1972 to 1992); *Second Amended
Complaint*, ¶ 13.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is
unsupported here and on the record, and inappropriate to include in a Local Rule 56.1
Statement of Undisputed Material Facts. To the extent that a response is required, it is
uncontested that the statute and the United States Constitution require that the plaintiff be
detained at the NCC under the least restrictive conditions necessary to achieve the purpose
of commitment.**

10.    "General Laws c; 123A is a comprehensive legislative program designed to identify and
treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the
public against future antisocial behavior by the offender, and of doing all that can be done to
rehabilitate him.'" *Commonwealth v. Barboza*, 387 Mass. 105, 111(1981), *cert. denied*, 459 U.S.
1020 (1982) (citations omitted).

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is
unsupported here and on the record, and inappropriate to include in a Local Rule 56.1
Statement of Undisputed Material Facts.**

11.    On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L.
c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC.
St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2. *See King III*, 149 F.3d at 11-12; *King*, 53
F.Supp.2d at 121.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is
unsupported here and on the record, and inappropriate to include in a Local Rule 56.1
Statement of Undisputed Material Facts. To the extent further response is required, it is
undisputed that the DOC and the defendants operate the NCC.**

12.    As a result of this legislative change, in 1994 the Court (Mazzone, J.) began overseeing
what ultimately became the final phase of the federal consent decree litigation. In 1994, the
Court appointed the law firm of Hale and Dorr to represent forty-nine SDPs who called

themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. *King*, 53 F.Supp.2d at 121.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.**

13.     The Court reopened another consent decree case concerning the Treatment Center, *Harold G. Williams, et al. v. Michael Lesiak, et al.*, U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with *Mitchell G. King, et al. v. Milton Greenblatt, M.D.*, et al., U.S,D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + I (together "the federal consent decree litigation"). *King*, 53 F. Supp.2d at 121.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.**

14.     Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. *King I*, 52 F.3d at 3.

**RESPONSE:**

**What the Commonwealth did or did not do in prior, unrelated litigation is immaterial to the case at bar, and this assertion is unsupported by citation to the record and/or on the record itself.**

15,     DOC submitted to the Court an extensive Management Plan for the administration of the Treatment Center. *King II*, 127 F.3d at 193.

**RESPONSE:**

**What the DOC did or did not do in prior, unrelated litigation is immaterial to the case at bar, and this assertion is unsupported by citation to the record or on the record itself.**

16.     The Management Plan encompassed in detail almost every aspect of life at the Treatment Center including policies, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. *Id., King III*, 149 F.3d at 15.

**RESPONSE:**

**What the Management Plan (which is not part of the record) did or did not include is immaterial to the case at bar, and this assertion is unsupported by citation to the record or on the record itself.**

17.     The Court permitted DOC to implement its plan and modified the consent decrees to place responsibility for and control of the Treatment Center in DOC. *King II*, 127 F.3d at 194.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.**

18.     The Court ordered the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan was filed on November 29, 1996. *King*, 53 F.Supp. 2d at 122.

**RESPONSE:**

**What the Court did or did not Order in the prior litigation is immaterial to the case at bar, and the referenced Amended Plan is not part of the record.**

19.     From 1994 to June, 1999, the Court approved, oversaw, and monitored DOC's assumption of sole control over the Treatment Center, including DOC's expansion of sex offender treatment services at the Treatment Center to noncivilly committed state prison inmates ("SPIs"). *See, e.g., King*, 53 F.Supp.2d at 12 1-23.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.**

20.     Throughout that period, the SDPs continued to assert that the DOC's policies and procedures and its introduction of the SPIs into the facility "essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." *King III*, 149 F.3d at 16.

**RESPONSE:**

**What the prior litigants did or did not assert is not material to the case at bar.**

21.     They also complained that DOC's new rules and regulations and the additional SPI population impaired or affected treatment so as to render it ineffective and in violation of G.L. c. 123A and the consent decrees. *King*, 53 F.Supp.2d at 123, 135.

**RESPONSE:**

**What the prior litigants did or did not complain about is not material to the case at bar.**

22.    This final phase of the consent decree litigation culminated in an evidentiary hearing before the Court in March, 1999. *King*, 53 F.Supp.2d at 124.

**RESPONSE:**

The referenced evidentiary hearing is not material to the case at bar.

23.    At the hearing, SDPs reiterated their numerous complaints about DOC's operation of the Treatment Center. *See King*, 53 F.Supp.2d at 129-31, 134-35.fr

**RESPONSE:**

**The referenced evidentiary hearing, and what took place at the hearing, is not material to the case at bar.**

24.    After the hearing, the Court terminated the consent decrees. *King*, 53 F.Supp.2d at 136, 139.

**RESPONSE:**

**The Court's termination of the Consent Decrees is immaterial to the case at bar. To the extent further response is required, this fact is generally uncontested.**

25.    The Court determined that the SDPs complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPIs in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees and, by implication, did not violate any state or federal rights. *King*, 53 F.Supp.2d at 135, 137. *See King III*, 149 F.3d at 19.

**RESPONSE:**

**This is not a statement of material fact, but an immaterial interpretation of law, which is unsupported here and on the record, and inappropriate to include in a Local Rule 56.1 Statement of Undisputed Material Facts.**

26.    The Treatment Center is a level four security facility administered by DOC. The Treatment Center currently houses three populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDPs") and committed for an indefinite period of one day to life pursuant to G.L. c. 123A; (ii) inmates committed to DOC's custody who are participating in DOC's voluntary sex offender treatment program ("SPIs"); and (iii) persons awaiting adjudication as SDPs pursuant to G.L. c. 123A, §~ 12-14. *Affidavit of Robert Murphy*, ¶ 3.

**RESPONSE:**

**Uncontested that the NCC is administered by the DOC and houses these three populations.**

27.     As a result of the Superior Court's decision in Durfee v. Maloney, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, issued in July, 2001, DOC decided to change its management of the Treatment Center to keep SDPs and SPIs separate and apart at all times. *Affidavit of Robert Murphy*, ¶ 4.

**RESPONSE:**

**This statement of fact is not material to the plaintiff's cause of action. To the extent further response is appropriate, it is uncontested that the DOC changed its policies and separated the two populations at the NCC, but contested that they in practice remain separated at all times, since they are transported to medical facilities and court together. Aff. of Pl., ¶ 26; Aff. Of Stevens, ¶ 24.**

28.     On December 10, 2001, DOC implemented its "separate and apart" management policy at the Treatment Center. *Affidavit of Robert Murphy*, ¶ 4.

**RESPONSE:**

**This statement of fact is not material to the plaintiff's cause of action. To the extent further response is appropriate, it is uncontested that the DOC changed its policies and separated the two populations at the NCC, but contested that they in practice remain separated at all times, since they are transported to medical facilities and court together. Aff. of Pl., ¶ 26; Aff. of Stevens, ¶ 24.**

29.     The implementation of the "separate and apart" management policy necessitated that the two populations be divided for purposes of access to the common areas of the facility (such as the gym, exercise yard, visiting room and library), in which they previously had the opportunity to commingle. *Affidavit of Robert Murphy*, ¶ 5.

**RESPONSE:**

**It is uncontested that the attempted separation of the two populations resulted in the reduction of SDP privileges and/or entitlements relative to access to the common areas of the NCC, but it is contested that it was "necessary," or in any way justified by, consistent with or related to the objectives of chapter 123A. In fact, this practice of delegating SDP rights and privileges to state prison inmates contradicts the promise of chapter 123A to detain SDPs in the least restrictive alternative. Aff. of Pl., ¶ 27; Aff. of Stevens, ¶ 24.**

30.     Where possible, SDPs continue to receive priority in terms of access to the Treatment Center's common areas. *Affidavit of Robert Murphy*, ¶ 5.

**RESPONSE:**

**Contested. SDPs psycho-educational classes are administered in a way that makes them more susceptible to cancellation due to staffing issues. State prison inmates will be released upon completion of all stages of treatment, while SDPs will not. Two therapists are provided to state prison inmates on each living unit at all times, while SDP access to therapists is extremely limited in time and scope. SDPs access to Vocational, Avocational, Educational, Library and Law Library programs occurs in the afternoons, while state prison inmates have access in the mornings. The facilities are almost exclusively closed early (as opposed to opening late) during staffing shortages, making SDPs take the brunt of the sacrifices caused by such shortages. SDP access to the Gym and Yard, and movement in general, must yield to state prison inmates getting prescriptions or eating, and SDPs lose time if these prisoner activities are running late. In contrast, state prison inmates are allowed to access the Yard and Gym from the outside, meaning that the presence of SDPs in the medication or chow lines does not interfere with their time. State prison inmates also have access to the Gym, Yard and Night Yard four days per week to the SDPs' three. State prison inmates are also allowed to run late when eating or getting medication, regardless of SDP schedules, whereas SDPs that are running late are transported to a holding cell when their time expires until the state prison inmates are finished with their scheduled event. SDPs must wait in line for their property, while state prison inmates have their property delivered to them weekly, and SDPs must also wait until state prison inmates have vacated the building before retrieving their property. SDPs have severely limited access to Correctional Program Officers, having one for eight living units who is available minutes per day and at unscheduled and irregular times, while state prison inmates have one in each living unit all day. Aff. of Pl., ¶ 9; Aff. of Stevens, ¶ 9.**

31.    Due to staffing and other administrative considerations, access to the library was divided between the two populations. As a result of the implementation of the "separate and apart" management plan, SDPs now have access to the library approximately 12 ½ hours per week (with an additional two hours of access to the book mobile). Previously, the population had access to the library approximately 22 hours per week (with each population having an additional two hours of access to the book mobile). *Affidavit of Robert Murphy*, ¶ 5.

**RESPONSE:**

**It is uncontested that the attempted separation of the two populations resulted in the reduction of SDP privileges and/or entitlements relative to access to the library, but it is contested that it was "necessary," or in any way justified by, consistent with or related to the objectives of chapter 123A. In fact, this practice of yielding SDP rights and privileges to state prison inmate rights and privileges contradicts the promise of chapter 123A to detain SDPs in the least restrictive alternative. Aff. of Pl., ¶ 27; Aff. of Stevens, ¶ 24. It is also contested that the book mobile is available for two hours, as the book mobile is only available on Saturdays during "movement time" from 9:00 AM to 10:40 AM, and must split time among eight units, leaving about 10 minutes for each unit. Aff. of Pl., ¶ 10; Aff. of Stevens, ¶ 10. It is also contested that any one SDP has access to the library for 12 ½ hours per week. My total access to the library was five hours 50 minutes for the month of September, 2007. Aff. of Pl., ¶ 11; Aff. of Stevens, ¶ 11.**

32.    Access to computers and typewriters are available during general movement hours. However, SDPs must sign up in advance for time in the computer lab. *Affidavit of Robert Murphy*, ¶ 6.

**RESPONSE:**

**Uncontested that one must sign up in advance for computer use. Contested that computers are "available" under any reasonable definition of that term. SDPs must earn "privilege status," measured by "Blue Dot" (1st priority), "Red Dot" (2nd priority) and "Yellow Dot" (low priority – only if time slots are left) status to sign up for computer use. This basic privilege must be earned by adherence to a DOC behavioral protocol, suggesting a penological bent. SDPs are also inexplicably forbidden to use the computers for legal purposes, and face loss of privileges for doing so, which unreasonably limits the "availability" of computers for reasons that are in no way justified by or related to the objectives of chapter 123A. Coupled with the extremely limited number of computers and typewriters per SDP capita, and in practice, the items are not truly "available" under any reasonable definition of that word. Aff. of Pl., ¶¶ 12-15; Aff. of Stevens, ¶¶ 12-15.**

33.    As a result of the implementation of the "separate and apart" management plan, SDPs now have access to either the gym or the yard 13 hours per week, the gym an additional 6 hours per week, and to the yard an additional 5 hours per week. Access to the gym and the yard is available every day of the week. *Affidavit of Robert Murphy*, ¶ 7.

**RESPONSE:**

**Disputed. The SDPs have access to these areas three days per week, while the state prison inmates have access four days. Aff. of Pl., ¶ 9(g); Aff. of Stevens, ¶ 9(g).**

34.    Visitation to SDPs is available five days a week. On Mondays, Wednesdays and Fridays, visiting hours are from 1:00 p.m. to 8:30 p.m. On Saturdays, visiting hours are from 6:00 p.m. to 8:30 p.m. On Sundays, visiting hours are from 1:00 p.m. to 5:00 p.m. *Affidavit of Robert Murphy*, ¶ 8.

**RESPONSE:**

**Undisputed, but it is disputed that this restriction on visitation is justified by, consistent with or related to the objectives of chapter 123A.**

35.    There are no free weights available in the gym. However, both "Universal" and "Nautilus" weight/exercise machines are available. Games are also available in the gym. Furthermore, games are available for the common areas of the living units. *Affidavit of Robert Murphy*, ¶ 9.

**RESPONSE:**

**Undisputed.**

36.    Native American religious services are offered at the Treatment Center. Such services are allowed weekly. On the day of the services, participating SDPs are given access to the Native American ceremonial pipe, a lighter, smudge shell, and sage and sweet grass compound. *Affidavit of Robert Murphy*, ¶ 10.

**RESPONSE:**

**Undisputed.**

37.    The Treatment Center has a written policy detailing the availability and procedure for these ceremonies. *Affidavit of Robert Murphy*, ¶ 10.

**RESPONSE:**

**The fact that the NCC has a written policy is not material to the plaintiff's claims, but is generally undisputed.**

38.    Additionally, a compact disc player is made available for the services. SDPs may request Native American music compact discs, which, within reason, are made available at no expense to the SDPs. *Affidavit of Robert Murphy*, ¶ 10.

**RESPONSE:**

**Undisputed that a compact disc player is made available, but disputed that the Program Director has done anything more than make the same four CD's available for the last four years, and has failed or refused to act upon regular requests for different CDs throughout that time period. In fact, the Program Director recently announced that CDs will no longer be purchased for them. Aff. of Pl., ¶¶ 16, 28; Aff. of Stevens, ¶¶ 16, 26.**

39.    Further, SDPs may order books, including Native American literature, in accordance with DOC's property policy, 103 CMR 403, *Inmate Property*, and the Treatment Center's attachment thereto. Pursuant to these policies, SDPs may order books directly from a publisher or approved vendors. *Affidavit of Robert Murphy*, ¶ 10.

**RESPONSE:**

**Undisputed, however it is disputed that the policy makes these items reasonably available, since wages paid to SDPs for their work are not enough to purchase even basic necessities. Aff. of Pl., ¶ 21; Aff. of Stevens, ¶ 20.**

40.    SDPs have requested that a sweat lodge be provided at the Treatment Center. The request is being studied by the DOC's Religious Review Committee. *Affidavit of Robert Murphy*, ¶ 10

**RESPONSE:**

**Undisputed, to the extent that defendant Murphy has been "studying" the request for almost four years with no signs or reports of progress. Aff. of Pl., ¶ 17.**

41.    Urine samples are collected from SDPs in accordance with 103 DOC 525, inmate Substance Abuse Testing and Sanctions. 103 DOC 525 is applicable to all DOC facilities. *Affidavit of Robert Murphy*, ¶ 11.

**RESPONSE:**

**Undisputed that the plaintiff and all SDPs are subject to this DOC inmate policy. Disputed that it is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

42.    In accordance with that procedure, the subject of the collection must be strip searched prior to the collection of the sample, in accordance with DOC's strip search procedure. 103 DOC 525.02 (I)(A)(8). The procedure also requires that the collecting officer "be in a position to verify that the specimen passes directly from the inmate's body into the collection cup." 103 DOC 525.02 (II)(A)(1). *Affidavit of Robert Murphy*, ¶ 11.

**RESPONSE:**

**Undisputed that the plaintiff and all SDPs are subject to this DOC inmate policy. Disputed that it is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

43.    It is the Treatment Center's policy to collect the specimen immediately after the strip search, while the SDP is still unclothed, to further ensure the verification of the validity of the sample. *Affidavit of Robert Murphy*, ¶ 11

**RESPONSE:**

**Undisputed that the plaintiff and all SDPs are subject to this DOC inmate policy. Disputed that it is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

44.    Strip searches are conducted at the Treatment Center in accordance with 103 DOC 506.04, *Search Policy-Strip Searches*. 103 DOC 506 is applicable to all DOC facilities. *Affidavit of Robert Murphy*, ¶ 12.

**RESPONSE:**

**Undisputed that the plaintiff and all SDPs are subject to this DOC inmate policy. Disputed**

**that it is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

45.    The strip search includes a visual inspection of the entire body, including mouth, pubic region and rectum. 103 DOC 506.04 (2)(C). *Affidavit of Robert Murphy*, ¶12.

**RESPONSE:**

**Undisputed that the plaintiff and all SDPs are subject to this DOC inmate policy. Disputed that it is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

46.    SDPs are served a standard meal at each mealtime. SDPs requiring a special diet for medical or religious purposes will be provided with special meals. Additionally, SDPs have access to approximately 200 food items for purchase through the canteen. Each housing unit has a microwave oven, a refrigerator and instant hot water dispenser for preparing and storing foods purchased through the canteen. An SDP may also purchase a hot pot for use within their rooms. *Affidavit of Robert Murphy*, ¶ 13.

**RESPONSE:**

**Undisputed, however it is disputed that the policy makes these food items or property reasonably available, since wages paid to SDPs for their work are not enough to purchase even basic necessities. Aff. of Pl., ¶ 21; Aff. of Stevens, ¶ 20.**

47.    SDPs may purchase and possess a number of types of property. The receipt, storage, maintenance, and transfer of property is governed by 103 CMR 403, Inmate Property Policy, and the Treatment Center attachment thereto. *Affidavit of Robert Murphy*, ¶ 14.

**RESPONSE:**

**Undisputed, with the caveat that without meaningful wages, the SDPs are helpless to purchase approved property on their own as freely as implied. Aff. of Pl., ¶ 21; Aff. of Stevens, ¶ 20. It is disputed that the limitations on property ownership are constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

48.    Lamps are not approved property for any inmate, including SDPs. *See* 103 CMR 403.10 (listing approved items). However, when DOC began administering the Treatment Center, SDPs who already possessed certain items were allowed to maintain, but not replace those items. Therefore, some SDPs were allowed to retain lamps, typewriters with memory and computers. *Affidavit of Robert Murphy*, ¶ 14.

**RESPONSE:**

**Disputed. At least two SDPs have been permitted to send their computer equipment out for processor upgrades. Aff. of Pl., ¶ 18; Aff. of Stevens, ¶ 17. It is also disputed that the limitations on property ownership are constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

49.     SDPs are allowed to possess or purchase from an approved vendor, subject to certain conditions, televisions, radios, fans, hot pots, "Walkman" radios, headphones, musical instruments, non-memory typewriters, and extension cords. Clothing may also be possessed and purchased by SDPs, subject to color and amount restrictions, through the approved vendor. 103 CMR 403.10. *Affidavit of Robert Murphy*, ¶ 14.

**RESPONSE:**

**Undisputed, with the caveat that without meaningful wages, the SDPs are helpless to purchase approved property on their own as freely as implied. Aff. of Pl., ¶ 21; Aff. of Stevens, ¶ 20. It is disputed that the limitations on property ownership are constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Pl.'s Second Am. Compl.; Aff. of Pl., ¶¶ 7(a) & (h); Aff. of Stevens, ¶¶ 7(a) & (h).**

50.     Showers are controlled by a push button. SDPs have no control over the temperature of the water. However, the Massachusetts Department of Public Health ("DPH") inspects the water temperature for the showers annually to ensure that they fall within the required range. The shower water temperature at the Treatment Center has consistently fallen within the required temperature range. *Affidavit of Robert Murphy*, ¶ 15.

**RESPONSE:**

**Disputed. The showers are consistently hot to the point of discomfort, and the plaintiff also disputes that refusing SDPs the ability to control the temperature of their showers is constitutional or authorized by, related to or consistent with the objectives of Massachusetts General Laws chapter 123A. Aff. of Pl., ¶¶ 29-30; Aff. of Stevens, ¶ 27-28.**

51.     Currently, after pressing the shower control button, the showers run for one minute. The button can then be pressed again to resume the shower. This system is currently being upgraded to allow for a continuous six-minute shower. *Affidavit of Robert Murphy*, ¶ 15.

**RESPONSE:**

**Disputed. The system was not being upgraded at the time of defendant Murphy's affidavit, and has not been upgraded in the interim. The showers are consistently too hot, and there is a four minute delay when one attempts to resume the shower after the decidedly insufficient one-minute cycle ends. Aff. of Pl., ¶¶ 29-30; Aff. of Stevens, ¶ 27-28.**

Respectfully Submitted,
The Plaintiff,
JOSEPH E. BLAKE,
By his counsel,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg, BBO #660832
Ten Winthrop Square
Boston, MA 02110
(P) 617-350-0950

Dated: October 5, 2007

## CERTIFICATE OF SERVICE

I, Michael D. Leedberg, attorney for the plaintiff in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing with the U.S. District Court, on this 5th day of October, 2007.

Michael D. Leedberg

14



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-10508 RGS

_____
                                            )
JOSEPH GENTLE MOOSE BLAKE                   )
         Plaintiff,                         )
v.                                          )
                                            )
ROBERT MURPHY & KATHLEEN DENNEHY,           )
         Defendants.                        )
_____)

## AFFIDAVIT OF JOSEPH GENTLE MOOSE BLAKE

1)    I am over the age of 18, and understand the obligations of an oath.

2)    I pled guilty to a sexual offense on May 18, 1995, and served a four year, four month
      prison sentence as a result.

3)    I served the first eight months at the Massachusetts Correctional Institute in Concord,
      Massachusetts [hereinafter "MCI"], and served the remainder of the sentence at the
      North Central Corrections Institute in Gardner, Massachusetts [hereinafter "NCCI"].

4)    After serving out my sentence, I was adjudicated a "sexually dangerous person"
      [hereinafter "SDP"] as defined by Massachusetts General Laws chapter 123A, and
      since have been indefinitely detained for a period of one day to life pursuant to that
      same statute.

5)    Since serving out my criminal sentence, I have been detained at the Nemansket
      Correctional Center in Bridgewater, Massachusetts [hereinafter "NCC"].

6)    The conditions at NCC are the same as or in many ways more restrictive than those of
      state prison inmates serving time in the Commonwealth, whether at Bridgewater, MCI
      or NCCI.

7)    The conditions for SDPs are the same as state prison inmates in that the SDPs:

      a.   have their freedom and privileges restricted in a manner that does not take into
           consideration the individual security justifications for each;
      b.   must earn certain privileges by following good behavior protocols, suggesting a
           punitive environment unless something better is earned;
      c.   are bunked and double-bunked in cells not even big enough under prison

1

standards;

d. earn the same paltry wages (and worse, as noted below) as state prison inmates;

e. are given the same, severely limited dietary choices as state prison inmates;

f. are given the same limited access to such items as books, magazines, typewriters with memory, computers, reading lights, copiers, games, appliances and electronic devices;

g. have the same limitations on their telephone, mail and visitation rights as state prison inmates;

h. are subjected to invasive searches of their bodies and property without probable cause to believe contraband or illegal activity will be found;

i. are given the same choices of clothing to wear;

j. are given the same limited options for showering and bathing;

k. are given the same restrictions upon access to religious items;

l. are not given access to adequate continuing education, to assist in the re-integration process should the SDPs be released into society;

m. are not given the opportunity to practice a trade, to assist in the re-integration process should the SDPs be released into society;

n. must earn computer laboratory time;

o. are not entitled to critical rights of privacy or doctor-patient confidentiality when seeking out psychiatric care.

8) The conditions of confinement at NCC are more restrictive than the conditions that I experienced while a prisoner at NCCI, a medium security prison, in the manners stated in my initial Complaint dated March 6, 2005, the contents of which I adopt by reference as if stated herein in its entirety.

9) The conditions for SDPs are worse than state prison inmates in that the SDPs:

a. earn the same amount of daily wages working in the kitchen for more work, with SDPs working the breakfast and dinner shifts (9 hours) in the kitchen earning the same as the state prison inmates earn for working only the lunch shift (1 hour, 50 minutes);

b. are subject to more frequent cancellations of psycho-educational classes due to staffing issues because the SDP treatment is administered at the NCC Learning Center, while the state prison inmates receive their treatment at a modular where they are housed;

c. are not released from the psycho-educational classes after successful completion of all phases, while the state prison inmates are guaranteed release after completion of all phases;

d. only have access to therapists twice weekly for 90 minutes each, and at house meetings one time weekly for five minutes, while state prison inmates have two therapists at each living unit at all times;

e. have access to the Vocational, Avocational, Educational, Library and Law Library from 12:40 PM to 3:50 PM, while the state prison inmates have access from 8:00

2

AM to 10:50 AM.  Budget shortfalls have frequently and recently led to these facilities closing at 2:30 PM, which cuts into the SDP time and not the state prison inmate time;

f.    have their access to the gym and yard frequently delayed or canceled by the presence of state prison inmates when meal times or medication lines are running late, whereas the reverse is never true because state prison inmates are allowed to access the gym and yard from the outside;

g.    have access to the yard, the gym and the night yard three days per week, while the state prison inmates have access four days per week;

h.    are de-prioritized when schedule conflicts arise with the medication lines, where the state prison inmates finish regardless of the SDP schedule;

i.    must wait in line for their property, while the state prison inmates get their property delivered to their modular unit weekly; and

j.    have one Correction Program Officer (a/k/a the "go to guy") to share among eight units, who spends perhaps five minutes in each unit per day at unspecified and irregular times, while the state prison inmates have CPOs at each living unit all day;

10)    The SDPs are given access to the book mobile only for the five to ten minutes it is at their living unit every Saturday.

11)    Notwithstanding the proclaimed schedule for SDP library time, in practice, actual SDP access to the library for the entire month of September 2007 was five hours and 50 minutes.

12)    I am prohibited from doing legal work on the library computers.

13)    The ability to sign up for computer use is limited by what "privilege status" the SDP has attained, measured by "Blue Dot (highest privilege)," Red Dot (intermediate)," or "Yellow Dot (lowest)" status, by meeting certain DOC behavioral protocols.

14)    There are 12 computers for more than 300 SDPs to share in the computer lab, further limiting access to computers.

15)    There are five typewriters in the library, which holds a maximum of 25 people at a time.

16)    The Program Director of the NCC has recently announced that the DOC is no longer required to purchase religious CDs, and that they cannot purchase audio or video materials from the DOC vendor.

17)    The defendants have been "studying" the possibility of securing a sweat lodge since 2003, with no success or signs or reports of any progress.

18) Civil detainees present before the DOC took over control of the NCC are allowed to keep several items that have since been banned by the DOC, and two have been permitted to send electronic equipment out for repair and/or upgrade.

19) The showers have not been upgraded, nor is there any indication that they are slated for upgrade, as claimed by defendant Robert Murphy in his affidavit dated more than a year and one-half ago.

20) There is the general population, and there is the "hole," which is used to punish wrongdoers. There is no other "differing levels of security."

21) Most jobs at NCC pay one or two dollars per day.

22) The Community Transition House has not been open since an attempted escape years ago, and even when it was open, users were exposed to embarrassing strip searches and use was taken away for even the most trivial matters.

23) When transported to the Shattuck Hospital I was placed in leg and belly irons while being placed in a locked cell, inside a locked wing in a secured area of Bridgewater surrounded by a large fence with barbed wire atop it with no justification for these excessive security measures.

24) Strip searches are often used as a sort of punishment, occurring after misconduct, which is unrelated to contraband.

25) Permitted appliances are only available through the DOC vendor at usurious prices.

26) SDPs and state prison inmates are not in practice separate "at all times," as claimed by defendants, since they are still transported to medical facilities and to court together.

27) I do not believe it is "necessary" to sacrifice any rights and privileges of the SDP population in order to keep them separate from state prison inmates, as the Commonwealth could simply choose to adequately fund the constitutionally precarious statutory scheme it has installed, and provide SDPs with adequate facilities to realize their promised right of detention in the least restrictive alternative.

28) The Native American SDPs have been forced to use to the same four compact discs for their religious music for the last four years, and numerous requests for new or different ones throughout that time period have gone ignored and/or unfulfilled.

29) The showers at the NCC are consistently hot to the point of discomfort, and there is a four-minute delay between the decidedly insufficient one-minute cycles.

30) There have been no signs of shower system upgrades in 2006 to the present.

Signed under the penalties and pains of perjury on this $\angle$ day of October, 2007.

/Joseph Gentle Moose Blake

**B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-10508 RGS

_____
                                         )
JOSEPH GENTLE MOOSE BLAKE                 )
        Plaintiff,                        )
v.                                        )
                                         )
ROBERT MURPHY & KATHLEEN DENNEHY,         )
        Defendants.                       )
_____)

## AFFIDAVIT OF WILLIAM G. STEVENS

1)  I was convicted of a sexual offense in the Commonwealth of Massachusetts.

2)  I served out my time in state prison in Massachusetts.

3)  After serving out my sentence, I was adjudicated a "sexually dangerous person" [hereinafter "SDP"] as defined by Massachusetts General Laws chapter 123A, and since have been indefinitely detained for a period of one day to life pursuant to that same statute.

4)  Since serving out my criminal sentence, I have been detained at the Nemansket Correctional Center in Bridgewater, Massachusetts [hereinafter "NCC"].

5)  The conditions at NCC are in many ways more restrictive than those I experienced as a state prison inmate.

6)  The conditions at NCC are the same as or in many ways more restrictive than those of state prison inmates serving time in the Commonwealth, whether at Bridgewater, MCI or NCCI.

7)  The conditions for SDPs are the same as state prison inmates in that the SDPs:

    a.  have their freedom and privileges restricted in a manner that does not take into consideration the individual security justifications for each;
    b.  must earn certain privileges by following good behavior protocols, suggesting a punitive environment unless something better is earned;
    c.  are bunked and double-bunked in cells not even big enough under prison standards;
    d.  earn the same paltry wages (and worse, as noted below) as state prison inmates;

1

    e.  are given the same, severely limited dietary choices as state prison inmates;

    f.  are given the same limited access to such items as books, magazines, typewriters with memory, computers, reading lights, copiers, games, appliances and electronic devices;

    g.  have the same limitations on their telephone, mail and visitation rights as state prison inmates;

    h.  are subjected to invasive searches of their bodies and property without probable cause to believe contraband or illegal activity will be found;

    i.  are given the same choices of clothing to wear;

    j.  are given the same limited options for showering and bathing;

    k.  are given the same restrictions upon access to religious items;

    l.  are not given access to adequate continuing education, to assist in the re-integration process should the SDPs be released into society;

    m.  are not given the opportunity to practice a trade, to assist in the re-integration process should the SDPs be released into society;

    n.  must earn computer laboratory time;

    o.  are not entitled to critical rights of privacy or doctor-patient confidentiality when seeking out psychiatric care.

8)    The conditions of confinement at NCC are more restrictive than the conditions that I experienced while a prisoner at NCCI, a medium security prison, in the manners stated in Joseph Gentle Moose Blake's initial Complaint in the above-captioned matter dated March 6, 2005, the contents of which I adopt by reference as if stated herein in its entirety.

9)    The conditions for SDPs are worse than state prison inmates in that the SDPs:

    a.  earn the same amount of daily wages working in the kitchen for more work, with SDPs working the breakfast and dinner shifts (9 hours) in the kitchen earning the same as the state prison inmates earn for working only the lunch shift (1 hour, 50 minutes);

    b.  are subject to more frequent cancellations of psycho-educational classes due to staffing issues because the SDP treatment is administered at the NCC Learning Center, while the state prison inmates receive their treatment at a modular where they are housed;

    c.  are not released from the psycho-educational classes after successful completion of all phases, while the state prison inmates are guaranteed release after completion of all phases;

    d.  only have access to therapists twice weekly for 90 minutes each, and at house meetings one time weekly for five minutes, while state prison inmates have two therapists at each living unit at all times;

    e.  have access to the Vocational, Avocational, Educational, Library and Law Library from 12:40 PM to 3:50 PM, while the state prison inmates have access from 8:00 AM to 10:50 AM. Budget shortfalls have frequently and recently led to these

facilities closing at 2:30 PM, which cuts into the SDP time and not the state prison inmate time;

    f. have their access to the gym and yard frequently delayed or canceled by the presence of state prison inmates when meal times or medication lines are running late, whereas the reverse is never true because state prison inmates are allowed to access the gym and yard from the outside;

    g. have access to the yard, the gym and the night yard three days per week, while the state prison inmates have access four days per week;

    h. are de-prioritized when schedule conflicts arise with the medication lines, where the state prison inmates finish regardless of the SDP schedule;

    i. must wait in line for their property, while the state prison inmates get their property delivered to their modular unit weekly; and

    j. have one Correction Program Officer (a/k/a the "go to guy") to share among eight units, who spends perhaps five minutes in each unit per day at unspecified and irregular times, while the state prison inmates have CPOs at each living unit all day;

10) The SDPs are given access to the book mobile only for the five to ten minutes it is at their living unit every Saturday.

11) Notwithstanding the proclaimed schedule for SDP library time, in practice, actual SDP access to the library for the entire month of September 2007 was five hours and 50 minutes.

12) I am prohibited from doing legal work on the ~~library~~ computer lab computers.

13) The ability to sign up for computer use is limited by what "privilege status" the SDP has attained, measured by "Blue Dot (highest privilege)," Red Dot (intermediate)," or "Yellow Dot (lowest)" status, by meeting certain behavioral protocols.

14) There are 12 computers for more than 300 SDPs to share in the computer lab, further limiting access to computers.

15) There are five typewriters in the library, which holds a maximum of ~~25~~ 24 people at a time, including three workers.

16) The Program Director of the NCC has recently announced that the DOC is no longer required to purchase religious CDs, and that they cannot purchase audio or video materials from the DOC vendor.

17) Civil detainees present before the DOC took over control of the NCC are allowed to keep several items that have since been banned by the DOC, and at least two have been permitted to send electronic equipment out for repair and/or upgrade.

3

18) The showers have not been upgraded, nor is there any indication that they are slated for upgrade, as claimed by defendant Robert Murphy in his affidavit dated more than a year and one-half ago.

19) There is the general population, and there is the "hole," which is used to punish wrongdoers. There is no other "differing levels of security."

20) Most SDP jobs at NCC pay one or two dollars per day.

21) The Community Transition House has not been open since an attempted escape years ago, and even when it was open, users were exposed to embarrassing strip searches and use was taken away for even the most trivial matters.

22) Strip searches are often used as a sort of punishment, occurring after misconduct, which is unrelated to contraband.

23) Permitted appliances are only available through the DOC vendor at usurious prices.

24) SDPs and state prison inmates are not in practice separate "at all times," as claimed by defendants, since they are still transported to medical facilities and to court together.

25) I do not believe it is "necessary" to sacrifice any rights and privileges of the SDP population in order to keep them separate from state prison inmates, as the Commonwealth could simply choose to adequately fund the constitutionally precarious statutory scheme it has installed, and provide SDPs with adequate facilities to realize their promised right of detention in the least restrictive alternative.

26) The Native American SDPs have been forced to use to the same four compact discs for their religious music for the last four years, and numerous requests for new or different ones throughout that time period have gone ignored and/or unfulfilled.

27) The showers at the NCC are consistently hot to the point of discomfort, and there is a four-minute delay between the decidedly insufficient one-minute cycles.

28) There have been no signs of shower system upgrades in 2006 to the present.

Signed under the penalties and pains of perjury on this _3_ day of October, 2007.

William G. Stevens

4